IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

WYNN'S EXTENDED CARE, INC.,        :
                                        :

      Plaintiff,                       :
                                        :

v.                                        : CIVIL ACTION NO. 5:13-cv-00114-MFU
                                        :

PENNY L. BRADLEY,                :
                                        :

      Defendant.                   :

## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Counterclaim Defendant Wynn's Extended Care, Inc. (hereinafter "Wynn's"), by and

through its undersigned counsel, respectfully submits the following Brief in Support of its

Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## I.    STATEMENT OF THE CASE

On or about August 21, 2012, Counterclaim Plaintiff Penny Bradley (hereinafter

"Bradley) purchased a 2007 Honda Civic Hybrid vehicle, a hybrid electric vehicle (hereinafter

the "Vehicle"), from Armstrong Auto Sales, Inc. (hereinafter "Armstrong Auto"). (Ex. 2, Dep.

T. Armstrong, pp. 55-59, 75-76; Ex. 4, Buyer's Order.) At the time of purchase, Bradley

expressed an interest in an extended vehicle service contract. (Ex. 2, p. 57.) Travis Armstrong

(hereinafter "Mr. Armstrong"), the owner and an officer of Armstrong Auto, offered to assist

Bradley in applying for a Wynn's Plus Used Vehicle Extended Service Contract (hereinafter

"VSC"). (Ex. 2, p. 58.) As a result, Bradley signed a completed application for a VSC

(hereinafter the "Application). (Ex. 2, pp. 72, 76; Ex. 6, Application.) Bradley elected to finance

the VSC purchase price of $1,580.00 (the "VSC Retail Rate") along with the purchase price of

the Vehicle and it was therefore included as part of the Retail Installment Sales Contract

(hereinafter the "Installment Contract") between Bradley and the finance company, Credit

Acceptance Corporation (hereinafter "CAC"). (Ex. 2, p. 65; Ex. 5, Installment Contract.) The

face of the Application indicates in unambiguous language that the document is an ***application***

and that it is subject to verification and may be rejected by the "Administrator" (i.e., Wynn's).

Specifically, the document states:

> This document is an Application for a service contract. If this
> application is accepted by the administrator, then it will become
> your contract.

(Ex. 6, p. 1). The signature block further provides:

> I understand that the above information may be subject to
> verification and that this Application may be rejected if any of the
> above information is incorrect ***or if the above Vehicle is not***
> ***eligible for the term or coverage written as determined by the***
> ***Administrator in its sole discretion***.

(Ex. 6, p. 2) (emphasis added). When Wynn's received the Application, Wynn's electronic

Vehicle Identification Number ("VIN") decoder system immediately determined that the Vehicle

was ineligible for coverage because it was a hybrid electric vehicle. (Ex. 3, ¶ 14.) A hybrid

electric vehicle is not eligible for coverage under a VSC, pursuant to the Wynn's Dealer

Agreement with Armstrong Auto dated April 4, 2012 (hereinafter the "Dealer Agreement") and

its associated rate chart. (Ex. 3, Att. A.)

On August 28, 2012, consistent with standard procedure, Wynn's sent Bradley a written

notice (hereinafter the "Notice") via certified mail stating that the Vehicle was ineligible for

coverage and that the Application had been voided. (Ex. 1, Dep P. Bradley p. 39; Ex. 7, Notice.)

Bradley signed for the Notice on September 8, 2012. (Ex. 8, Certified Mail Receipt and USPS

Tracking Information.) Wynn's then refunded $735.00 to CAC, which was the portion of the

VSC Retail Rate that Wynn's had received from CAC (the lienholder of record), pursuant to the

"Refunds and Charges" section of the Application and consistent with standard procedure.  (Ex. 3, ¶ 15; Ex. 3, Att. C; Ex. 6, p. 4.)

On or about February 22, 2013, Bradley took the Vehicle to Armstrong Auto for issues related to the Vehicle's battery.  (Ex. 1, Dep. P. Bradley pp. 87-88; Ex. 9, Honda Estimate.) Armstrong Auto contacted Wynn's, who confirmed that there was no coverage on the Vehicle because the Application had been voided on August 28, 2012, as set forth in the Notice.  (Ex. 2, pp. 85-86.)

Bradley originally filed suit in this Court against Armstrong Auto, Mr. Armstrong, and CAC.  The case was styled *Bradley v. Armstrong Auto Sales, Inc. et al.,* Case No. 5:13-cv-00054. Upon a motion to compel arbitration, this Court dismissed the case and Bradley refiled her claims with JAMS Arbitration.[1]  Bradley then named Wynn's as a defendant in the arbitration proceedings.  Wynn's filed a complaint to enjoin the arbitration with this Court on December 12, 2013.[2]  Bradley dismissed her arbitration proceeding against Wynn's and filed a counterclaim for fraud/constructive fraud, violations of the Virginia Consumer Protection Act (the "VCPA") and violations of the Magnuson-Moss Warranty Act (the "MMWA").  The parties have engaged in discovery, and this case is now ripe for summary judgment.  Indeed, there is not a single fact in dispute here that, as a matter of law, should prevent dismissal of Bradley's entire Counterclaim.

## II.     STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE

1.     The Dealer Agreement provides:

> No Agency.  Dealer is not an employee or agent of Administrator for any purpose whatsoever, but is an independent contractor. Dealer does not have nor shall it hold itself out as having any right, power or authority to create any contract or obligation, either

---

[1] The arbitration is still pending and is set to be heard in the spring of 2015.

[2] Citations to Wynn's original Complaint are designated "Compl."  Citations to the Counterclaim are designated "Countercl."

> express or implied, on behalf of, in the name of or binding upon
> Administrator unless Administrator shall consent thereto in
> writing.

(Ex. 2, pp. 34-35; Ex. 3, Att. A p. 1, ¶ 1.B(6).)

