# In the Matter Of:

## WYNN'S EXTENDED CARE

vs.

## PENNY L. BRADLEY

---

**PENNY BRADLEY**

*August 29, 2014*

---



Casamo | Court Reporting, Videography, Videoconferencing

Phone: 703-837-0076
Fax: 703-837-8118
Toll Free: 877-837-0077

1010 Cameron Street
Alexandria, VA 22310
transcript@casamo.com

Page 19

1  payment or was it Mr. Armstrong?

2  A.    Mr. Armstrong.

3  Q.    Okay. And what happened after -- was that a
4  verbal conversation?

5  A.    Yes. We were in his office and going through
6  all of the paperwork. And he was just flipping through
7  the pages really fast and telling me, you know, sign
8  here, initial here, sign here, initial here.

9        And he did tell me the payment would be 401.93.
10 And that was with the understanding that he was throwing
11 in the warranty.

12 Q.    Okay. And did you get the paperwork before he
13 came in to talk to you about it or did he just bring it
14 in and sit down with you?

15 A.    Oh, he printed it off the printer while I was
16 sitting there and got them all in a big pile. And then
17 he just put the big pile in front of me.

18 Q.    Did you ask him if you could sit down and read
19 through the papers?

20 A.    The -- there was a huge amount of papers. I
21 would have probably sat there for a long time.

22        I mean it would have taken probably several

1  hours if I were to sit there and read through
2  everything.
3      I just -- he just reached across and told me,
4  you know, just sign here and date here and initial here
5  so --
6  Q.   Okay.  So you never asked him for a few minutes
7  to go through the papers or anything?
8  A.   No.
9  Q.   All right.  Did you look at the -- turning back
10 to Exhibit 1, that first page.
11     When he told you how much the payment was, did
12 you look at this page -- the front page of the retail
13 installment sales contract?
14 A.   Oh, yeah, I looked at this.
15 Q.   Okay.
16 A.   I was checking for the amount of the payment.
17 Q.   The 401.93?
18 A.   Uh-huh.
19 Q.   Okay.  And then when you say -- all right.  So
20 it has the service contract on here for $1,580 in 5B.
21 Do you see that?
22 A.   Uh-huh.

1   When you completed this form or when you signed
2   it, did you understand that your application would have
3   to be approved by someone?
4   A.   No, I did not.  I mean he -- he explained this
5   as my contract.
6        And I looked at this part right here, contract
7   information and the 24,000 mile portion, and signed like
8   he asked me to do.
9   Q.   Okay.
10  A.   He never explained that this was an application.
11  Q.   And then -- see under the section it says
12  contract obligor administrator?
13       Can you read that paragraph in there for me?
14  You don't have to read it out loud.
15       It starts I have agreed to acknowledge the
16  maintenance schedule.
17  A.   Uh-huh.  Okay.
18  Q.   The portion that says I understand that the
19  above information may be subject to verification and
20  that this application may be rejected if any of the
21  above information is incorrect or if the above vehicle
22  is not eligible for the term of coverage written as

```
 1   determined by the administrator in his sole discretion.
 2   What did you understand that to mean?
 3     A.   Again, I just signed.
 4          He explained this as my contract, so I didn't --
 5   I did not see that.
 6     Q.   Did he explain that this would turn into your
 7   contract if it were approved?
 8     A.   No, he did not.  I wouldn't have purchased the
 9   car had he done that.
10     Q.   Have you ever purchased a vehicle before?
11     A.   Yes.
12     Q.   Did you buy a service contract on your other
13   vehicle?
14     A.   I bought Toyota -- from Steven Toyota, and I
15   think it already came with a warranty and everything.
16     Q.   Was it new?
17     A.   Yes, brand new.
18     Q.   Had you ever purchased a used car before this?
19     A.   No.
20     Q.   And then see up at the top, it says Wynn's Plus
21   used vehicle service contract/application?
22     A.   Yes.
```

1   Q.   Did you ask him any questions about that?

2   A.   No. Because he had said just sign this

3   contract. And I seen that word contract there and

4   contract information here (indicating) and the 24,000

5   miles that I was checking for that he said that I was

6   getting and signed it.

7   Q.   Did you ask him any questions about this

8   particular document?

9   A.   Oh, no. Because I had a whole other stack of

10  documents to sign. And he just told me what to sign for

11  my contract, and I signed.

12  Q.   What portions of this document, Exhibit 2, do

13  you recall -- you mentioned that you saw the coverage

14  term.