2.     Wynn's did not solicit Armstrong Auto to enter into the Dealer Agreement.  Mr. Armstrong has never spoken to any Wynn's officers or employees.  The first time any Armstrong Auto employee ever contacted Wynn's was after Bradley brought the Vehicle in for repairs.  (Ex. 2 pp. 33-34, 98-99.)

3.     Armstrong Auto may in its discretion provide to its customers certain materials on VSCs that were originally prepared by Wynn's, but Armstrong Auto does not have the power to bind Wynn's to any VSC, which power is solely in the discretion of Wynn's.  (Ex. 6, p. 1; Ex. 3, Att. A, p. 1, ¶¶ 1.A, 1.B(6).)

4.     Under no circumstances does Armstrong Auto have, or has it ever had, the authority to accept an application for a VSC on behalf of Wynn's and bind Wynn's to a VSC with an Armstrong Auto customer.  (Ex. 3, ¶ 4.)

5.      When one of Armstrong Auto's customers wishes to apply for a VSC, an Armstrong Auto employee assists that customer with completing a VSC application, which that customer reviews and signs.  Armstrong Auto then submits that VSC application to CAC with the applicable vehicle's financing documentation.  The application is then forwarded by CAC electronically to Wynn's for review and approval.  (Ex. 2, pp. 48, 77, 119; Ex. 3, ¶ 11.)

6.     Wynn's did not provide training to Armstrong Auto concerning the marketing or sale of VSCs.  Armstrong Auto was never told anything by Wynn's about how to market or sell VSCs.  Armstrong Auto was never directed to provide any information to customers other than blank VSC applications.  (Ex. 2, p. 117.)

4

7.     Wynn's does not control the manner in which Armstrong Auto provides VSC applications to customers.  Armstrong Auto is not required to submit a fixed number of VSC applications per month for Wynn's acceptance, or to provide any materials on VSCs to any of its customers.  (Ex. 3, ¶ 10; Ex. 3, Att. A.)

8.     Wynn's provides Armstrong Auto with a rate chart and information on vehicle eligibility for a VSC, and Armstrong Auto decides in its sole discretion whether or not to provide its customer with a VSC application.  (Ex. 3, ¶ 10; Ex. 3, Att. A; Ex. 11, Dec. T. Armstrong, ¶ 13.)

9.     When a customer does not affirmatively express interest in a vehicle service contract, Armstrong Auto frequently does not offer the customer one.  This is because it is not profitable for Armstrong Auto to sell a service contract on certain vehicles or to certain customers.  (Ex. 2 pp. 37-38, 150-151.)

10.     Wynn's does not have the power to hire or fire Mr. Armstrong or other Armstrong Auto employees, does not determine how Mr. Armstrong or other Armstrong Auto employees are paid, does not decide the times at which Armstrong Auto is open for business, does not own the land or the building in which Armstrong Auto operates (or lease same for Armstrong Auto), and does not own the furniture or the computer equipment used by Armstrong Auto (or lease same for Armstrong Auto).  (Ex. 2, pp. 140; Ex. 3, ¶¶ 5-8; Ex. 11, ¶¶ 10-12.)

11.     Armstrong Auto is paid a flat fee by CAC out of the VSC retail purchase price for each VSC application that Armstrong Auto submits and that is accepted by Wynn's for which a VSC is issued.  Wynn's receives an $80.00 administrative fee from CAC out of the VSC retail purchase price for each VSC issued by Wynn's.  (Ex. 2, pp. 37-38; Ex. 3, ¶¶ 9, 13; Ex. 11, ¶ 9.)

12.     On or about August 21, 2012, Bradley went to Armstrong Auto and expressed interest in purchasing the Vehicle.  (Ex. 2, pp. 55-59; Ex. 4.)

13.     Bradley told Mr. Armstrong that she wanted an extended vehicle service contract for the Vehicle.  (Ex. 2, p. 57.)

14.     Mr. Armstrong believed that the Vehicle was eligible for such a contract, even though the Vehicle was a hybrid and he knew that a VSC would not cover any electric vehicle. Mr. Armstrong did not realize a hybrid was an electric vehicle.  (Ex. 2, pp. 54-55, 95.)

15.     Mr. Armstrong did not tell Bradley at any time that he was employed by Wynn's. Bradley did not know whether or not Mr. Armstrong was employed by Wynn's.  Mr. Armstrong told Bradley about Wynn's only during the course of explaining the terms of the Application. Armstrong Auto does not display Wynn's insignia or signage anywhere on or around its dealership premises.  (Ex. 1 pp. 29, 42; Ex. 2 pp. 139, 151-152, 158.)

16.     Bradley did not take any action in reliance on the belief that Mr. Armstrong was an agent or employee of Wynn's.  (Ex. 1, p. 42.)

17.     Bradley asked Mr. Armstrong to complete the Application, and Bradley signed it. (Ex. 2, pp. 72, 76; Ex. 6.)

18.     The front page of the Application states "[t]his document is an Application for a service contract.  If this application is accepted by [Wynn's], then it will become your contract."  The signature block of the Application states:

> I have agreed to and acknowledge . . . the coverage provided, . . . the exclusions of coverage, the cancellation provisions of this Contract including the "Other Important Contract Provisions/Limitations" exceptions section, and have read and understood said provisions.  I understand that the above information may be subject to verification and that this Application may be rejected if any of the above information is incorrect or if

> the above Vehicle is not eligible for the term or coverage written as
> determined by the Administrator in its sole discretion.

Bradley's signature appears directly underneath the above text on the Application.  (Ex. 6, p. 1.)

19.     The term "Contract" is defined to mean "this Application once it is accepted by Administrator [i.e. Wynn's] (if at all)."  (Ex. 6, p. 1.)

20.     The term "Administrator" is defined as Wynn's.  The term "Selling Dealer" is defined as Armstrong Auto. (Ex. 6, p. 1.)

21.     The exclusions section, titled "Exclusions – What This Contract Does Not Cover," provides that there is no coverage for "Other normal maintenance services and parts, including, without limitation . . . batteries . . . ." (Ex. 6, p. 3 ¶ 22.)