15       What other portions did you look at when you did

16  sign it?

17  A.   I looked at this information up top here where

18  my name and address, phone number -- the coverage,

19  signed my name. Like I said, I had a whole stack of

20  papers to sign.

21  Q.   Did you read through any of the attached pages

22  to this application at the time?

1   A.   No, ma'am. I would have been there several
2   hours had I read through all of those.
3        He was just showing me the places where I needed
4   to sign, date or initial.
5   Q.   Did he ever -- did Mr. Armstrong ever tell you
6   not to read the pages?
7   A.   He didn't tell me not to read them. But he
8   just -- he would flip them over. I would sign. He
9   would flip to the next page. And basically, he just
10  went through all of the pages with me --
11  Q.   Did you --
12  A.   -- pretty quickly so --
13  Q.   Did you get to take copies of -- it sounds like
14  there were -- let me -- I'll back up.
15       Were there other documents that you signed that
16  day other than these two that we've looked at so far?
17  A.   Yes.
18  Q.   Do you recall what they were?
19  A.   I remember he said that I needed some type of
20  GAP coverage. And then there was the paperwork with the
21  Credit Acceptance. I'm not sure if all of that is here.
22       I'm trying to recall. I know there was a stack

1   Q.   Other than Exhibit 2, did you get any documents
2   that had the name Wynn's on it?
3   A.   No.
4   Q.   Other than the name on this document, did Mr.
5   Armstrong ever discuss Wynn's with you at all?
6   A.   He -- just when he said that I was getting the
7   Wynn's contract.
8   Q.   Okay.  Was that when you were signing this piece
9   of paper?
10  A.   When he asked me to sign that, yeah.
11  Q.   Okay.  When you were looking at the car and
12  talking about the warranty or service contract, did he
13  indicate at that point in time what company was
14  issuing -- or would be issuing that?
15  A.   No.
16  Q.   Okay.
17  A.   He just said he would throw it in.
18  Q.   So the -- I guess the first and only time that
19  Wynn's came up was when you were signing this piece of
20  paper, which is Exhibit 2.  Is that fair?
21  A.   Yes.
22       MR. CUPP:  And you're still talking about the

1   day of the transaction, right?

2           MS. SADLER:  Yes.

3           BY MS. SADLER:

4   Q.   All right.  And so then you got your package of
5   paperwork.  Did you just drive off the lot with your car
6   at that point?

7   A.   Yes, ma'am.

8   Q.   Did you go home and look at the paperwork?

9   A.   No.  I put it in my dashboard.

10  Q.   Okay.  When was the next time that you looked at
11  that paperwork?

12  A.   I believe that's when he started giving me the
13  runaround about fixing -- fixing the vehicle.

14  Q.   Okay.

15  A.   And he kept telling me he was going to call.
16  And I was look well, I've got that warranty.

17          And he was like well, I'll call them for you and
18  find out about the repairs.  That's when I went and got
19  it out.

20  Q.   Okay.  And that was when you were experiencing
21  problems with the vehicle?

22  A.   Yes.  I was having -- the battery light had come

```
 1            I didn't know the letter was from Wynn's.  But I
 2   just called him.  Because in the letter, it referenced
 3   calling your dealership.
 4       Q.   Okay.  When did that conversation happen
 5   compared to the conversation about the battery?
 6       A.   I got the letter first.
 7       Q.   Okay.
 8       A.   And I had called him.  The battery -- the
 9   battery light had come on.  And I had talked to him
10   about that.
11            That's when he -- I started getting the
12   runaround with him.
13       Q.   Okay.  And when was -- when were the
14   conversations about the battery and the battery light?
15       A.   It wasn't long after I purchased the car that
16   the battery light came on.
17       Q.   Would it have been within like a month?
18       A.   That the battery light came on?
19       Q.   Yes.
20       A.   Yes.
21       Q.   Okay.
22       A.   I believe so.
```

1  fix it if it costs $7,000, we can't fix it.

2  Q.  How did you know how much it cost?  Because

3  Armstrong --

4  A.  Travis told me that.  Yeah, he had told me that

5  when I was telling him that I wanted a warranty.

6      And he was like yeah, that's a good idea because

7  those batteries in those things are terribly expensive,

8  they cost around $7,000.  I said yikes.

9      Yeah, I definitely wanted the warranty.

10 Q.  Tell me a little bit about the conversation you

11 had with Mr. Armstrong when he said -- let me just give

12 you this so we can make it an exhibit.