22.     Mr. Armstrong did not prevent Bradley from reading the Application before she signed it.  (Ex. 1 p. 26; Ex. 2 p. 141.)

23.     Bradley had the opportunity to review the Application before she signed it. Bradley did not ask Mr. Armstrong if she could have some time to review the Application because she thought that would take too long.  Bradley did not ask Mr. Armstrong any questions about the contents of the Application.  Bradley brought a copy of the Application home with her, but did not look at the Application until she began experiencing problems with the Vehicle.  (Ex. 1, pp. 19-20, 23-26, 30; Ex. 2, pp. 78-79, 141-142.)

24.     At the time of purchase, Bradley executed the Installment Contract in order to obtain financing from CAC.  Wynn's was not a party to the Installment Contract.  (Ex. 2, p. 65; Ex. 5.)

25.     Bradley was charged the VSC Retail Rate in connection with the Application. Bradley elected to finance that amount under the Installment Contract.  CAC forwarded a total of $735.00 to Wynn's out of the VSC Retail Rate.  That amount included Wynn's $80.00

administrative fee and $655.00 to be held in reserve for claims and state premium tax payments, in the event that Wynn's chose to accept the Application and issue a VSC for the Vehicle. (Ex. 3, ¶¶ 12-13; Ex. 3, Att. B; Ex. 5 p. 1; Ex. 10, Dep. D. Ulatowski pp. 13-14, 20.)

26. When Wynn's received the Application, Wynn's electronic VIN decoder system immediately identified that the Vehicle was ineligible for a VSC. Wynn's then issued a refund to CAC (the lienholder of record) of the full $735.00 that it had received out of the VSC Retail Rate, as per the "Refunds and Charges" section of the Application. That refund was reflected in a batch payment record from CAC to Wynn's dated October 29, 2012. Wynn's neither earned nor retained any monies in connection with the Application. (Ex. 3, ¶¶ 14-15; Ex. 3, Att. B; Ex. 6 p. 4; Ex. 10, pp. 20-21.)

27. Armstrong Auto received no payments related to the Application because Wynn's rejected it and never issued a VSC on the Vehicle. (Ex. 2, p. 144.)

28. The Notice, which was prepared and sent on August 28, 2012, seven days after Bradley's purchase of the Vehicle from Armstrong Auto, stated that the Vehicle was ineligible for coverage under a VSC and that the Application was voided. Bradley signed for the Notice on September 8, 2012. (Ex. 1, pp. 39-40; Ex. 3, ¶ 14; Ex. 7; Ex. 8.)

29. The Notice advised Bradley to contact Armstrong Auto with any questions. The reason that the Notice advised Bradley to contact Armstrong Auto with any questions was because Mr. Armstrong was in the best position to provide information and assistance related to Bradley's purchase and financing of the Vehicle. (Ex. 3, ¶ 14; Ex. 7.)

30. Bradley claims that she did not know that Wynn's sent her the Notice. (Ex. 1, pp. 32, 41, 61-62.)

31. Bradley did not call the telephone number listed on the Notice, and made no attempt to contact Wynn's in response to the Notice. (Ex. 1, pp. 43-44.)

32. On or about February 22, 2013, Bradley discovered that the Vehicle required repairs, including replacement of the battery pack due to deterioration. (Ex. 1, pp. 87-88; Ex. 9.)

33. Bradley took the Vehicle to Armstrong Auto and requested that repairs be made under the VSC. (Countercl. ¶ 72.)

34. Armstrong Auto contacted Wynn's, and Wynn's informed Armstrong Auto that there was no coverage on the Vehicle. (Ex. 2, pp. 85-86.)

## III.  LEGAL STANDARD

Under Rule 56, "the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. Civ. Proc. R. 56(a). *See Nasser v. Whitepages, Inc.*, 2013 U.S. Dist. LEXIS 166133 at *5 (W.D. Va. Nov. 21, 2013). Summary judgment is mandated against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

## IV.  LEGAL ARGUMENT AND AUTHORITIES

### A.  Bradley Has No Evidence to Support the Elements of her Claim for Fraud or Constructive Fraud.

Discovery in this case has come to a close and there is no evidence to support a claim for fraud or constructive fraud against Wynn's. To prevail on her claim for fraud, Bradley must prove: "(1) a false representation; (2) of a material fact; (3) made intentionally and knowingly; (4) with intent to mislead; (5) reliance; and (6) damage as a result." *Coles v. Oakwood Mortg., LLC.*, 2012 U.S. Dist. LEXIS 157915 at *14 (E.D. Va. Oct. 11, 2012). Constructive fraud

consists of the same elements; however, "the misrepresentation of material fact is not made with the intent to mislead, but is made innocently or negligently." *Stone Castle Fin., Inc. v. Friedman, Billings, Ramsey & Co.*, 191 F. Supp. 2d 652, 662 (E.D. Va. 2002). "In order to prove reliance, a plaintiff must demonstrate that its reliance upon the representation was reasonable and justified." *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 629 (4th Cir. 1999).

There is not a shred of evidence that Wynn's made any false representations directly to Bradley in respect of anything whatsoever. Bradley undisputedly agrees that she received the Notice informing her, shortly after she purchased the Vehicle, that Wynn's voided the Application and did not issue a VSC for the Vehicle. Consistent therewith, she undisputedly agrees that Wynn's informed Armstrong Auto in February of 2013 that the Vehicle had no coverage under a VSC. As a matter of law, Wynn's cannot be found liable to Bradley for fraud or constructive fraud based on the Notice, which undisputedly was its *only* communication to Bradley. Thus, fundamental to Bradley's claim of fraud or constructive fraud against Wynn's is her contention that Armstrong Auto or Mr. Armstrong is an agent of Wynn's. However, the evidence presented in this case establishes no such agency relationship, as a matter of law. Furthermore, the evidence fails to establish any misrepresentations by Armstrong Auto or Mr. Armstrong that could constitute fraud or any resulting damage to Bradley.