13     (Thereupon, the document was marked Bradley

14     Exhibit #3 for identification.)

15     BY MS. SADLER:

16 Q.  I hand you -- or the court reporter handed you

17 Exhibit 3.

18     You mentioned a letter that you had gotten

19 earlier.  Is this the letter you were referring to?

20 A.  Yes, ma'am, it is.

21 Q.  And the second page is a blown-up copy of a

22 receipt for mailing.  Is that your signature?

1  A.    It is. Yes, ma'am.

2  Q.    When you got this letter, had you already had

3  problems with the battery at that point? Had the light

4  come on?

5  A.    No. No. I don't believe so.

6  Q.    How long after you got this letter did the light

7  come on?

8  A.    I'm trying to remember. It went a little while.

9  It may have been maybe a week or so.

10 Q.    Okay. But no more than like a month?

11 A.    I don't believe so. It's hard for me to

12 remember from two years ago.

13 Q.    Yeah. And it looks like I think the date on

14 this letter is August 28th.

15       But I think you got it September 8th. Does --

16 do you remember getting it about a week after it was

17 dated -- or signing for it, at least?

18 A.    It's hard for me to remember.

19 Q.    I will ask you a different question.

20       Did you have to go pick this up at the post

21 office --

22 A.    Yes.

```
 1    Q.    -- because it was certified?
 2    A.    Yes.
 3    Q.    You did?  Okay.
 4    A.    Yes.
 5    Q.    Had you received a couple of notices in the mail
 6  that you had a certified?
 7    A.    I believe I had only seen one notice.
 8    Q.    And then did you go pick it up a few days later?
 9    A.    I did.  Yes, ma'am.
10    Q.    Okay.  When you got this letter, did you read
11  it?
12    A.    Yes.
13    Q.    And did you know that it came from Wynn's?
14    A.    No.  It doesn't say it come from Wynn's.
15    Q.    Okay.  Who did you think it came from?
16    A.    Well, I wasn't sure who it came from.  It didn't
17  really say.
18          All it says is administrative office.  I just
19  saw this part where it says please contact your selling
20  dealership with any questions.
21    Q.    Okay.
22    A.    So I called -- I called Travis.
```

```
 1    Q.    Did you -- when you signed Exhibit 2, did you
 2  understand that Wynn's was a different company from the
 3  company selling you your car?
 4    A.    No. No, I didn't.
 5    Q.    Did you think Travis Armstrong worked for
 6  Wynn's?
 7    A.    I wasn't sure. I just know I was getting my
 8  warranty that I wanted.
 9    Q.    Okay.
10    A.    And I wasn't going to purchase the car without
11  one.
12    Q.    So you didn't know one way or another if he
13  worked for Wynn's or not?
14    A.    No.
15    Q.    So when you got this letter that's Exhibit 3,
16  what did you do?
17    A.    I called Travis.
18    Q.    How long after you got the letter did you call
19  him?
20    A.    Immediately.
21    Q.    Okay. And tell me about that conversation.
22    A.    I said Travis, I've got this letter saying
```

1    something about the vehicle listed on the vehicle
2    service agreement is ineligible.
3         And he was like oh, you got one of those. Oh,
4    that happens all of the time. And I was like well, I
5    just want to make sure that I have my warranty and
6    everything that you supposedly gave me.
7         He was like oh, yeah, oh, yeah, you don't have
8    to worry about that. That's just -- and I was like
9    well, why did I get that letter. And he said well,
10   that's just a computer glitch. That happens all of the
11   time. It's something about when they run the tags
12   through the DMV.
13   Q.   Did that make sense to you?
14   A.   It didn't make a whole lot of sense. But I
15   trusted what he said to me.
16        I mean he does sell cars. So I figured, you
17   know, he knew what he was talking about when he tells me
18   that this happens all of the time and it's a computer
19   glitch. Because I guess computer glitches do happen.
20   Q.   After you talked to him, did you call the number
21   on the letter?
22   A.   No. I just did what it told me to do and called