1. ***Wynn's Made No Representations to Bradley To Support a Claim for Fraud or Constructive Fraud.***

In this case, Wynn's itself did not make any false statements. The Notice was the only direct communication between Wynn's and Bradley. There is no allegation that the Notice was false, in fact Bradley has admitted that the Vehicle was not eligible for coverage under a VSC. Therefore, the Notice cannot give rise to a claim for fraud.

### 2. **_The Statements Alleged by Bradley Do Not Support a Claim for Fraud or Constructive Fraud._**

Bradley's fraud claim is premised on three statements attributed to Mr. Armstrong. First, on August 21, 2012, Mr. Armstrong allegedly told Bradley she would receive a 24 month/24,000 miles warranty with the purchase of the Vehicle. (Countercl. ¶ 36.) Second, the Installment Contract prepared by Mr. Armstrong allegedly implied that Bradley would receive an extended warranty. (_Id._ ¶ 43.) Third, Mr. Armstrong allegedly told Bradley that the Notice was sent in error and that the Vehicle had coverage under a VSC. (_Id._ ¶ 65.) As explained below, none of the foregoing statements can be held to constitute fraud, as a matter of law.

### a. **_Neither Armstrong Auto nor Mr. Armstrong is Wynn's Actual or Apparent Agent._**

Bradley's theories of liability are premised on a purported claim of agency between Armstrong Auto and Wynn's, but the facts of this case negate claim. Armstrong Auto is neither the actual agent nor the apparent agent of Wynn's, and never has been.

### i. **_Neither Armstrong Auto nor Mr. Armstrong acted as Wynn's actual agent._**

An employer is liable for the intentional torts of its employees, but not for the conduct of an independent contractor. _See Terril v. Credit Acceptance Corp._, 2010 U.S. Dist. LEXIS 31269 at *6-7 (W.D. Va. Mar. 30, 2010). "The Supreme Court of Virginia has identified four factors that are relevant to the determination of whether a master-servant relationship exists for purposes of the doctrine of _respondeat superior_: (1) selection and engagement; (2) payment of compensation; (3) power of dismissal; and (4) power of control." _Morvillo v. Shenandoah Mem. Hosp._, 547 F. Supp. 2d 528, 534 (W.D. Va. 2008). "The first three factors are not essential to the existence of the relationship; the fourth, the power of control, is determinative." _Naccash v. Burger_, 223 Va. 406, 418-419 (1982).

"The criterion for determining whether a relationship is one of principal-agent or master-servant, on the one hand, or independent contractor on the other, is control or right to control the methods or details of doing the work, not control of the results." *Wells v. Whitaker*, 207 Va. 616, 624 (1966). *See, e.g., Hesse v. Ebbets*, 2007 U.S. Dist. LEXIS 93464 at *10-11 (E.D. Va. Dec. 20, 2007) (realtor was an independent contractor because the realty company "could only demand his best efforts to solicit listings, clients, and contracts—i.e., the end product"). The Virginia Supreme Court has held that where there is no control over the day-to-day operations, there is no agency relationship. *See Murphy v. Holiday Inns, Inc.,* 216 Va. 490 (1975). *See also Jones v. C.H. Robinson Worldwide, Inc.*, 558 F. Supp. 2d 630 (W.D. Va. 2008) (freight broker was not liable for tort committed by a trucking company because the agreement provided that the trucking company was an independent contractor).

In *Murphy v. Holiday Inns, Inc.*, 216 Va. 490 (1975), the plaintiff filed suit against Holiday Inns for personal injuries sustained at a motel, alleging that the motel operator (a franchisee) was the defendant's agent. Under the franchise agreement, the franchisee had to obtain approval from Holiday Inns for the motel building's "plans, specifications, feasibility studies, and locations," to use the Holiday Inns trade name, signs, and other symbols, to observe the Holiday Inns rules of operation, make quarterly reports to Holiday Inns, and submit to periodic inspections. *Id.* at 493-494. Moreover, Holiday Inns provided training for all the franchisee's employees. *Id.* at 494. Nonetheless, the court granted summary judgment in favor of Holiday Inns, finding there was no agency relationship because Holiday Inns exercised no control over the day-to-day operations of the motel. *Id.* at 495.

Here, the Dealer Agreement not only states that Armstrong Auto is not Wynn's agent, but specifically provides that Armstrong Auto is not authorized to enter into or bind Wynn's to any contractual liabilities:

> No Agency. Dealer is not an employee or agent of Administrator [i.e. Wynn's] for any purpose whatsoever, but is an independent contractor. Dealer does not have nor shall it hold itself out as having any right, power or authority to create any contract or obligation, either express or implied, on behalf of, in the name of or binding upon Administrator unless Administrator shall consent thereto in writing.

(Ex. 3, Att. A p. 1, ¶ 1.B(6).) The unambiguously drafted and undisputed Dealer Agreement is alone sufficient to negate the agency relationship here as a matter of law. *See Acordia of Va. Ins. Agency v. Genito Glenn, L.P.*, 263 Va. 377, 384 (2002).

Even without such express provision, Mr. Armstrong would not be considered an employee or agent of Wynn's. It is undisputed that Armstrong Auto is an independent vendor primarily engaged in the sale of used vehicles to its own customers. (Ex. 11, ¶ 2.) Wynn's does not control Armstrong Auto's process for providing its customers with VSC applications. (Ex. 3, ¶ 10.) Armstrong Auto is not required to offer a VSC application to all of its customers, and the decision of whether to provide any vehicle service contract application to any customer is in the sole discretion of Armstrong Auto. (Ex. 3, ¶ 10; Ex. 3, Att. A.) Wynn's decides based on vehicle eligibility whether or not to accept VSC applications that it ultimately receives from CAC, from transactions at Armstrong Auto. (Ex. 3, ¶ 11.)

Moreover, Wynn's does not have the power to hire or fire Mr. Armstrong and other employees of Armstrong Auto, does not control how Mr. Armstrong and other employees are paid, and does not decide the times at which Armstrong Auto is open for business. (Ex. 2, p. 140; Ex. 3, , ¶¶ 5-7.)