T: (703) 837-0076           Toll Free (877) 837-0077         F: (703) 837-8118
http://www.casamo.com         Casamo and Associates          transcript@casamo.com

```
 1   him.
 2      Q.   Did you have any idea why it was considered
 3   ineligible at that point?
 4      A.   No.  I had no idea.
 5      Q.   Okay.  What was the next conversation you had
 6   about the service contract with anyone?
 7      A.   When I actually had to call Wynn's.  And they
 8   told me that I didn't have any warranty.
 9      Q.   Okay.  When was that?
10      A.   That was after all of the runaround with him and
11   trying to get him to fix my vehicle.  And he had acted
12   like he had called Wynn's, which I don't know if he did
13   or didn't.  He may have.
14           But he was like well, they're not going to cover
15   the battery.  So -- but don't worry, I'll take care of
16   this for you.
17           And I was like I called Wynn's.  And that's when
18   they told me you don't have a warranty.  And I was like
19   I don't have a warranty.  That's the whole reason why I
20   bought the car is because I would have the warranty.
21      Q.   Did you go back to Armstrong after that?
22      A.   Yeah.
```

1  Q.  Okay. And so was it clear to you at that point
2  that this is the letter that the gentleman on the phone
3  from Wynn's was referring to?
4        MR. CUPP: When you say 3, for the record, she's
5  pointing to Exhibit 3.
6        MS. SADLER: Yeah, Exhibit 3, the one you're
7  looking at, I think. Yeah.
8        THE WITNESS: Okay. What are you asking?
9        BY MS. SADLER:
10  Q.  You referenced in your conversation with the
11  gentleman at Wynn's that he said you should have gotten
12  a letter.
13  A.  Yes.
14  Q.  Is it your understanding it was this letter
15  that's marked as Exhibit 3 he was referring to?
16  A.  At that time. Because I told him I had received
17  a letter.
18  Q.  Okay.
19  A.  And the gentleman told me -- Travis told me I
20  didn't have to worry about that.
21  Q.  Okay. Did you tell the person at Wynn's --
22  A.  I didn't know at the time it came from Wynn's,

1  because it doesn't say anywhere on here. But --

2  Q.    Okay. Did you tell the person at Wynn's that

3  Armstrong had said to ignore the letter?

4  A.    Yes. I believe I did.

5  Q.    And what did the person say?

6  A.    Oh, they sent me back to him.

7  Q.    Okay. Did they say -- other than saying just go

8  back and talk to him, did they say anything else, like

9  why did --

10 A.    You need to take it up with your dealer.

11 Q.    And that was all they said, you need to take it

12 up with your dealer --

13 A.    Yes.

14 Q.    -- end of story?

15 A.    Yes.

16 Q.    And you have not made any payments on the car

17 since January of -- January 20 of 2013?

18 A.    Yes.

19 Q.    Is that correct?

20 A.    Yes, ma'am.

21 Q.    When you spoke with the gentleman at Wynn's on

22 the phone, did that person tell you that the money

1  Q.  So when you first called Wynn's about whether
2  you had a warranty before -- and how much time was it
3  before you got Exhibit 4?
4  A.  I think they sent it the same day.
5  Q.  Okay. All right. And you called Wynn's as soon
6  as you learned that you didn't -- that it was told to
7  you that you didn't have a warranty?
8  A.  Yes. Yes.
9  Q.  Okay. All right. There were questions about
10 and answers that you gave about going to the Honda
11 dealership and having --
12     MR. CUPP: Mark that as 5, please.
13     (Thereupon, the document was marked Bradley
14     Exhibit #5 for identification.)
15     BY MR. CUPP:
16 Q.  So I'm handing you what's been marked Exhibit 5.
17 Can you describe for the record what this document is?
18 A.  Yes. This is what they gave me when I took the
19 vehicle over to the Honda place to have it checked out
20 to find out what was wrong with it besides the battery.
21 Q.  All right. And when was that done?
22 A.  That was in February, I believe -- February

1   22nd.

2   Q.   Of 2013?

3   A.   Yes, sir.

4   Q.   And in relation to when you learned that you
5   didn't have a warranty, is that right around the same
6   time?

7   A.   Yes, sir.

8   Q.   Okay.  Do you recall that after you retained
9   counsel, that a letter was written on your behalf to
10  Credit Acceptance and to Armstrong Auto Sales?

11  A.   Yes, sir.

12       (Thereupon, the document was marked Bradley
13       Exhibit #6 for identification.)

14       BY MR. CUPP:

15  Q.   So I'm handing you what's been marked as Exhibit
16  6 to your deposition, and I'll ask you to identify that
17  document.

18  A.   Yes, sir.  This was after I came to visit with
19  you guys and asked that you represent me.

20  Q.   Okay.  And this was -- this document was -- this
21  letter was sent out on your behalf?

22  A.   Yes, sir.