13

There is simply no evidence to support the conclusion that either Armstrong Auto or Mr. Armstrong was Wynn's actual agent. Thus, Wynn's cannot be liable as a matter of law for Armstrong Auto or any of its employees' alleged conduct under a theory of *respondeat superior*.

### ii. Neither Armstrong Auto nor Mr. Armstrong acted as Wynn's apparent agent.

"The apparent agency relationship is not easily established, even in circumstances where the alleged apparent agent seems closely connected to the principal." *Giordano v. Atria Assisted Living, Va. Beach, LLC*, 429 F. Supp. 2d 732, 738 (E.D. Va. 2006). Critically, apparent agency "must be based on the actions of the alleged principal," and "not on the actions of the alleged agent." *Wells Fargo Bank, N.A. v. Old Republic Nat'l Title Ins. Co.*, 2009 U.S. Dist. LEXIS 118655 at *18-19 (E.D. Va. Dec. 17, 2009). The law is clear that "one who deals with an agent does so at his own peril and has the duty of ascertaining the agent's authority." *Tyc Dev. Co., LLC v. Birach Broad. Corp.*, 2010 U.S. Dist. LEXIS 41551 at *15 (E.D. Va. Apr. 27, 2010). However, "one party may be held to be an agent of a second party on the basis that the first party has been held out by the second party in such a way that reasonably induces reliance on the appearance." *Noble Sec., Inc. v. MIZ Eng'g, Ltd.*, 611 F. Supp. 2d 513, 534 (E.D. Va. 2009).

Under applicable law, Bradley must demonstrate that Wynn's created the appearance of agency with Armstrong Auto through Wynn's own actions. Here, there is no evidence that Wynn's took any action that was in any way inconsistent with Armstrong Auto's true role as an independent vendor. It was not *remotely reasonable* for Bradley to assume that Mr. Armstrong was acting as an agent for Wynn's when she applied for a VSC, especially when the Application identified the dealer and administrator as separate entities and unequivocally stated, right above Bradley's signature, that it had to be accepted by Wynn's in order for there to be coverage on the Vehicle. (Ex. 6).

Bradley contends that Wynn's held out Armstrong Auto as its agent by issuing the Notice, which suggested that Bradley contact Armstrong Auto with any questions. However, that argument cannot prove apparent agency, because, according to her own testimony, Bradley did not know the Notice was issued by Wynn's. (Ex. 1, pp. 32, 41, 61-62.)

The reason that Wynn's advised Bradley to contact Armstrong Auto with any questions was because Mr. Armstrong was responsible for assisting Bradley with the Application that was rejected by Wynn's, and he might therefore have been able to rectify the situation by repurchasing the Vehicle or by helping Bradley find another appropriate service product for the Vehicle. The Notice was not intended to hold out Armstrong Auto or Mr. Armstrong as an agent of Wynn's, but rather to point Bradley in the direction of the person most capable of offering her assistance with the Vehicle. (Ex. 3, ¶ 14.) Finding agency based on Bradley's farfetched theory of apparent agency and the evidence presented in this case surrounding the Notice would run afoul of well-articulated case law in Virginia.

Moreover, to prevail on a claim of apparent agency, Bradley must demonstrate that she took some action in reliance on her belief that Mr. Armstrong was an agent of Wynn's. Bradley's own deposition testimony undercuts that theory:

> Q.   Did you think Travis Armstrong worked for Wynn's?
> A.   I wasn't sure. I just know I was getting my warranty that I wanted.
> Q.   Okay.
> A.   And I wasn't going to purchase the car without one.
> Q.   So you didn't know one way or another if he worked for Wynn's or not?
> A.   No.

(Ex. 1, p. 42.) In other words, Bradley was allegedly relying on Mr. Armstrong to provide her with the warranty she wanted, because that is what he allegedly promised her. Bradley did not know or care whether Mr. Armstrong served as an agent for Wynn's.

Finally, even if Bradley could prove the elements of apparent agency, it would not save her tort claims against Wynn's from dismissal on summary judgment. The doctrine of apparent agency cannot be used to impose vicarious liability on an employer for torts committed by an independent contractor. *See Sanchez v. Medicorp Health Sys.*, 270 Va. 299, 308 (2005). "Under Virginia law, an apparent agent may bind his principal only in contract. Virginia has not adopted the theory of apparent agency as a basis of tort liability." *Craddock v. A & E Moving Storage, Inc.*, 82 Va. Cir. 491, 493 (Norfolk 2011) (dismissing claims for fraudulent inducement and violation of the VCPA because apparent agency cannot serve as the basis for a cause of action sounding in tort).

In the instant case, therefore, Wynn's cannot be held liable for any statements made by Mr. Armstrong under a theory of *respondeat superior*. Even if Mr. Armstrong were an apparent agent of Wynn's—which he is not—Wynn's would not be liable for torts committed by Mr. Armstrong or Armstrong Auto.

### b. *The evidence fails to demonstrate any reasonable reliance or resulting damage.*

In this case, Wynn's itself did not make any false statements. The Notice was the *only* direct communication between Wynn's and Bradley. There is no dispute about what the Notice stated or that the Notice was anything but true. Therefore, the Notice cannot give rise to a claim for fraud. The remaining statements upon which Bradley rests her claim are that, on August 21, 2012, Mr. Armstrong allegedly told Bradley she would receive a 24 month/24,000 miles warranty with the purchase of the Vehicle, (Countercl. ¶ 36), and that the Installment Contract prepared by Mr. Armstrong allegedly implied that Bradley would receive an extended warranty. (*Id.* ¶ 43.) As explained below, none of the foregoing statements can be held to constitute fraud, as a matter of law.

16

### i. *Any reliance by Bradley is patently unreasonable.*

To prevail on her cause of action for fraud, Bradley must prove that her reliance on the purported misrepresentations was reasonable. *See Ostolaza-Diaz v. Countrywide Bank, N.A.*, 360 Fed. Appx. 504, 507 (4th Cir. 2010). However, the evidence developed through discovery reveals that any reliance on Bradley's part was patently unreasonable. The basis for reasonable reliance is set forth in *Costello v. Larsen*, 182 Va. 567, 571 (1944): "Where ordinary care and prudence are sufficient for full protection, it is the duty of the party to make use of them." If a party fails to exercise ordinary care for his own protection, the law "will leave him where he has been placed by his own imprudent confidence." *Id.* at 571-572.

The Fourth Circuit has repeatedly held that under Virginia law, a plaintiff may not rely on oral statements to support a claim for fraud while in possession of a contrary statement in writing. *See Ostolaza-Diaz*, 360 Fed. Appx. at 507; *Calhoun v. Exxon Corp.*, 1995 U.S. App. LEXIS 21668 at *7-8 (4th Cir. Va. Aug. 11, 1995); *Foremost Guaranty Corp. v. Meritor Sav. Bank*, 910 F.2d 118 (4th Cir. 1990). A plaintiff who has failed to read the relevant documents cannot be heard to complain. *See Johnson v. Washington*, 559 F.3d 238, 245 (4th Cir. 2009). In *Ostolaza-Diaz*, 360 Fed. Appx. at 506, a claim for fraud filed against a mortgage broker for his alleged misrepresentations was dismissed because the plaintiffs had been presented at closing "with documents that unambiguously spelled out the terms of the loan and contradicted [the mortgage broker's] oral statements." *Id.* at 507. Therefore, the court concluded that the plaintiffs' reliance there was not reasonable.

Here, the VSC Application is titled "Application/Contract" and unambiguously states that the document is an application that must be accepted by Wynn's. (Ex. 6, p. 1.) The Application also provided that it may be rejected in Wynn's sole discretion if the Vehicle is deemed

ineligible. (Ex. 6, p. 1.) Those provisions demonstrate unequivocally that submission of the Application could not have resulted in a binding contract until it was reviewed and accepted by Wynn's.

The Application signature block contains an acknowledgement by Bradley that she read the terms and conditions of the Application including, but not limited to, its "exclusions" section. (Ex. 6, p. 1.) Bradley testified that she had an opportunity to review the Application before signing it. She simply chose not to read it more carefully, and chose not to ask Mr. Armstrong any questions about the Application, because she thought this would take too long. (Ex. 1 pp. 19, 25.) Therefore, no matter what Bradley claims that Mr. Armstrong told her, it was unreasonable for Bradley to believe that that the Application was a final, binding contract.[3]

Likewise, the Application specifically excludes coverage for battery repairs. (Ex. 6, p. 3, ¶ 22.) Therefore, even if Wynn's somehow magically had entered into a binding VSC with Bradley, repairs to the Vehicle's battery would not have been covered. Bradley had no reasonable basis for relying on Mr. Armstrong's alleged statements to the contrary. Most of all, it was patently unreasonable for Bradley to disregard the Notice. (Ex. 1, pp. 39-40.) The Notice states unambiguously stated that the "contract has been voided." (Ex. 7.) Even if, as alleged, Mr. Armstrong orally contradicted the Notice, Bradley should have at least suspected that he was mistaken, and taken steps to confirm whether the Application had been accepted by Wynn's.

---

[3] Here, there is no evidence that Mr. Armstrong prevented Bradley from carefully reviewing the Application or from reading the Notice. To the contrary, Bradley and Mr. Armstrong both testified that he did not prevent her from doing so. (Ex. 1, p. 26; Ex. 2 p. 141.) Notably, it was Bradley who did not want to take the time to review the documents. (Ex. 1, pp. 19-20, 25.) Thus, the narrow exception articulated in *Spence v. Griffin,* 236 Va. 21 (1988) is inapplicable to the facts of this case.

According to Bradley, obtaining a VSC was very important to her—she avers that she would not have purchased the Vehicle without a VSC. (Countercl. ¶¶ 35, 38.) Yet, when Bradley received the Notice, she apparently disregarded it based on alleged oral representations to her by Armstrong, and made no effort to corroborate those representations. (Ex. 1, pp. 43.) She did not even bother to call the telephone number for Wynn's administrative offices, which was listed on the Notice. (Ex. 1, pp. 43-44.) Bradley thus failed to exercise reasonable care for her own protection.

### ii.    *Bradley has suffered no damages traceable to Wynn's.*

In order to prevail on her claim for fraud, Bradley must prove that she suffered damages traceable to Wynn's. The evidence belies any such claim. Notably, Wynn's immediately identified the Vehicle as being ineligible and promptly notified Bradley, CAC and the Armstrong Auto. (Ex. 1, pp. 39-40; Ex. 3, ¶ 14.) Wynn's also returned the money it had received from CAC. (Ex. 3 ¶ 15; Ex. 10 pp. 20-21.) Bradley cannot claim that she suffered damages as a result of any conduct of Wynn's.

### iii.    *The alleged misrepresentations relate to future events.*

Under Virginia law, "fraud must relate to a present or a pre-existing fact, and cannot ordinarily be predicated on unfulfilled promises or statements of future events." *Patrick v. Summers,* 235 Va. 452, 454 (1988). A promise made with no intention of performing is considered a statement of present fact. *See Colonial Ford Truck Sales, Inc. v. Schneider*, 228 Va. 671, 677 (1985). However, a claim for constructive fraud can never be supported by promises of unfulfilled actions. *See SuperValu, Inc. v. Johnson*, 276 Va. 356, 368 (2008). Otherwise, "every breach of contract would potentially give rise to a claim of constructive fraud." *Id.*

Here, the alleged statements relate to Bradley's request for a VSC, which when it becomes a binding contract is a promise to provide coverage for future repairs. Thus, those sort of statements cannot support a claim for constructive fraud. Bradley must prove that Mr. Armstrong made misrepresentations with fraudulent intent, on behalf of Wynn's. Mr. Armstrong testified that **he made a mistake** concerning the Vehicle's eligibility for a VSC. (Ex. 2, p. 95.) There is no evidence whatsoever that Mr. Armstrong intended to deceive Bradley. In fact, Mr. Armstrong had no motive to induce Bradley to submit the Application for an ineligible vehicle. Armstrong Auto earned no income on the Application because Wynn's rejected it due to vehicle ineligibility and therefore Wynn's never issued a VSC for the Vehicle. (Ex. 2 p. 144.)

**B.     The VCPA Claim Has No Merit as a Matter of Law.**

Bradley's claim for violations of the VCPA fails for largely the same reasons that her fraud and constructive fraud claims fail. First, as noted above, the facts of this case do not establish that there were any misrepresentations by Wynn's to Bradley or that there was any agency relationship between Wynn's and Armstrong Auto or Mr. Armstrong. Second, even if there existed disputed material facts as to whether there was any such agency relationship, there is absolutely no evidence of any intentional misrepresentation by Wynn's or Armstrong Auto to support a claim under the VCPA.

Pursuant to Virginia Code § 59.1-204, any person who "suffers a loss as a result of a violation" of the VCPA may bring an individual action for damages. "In order to sustain a claim under the VCPA, a plaintiff must prove that the defendant acted with an intent to deceive or otherwise mislead, i.e., with *fraudulent intent*, as to a material fact on which the plaintiff relied to his detriment and which resulted in measurable damages." *Padin v. Oyster Point Dodge*, 397 F. Supp. 2d 712, 722 (E.D. Va. 2005) (emphasis added). "Virginia courts have consistently held

Case 5:13-cv-00114-MFU-JGW   Document 60   Filed 09/17/14   Page 20 of 26   Pageid#: 470

that reliance is required to establish a VCPA claim." *Fravel v. Ford Motor Co.*, 973 F. Supp. 2d 651, 658 (W.D. Va. 2013). For such purposes, reliance must be "reasonable and justified." *Adardour v. American Settlements, Inc.*, 2009 U.S. Dist. LEXIS 56675 at *8 (E.D. Va. July 2, 2009).

Here, Mr. Armstrong testified that ***he merely made a mistake*** concerning the Vehicle's eligibility for a VSC. (Ex. 2, pp. 54-55, 95). There is not one iota of evidence that he acted with fraudulent intent toward Bradley. And, there is no evidence that Mr. Armstrong had any possible motive for deliberately inducing Bradley to apply for a VSC on an ineligible vehicle. (Ex. 2, p. 144). *See Padin*, 397 F. Supp. 2d at 723 (granting summary judgment to automobile dealership on fraud and VCPA claims filed by customer whose credit application was rejected because the dealership's actions ran contrary to a finding of intent to defraud the plaintiff). *Id.* at 723.

Third, Bradley could not have reasonably relied on Mr. Armstrong's alleged oral statements while she was in possession of contrary written communications. *See Cooper v. GGGR Invs., LLC*, 334 B.R. 179, 190 (E.D. Va. 2005) (denying VCPA claim because the plaintiff "was furnished with all the transaction documents, which on their face, plainly described the nature of the transaction").

Fourth, there is no resulting damage that flows from the undisputed actions of Wynn's. *See Alston v. Crown Auto, Inc.,* 224 F.3d 332, 36 (4th Cir. 2000). Wynn's received the Application and immediately identified the Vehicle as ineligible. (Ex. 3 ¶ 14). The money that Wynn's received constituted Wynn's $80.00 administrative fee and the $655.00 reserve amount that were contingent on approval of the Application. (Ex. 3 ¶ 13.) That full amount was promptly returned to CAC by Wynn's in accordance with standard procedure. (Ex. 3, ¶ 15, Ex.

10, pp. 20-21.)  Thus, Bradley can claim no damages *whatsoever* resulting from the conduct of Wynn's.

**C.**   **The MMWA Claim Fails Because There Was No Binding Service Contract.**

The MMWA creates a consumer right to file a civil action for damages caused by the "failure of a supplier, warrantor, or service contractor to comply with any obligation under this title . . . or under a written warranty, implied warranty, or service contract."  15 USC § 2310(d).  In this case, ***no contract was ever entered into by Wynn's***.  Bradley's unstated assumption underlying her MMWA claim is that Wynn's actually entered into a binding VSC.  However, the evidence is undisputed that the Application clearly states that no VSC can be formed without approval from Wynn's, and that Armstrong Auto had no actual or apparent authority to enter into a binding VSC on behalf of Wynn's.  Moreover, an oral agreement is not redressable under the MMWA.  Therefore, the MMWA claim should be dismissed.

### *1.*        *The Application Did Not Result in a Binding Contract.*

The Application did not, by its express and clear terms, give rise to a binding contract between Wynn's and Bradley.  Rather, the Application was an offer by Bradley that Wynn's was free to accept or reject.  The Application itself states that it may be rejected in the Administrator's sole discretion.  Wynn's rejected it as clearly set forth in the Notice.  (Ex. 7.)  Similarly, the Application specifically excludes batteries from coverage.  (Ex. 6, p. 3 ¶ 22.)  Therefore, even if Wynn's is held to have entered into a binding VSC with Bradley in respect of the Vehicle, there would never have been coverage thereunder for repairs to the Vehicle's battery which Bradley asked Armstrong Auto to perform in February of 2013.

As established herein, no agency relationship ever existed between Wynn's and Armstrong Auto or Mr. Armstrong.  No actual or apparent agency ever existed between Wynn's

and Armstrong Auto or Mr. Armstrong.  Mr. Armstrong would not have the ability to create a contract that was binding upon Wynn's.  The VSC Application states that additional approval would be required from Wynn's after the Application was submitted.  (Ex. 6, p. 1).  Mr. Armstrong testified that he informed Bradley that there would be no VSC until Wynn's reviewed and approved the Application.  (Ex. 2, pp. 77, 79.)  The Notice stated nothing whatsoever about Armstrong Auto's authority to enter into contractual obligations on behalf of Wynn's.  (Ex. 7.)

## 2. _Any Alleged Oral Agreement Would Not be Redressable under the MMWA._

The MMWA allows a private action to be brought only for failure to comply with statutory obligations or obligations arising under a "written or implied warranty" or a "service contract."  There is no allegation that Wynn's has failed to comply with its statutory obligations or with an implied warranty.  Therefore, Bradley's claims must be premised on a "written warranty" or "service contract" as defined by the MMWA.

Unsurprisingly, a "written warranty" must be in writing.  Similarly, the term "service contract" means " a contract *in writing* to perform, over a fixed period of time or for a specified duration, services relating to the maintenance or repair (or both) of a consumer product."  15 USC § 2301(8) (emphasis added).  Therefore, Bradley cannot prevail under the MMWA unless she is the beneficiary of an agreement with Wynn's *in writing*.  *See McNamara v. Nomeco Bldg. Specialties*, 26 F. Supp. 2d 1168, 1172 (D. Minn. 1998).

As discussed above, there's no dispute that a written service contract was ever entered into between Wynn's and Bradley; Wynn's voided the Application and it never became a VSC.  Armstrong's oral representations would not have any effect on the terms of the Application or a VSC as parol evidence should not be considered.  Notably, "Parol evidence of prior or contemporaneous oral negotiations are generally inadmissible to alter, contradict, or explain the

23

terms of a written instrument provided the document is complete, unambiguous, and unconditional." *Ilozor v. Hampton Univ.,* 2007 U.S. Dist. LEXIS 33032 AT *36 (E.D. Va. May 3, 2007). Therefore, Armstrong's alleged oral representations are inadmissible to convert the Application into a binding VSC.

The MMWA claim should be dismissed on summary judgment.

### D. Bradley Cannot Recover Punitive Damages or Treble Damages Because There is No Evidence of Authorization or Ratification.

Bradley seeks both punitive damages for fraud and statutory treble damages pursuant to the VCPA. Not only does the conduct complained of fail to demonstrate the necessary factual predicate, but discovery has revealed no facts to impute liability for punitive or treble damages to Wynn's.

To state a claim for punitive damages on a theory of *respondeat superior*, Bradley must demonstrate that Wynn's participated in, authorized, or ratified the alleged wrongful conduct of its purported agent. *See Oakes v. Patterson*, 2014 U.S. Dist. LEXIS 54596 at *32 (W.D. Va. Apr. 17, 2014). The basis for this rule was stated in *Hogg v. Plant*, 145 Va. 175, 180 (1926): "Exemplary or punitive damages, being awarded, not by way of compensation to the sufferer but by way of punishment of the offender, and as a warning to others, can only be awarded against one who has participated in the offense."

Wynn's sent Bradley the Notice, which Bradley received, clearly stating that the Application was voided and the Vehicle was ineligible for coverage. Wynn's did not authorize or ratify Mr. Armstrong's alleged misrepresentations, but specifically repudiated them. There is no allegation that Wynn's was aware of any alleged statements made by Mr. Armstrong to Bradley after the Notice was issued. Wynn's did not learn of those alleged statements at any

24

time prior to February of 2013.  At base, it would be grossly unfair to punish Wynn's for the alleged misconduct of Mr. Armstrong; there's no evidence of any nexus whatsoever.

The rationale articulated in *Hogg v. Plant* applies equally to Bradley's claim for treble damages under the VCPA.   If a violation of the VCPA is found to be willful, the finder of fact can "increase damages to an amount not exceeding three times the actual damages sustained." Va. Code Ann. § 59.1-204.A.  An award of treble damages under the VCPA requires a "willful intent to deceive."  *Grey-Theriot v. Quansah (In re Quansah)*, 2011 Bankr. LEXIS 1319 at *9-10 (Bankr. E.D. Va. Apr. 9, 2011).

Here, there is no allegation that Wynn's acted with a willful intent to deceive.  Rather, Bradley seeks to hold Wynn's liable for Mr. Armstrong's alleged misconduct.  To the extent that Bradley can prove Mr. Armstrong committed a willful violation of the VCPA, Wynn's should not be punished for such violation absent some evidence of authorization or ratification.

## V.    CONCLUSION

Based on the foregoing, Wynn's respectfully requests this Court to grant its Motion for Summary Judgment.

WYNN'S EXTENDED CARE, INC.
By Counsel

_____ /s/

Virginia M. Sadler
Virginia State Bar No. 48736
Attorney for Wynn's Extended Care, Inc.
JORDAN COYNE LLP
10509 Judicial Drive, Suite 200
Fairfax, Virginia 22030
(Tel.)   (703) 246-0900
(Fax)    (703) 591-3673
E-Mail:  v.sadler@jocs-law.com

25

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 17th day of September, 2014, I electronically filed the
foregoing Memorandum of Points and Authorities in Support of Motion for Summary Judgment
with the Clerk of the Court using the CM/ECF system, which will send notification of such filing
(NEF) to the following:

Timothy E. Cupp, Esquire
Virginia State Bar No. 23017
CUPP & CUPP, P.C.
1951-D Evelyn Byrd Avenue
P.O. Box 589
Harrisonburg, Virginia 22803-0589
(Tel.) (540) 432-9988
(Fax) (540) 432-9557
E-Mail: cupplaw@comcast.net


Thomas D. Domonoske, Esquire
Virginia State Bar No. 35434
461 Lee Avenue
Harrisonburg, Virginia 22802
(Tel.) (540) 442-7706
E-Mail: tomdomonoske@earthlink.net

*Counsel for Counterclaim Plaintiff*


_____/s/_____
Virginia M. Sadler
Virginia State Bar No. 48736
Attorney for Wynn's Extended Care, Inc.
JORDAN COYNE LLP
10509 Judicial Drive, Suite 200
Fairfax, Virginia 22030
(Tel.) (703) 246-0900
(Fax) (703) 591-3673
E-Mail: v.sadler@jocs-law.com