Page 1

IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF VIRGINIA

HARRISONBURG DIVISION

WYNN'S EXTENDED CARE, INC.,           )

Plaintiff and Counter-Defendant, ) Case Number

v.                                    ) 5:13-cv-00114

PENNY L. BRADLEY,                     )

Defendant and Counter-Plaintiff.  )

Deposition of 30(B)(6) CORPORATE

REPRESENTATIVE OF ARMSTRONG AUTO SALES, INC.

BY TRAVIS W. ARMSTRONG

Harrisonburg, Virginia

Wednesday, September 3, 2014

9:15 a.m.

Pages 1 - 165

Reported by:  Karen L. Hart, RMR, CRR

Case 5:13-cv-00114-MFU-JGW  Document 60-2  Filed 09/17/14  Page 1 of 38  Pageid#: 497

1    A.    South Main Street.

2    Q.    And actually, I've driven by.  It says

3 Harrisonburg Motor?

4    A.    It's dba, yes, sir.

5    Q.    Okay.  But that's part of Armstrong Auto

6 Sales, Inc.?

7    A.    Yes, sir.

8    Q.    Where's your office currently?

9    A.    Armstrong Auto Sales, 1370 North Main

10 Street.

11    Q.    And who is located at the location on

12 South Main Street?  What employees?

13    A.    You want their names?

14    Q.    Yes.

15    A.    Okay.  Peggy Schoenduby, Chris King,

16 Gordon Hamrick, Krista Reedy, Seth Payne, Jeff Groah,

17 Patty Armstrong and Aaron Knupp.

18    Q.    And who works out of the North Main Street

19 property?

20    A.    Myself, Amanda Cousins and, part time,

21 Anthony Vaughn, V-a-u-g-h-n.  And Brandon Meadows.  I

22 apologize.

23    Q.    And Mr. Vaughn and Mr. Meadows, are they

24 both salespeople?

25    A.    No, sir.  Anthony Vaughn is sales.  Amanda

Case 5:13-cv-00114-MFU-JGW  Document 60-2  Filed 09/17/14  Page 2 of 38  Pageid#: 498

1    Cousins is sales.  Brandon is our lot boy and window

2    tinter.

3         Q.    Did you ever have any direct dealings with

4    anyone at Wynn's Extended Care, Inc. as far as -- up

5    until the point where you signed an agreement with

6    them?

7         A.    No, sir.

8         Q.    Okay.

9

10              (Armstrong Deposition Exhibit No. 3 was

11    marked for identification and attached to the

12    transcript.)

13

14    BY MR. CUPP:

15         Q.    I'm handing you what's been marked as

16    Exhibit 3 to your deposition -- to the Armstrong Auto

17    Sales deposition.  And I'll ask you to look at that.

18    It's a three-page document.  Tell me if you can

19    identify it.

20         A.    I mean, I don't personally recall this

21    paper, but it looks like it is our dealer agreement

22    with Wynn's.

23         Q.    Okay.  Well, look on page 2 of Exhibit 3.

24    Under "dealer" -- or beside the word "dealer" it says

25    Armstrong Auto Sales, Inc., and then there appears to

Case 5:13-cv-00114-MFU-JGW  Document 60-2  Filed 09/17/14  Page 3 of 38  Pageid#: 499

1   be a signature and, under that, it says,

2   "vice-president."

3       A.    Yes, sir.

4       Q.    Is that your signature?

5       A.    Yes, sir.

6       Q.    On the front page in handwriting it says,

7   "April 4, 2012."

8             Whose handwriting is that?

9       A.    That's mine.

10      Q.    Okay.  So at least at some point you put

11  pen to this paper?

12      A.    Yes, sir.

13      Q.    All right.

14      A.    I'd say April 4th, 2012.

15      Q.    Okay.  How did you receive this document?

16      A.    This would have been brought in by Arnie

17  Railey, our Credit Acceptance manager.

18      Q.    Was this at the same time that -- and when

19  I say "this," did you enter into this agreement that

20  says, "Wynn's Extended Care, Inc. dealer agreement"

21  at the same time that you entered into an arrangement

22  with Credit Acceptance Corporation?

23      A.    I do believe so.

24      Q.    Okay.  Did you read this document before

25  you signed it?

Case 5:13-cv-00114-MFU-JGW  Document 60-2  Filed 09/17/14  Page 4 of 38  Pageid#: 500

1    doesn't.  Sometimes changing your rate or your term
2    or your down payment -- there's a lot of variables.
3         Our goal was to make sure that we made an
4    initial profit, and we would use any tools that we
5    had to try and make sure that we did that.
6         Q.    So did you understand that you were not
7    necessarily going to get paid if you sold a service
8    contract?
9         A.    I understood that myself.  To me, that
10   was -- I assumed that.  Mr. Railey may say, hey, if
11   you put a warranty on, you're going to get X number
12   of dollars.  I could put a warranty on and I might
13   lose money because it made the risk higher because it
14   increased the value of the loan.
15        So just because it may have added value,
16   that could have been money that I would be expecting
17   three or four years down the road, not immediately.
18   So it's not always advantageous to add a warranty
19   simply for profit.  Did that answer your question?
20        Q.    It's an answer.
21        Were you told that you would get a certain
22   percentage commission in the sale of a Wynn's
23   Extended Care, Inc. service contract?
24        A.    Every time you add a warranty there's a
25   set amount of money that is -- let me try to word

Case 5:13-cv-00114-MFU-JGW   Document 60-2   Filed 09/17/14   Page 5 of 38   Pageid#: 501

1　this correctly -- that you -- that would be put into

2　your deal as potential profit.  And that's set.  It's

3　not a percentage, to my knowledge.  It's a set

4　amount.  I don't know exactly what that is.

5　Obviously, if I add a warranty, it's because I feel a

6　customer wants a warranty.  I could care less about

7　the profit.

8　　　　Q.　　What is the set amount?

9　　　　A.　　Like I said, I honestly don't know.  I

10　think $295, but I'm not positive.  That's just a

11　number that's coming to my head, but I could be

12　wrong.

13　　　　Q.　　And when you say put into -- money put

14　into the deal as potential profit, what do you mean

15　by that?

16　　　　A.　　I'd have to explain to you how Credit

17　Acceptance works.

18　　　　Q.　　All right.  Well, do that, please.

19　　　　A.　　And I'm going to give you a rough example.

20　You could buy a car for $5,000 and you could sell it

21　for $10,000.  That doesn't mean you've made $5,000.

22　If I bought it for 5,000 and Credit Acceptance, even

23　if I put on warranties and GAPs and everything, is

24　only going to give me initial money of $5,000, then I

25　haven't made any profit at all.  The only profit that

Case 5:13-cv-00114-MFU-JGW   Document 60-2   Filed 09/17/14   Page 6 of 38   Pageid#: 502

1          MS. SADLER:  Same objection.

2          THE WITNESS:  The money?

3   BY MR. CUPP:

4      Q.    Yes.  No, no.  Do you get an indication of

5   what you would get?

6      A.    Oh, yes, sir, while we're working the

7   deal.  That's real-time.

8      Q.    All right.  And at the time involved in

9   Ms. Bradley's transaction, how would you be notified

10  of what amounts of money you would be getting?

11     A.    It's on the computer screen while you're

12  putting her information in.

13     Q.    Okay.  And is there a particular program

14  that's used?

15     A.    Their program, yes, sir, the Credit

16  Acceptance.  You actually go to their portal.  That's

17  the CAPS 2.0 now.

18     Q.    All right.  Previously what was it when

19  Ms. Bradley's transaction took place?

20     A.    I believe they just called it CAPS back

21  then.

22          Actually, I'm sorry, when Ms. Bradley's

23  transaction was taking place, we were on the testing

24  for the CAPS 2.0, so we were actually, I guess, beta

25  testing their new system.

Case 5:13-cv-00114-MFU-JGW   Document 60-2   Filed 09/17/14   Page 7 of 38   Pageid#: 503

1  BY MR. CUPP:

2     Q.    We're back on the record, Mr. Armstrong.

3  Let me refer you to Exhibit 4 to the Armstrong Auto

4  Sales deposition and ask you, is this the document

5  that you said you had posted on the wall at Armstrong

6  Auto Sales?

7     A.    I do believe, yes, sir.  It looks that

8  way.

9     Q.    And understanding that the areas that are

10  redacted would have had numbers in them; right?

11     A.    Yes, sir.

12     Q.    But other than that, this is the document

13  that you referred to to see -- is this a document

14  that you referred to to see whether vehicles were

15  eligible or ineligible?

16     A.    For warranties, yes, sir, before the CAPS

17  2.0 system.  So for the brief couple months before

18  the 2.0 system came out, this is what we used to

19  determine if a vehicle was eligible or ineligible and

20  what our cost would be on that service contract.

21     Q.    And did you know from this document that

22  hybrid vehicles were not eligible?

23     A.    No, sir.

24     Q.    Did you know from this document that

25  electric vehicles were not eligible for the Wynn's

Case 5:13-cv-00114-MFU-JGW   Document 60-2   Filed 09/17/14   Page 8 of 38   Pageid#: 504

1   Extended Care service contract?

2          A.     I was just looking on here a minute ago

3   and I didn't see that, but that doesn't mean I didn't

4   miss it.  So let me look once more.

5                 Electric vehicles.  Yes, sir, it does say

6   electric vehicles are ineligible.

7          Q.     And are hybrids electric vehicles?

8          A.     No, sir.

9          Q.     So is it your testimony that there's

10   nothing on this document, Exhibit 4, that would

11   indicate that hybrid vehicles are not eligible?

12          A.     Yes, sir.  The fact that it says electric

13   vehicles are ineligible could raise a question, but

14   hybrids aren't.  They have a gas engine.

15          Q.     Did you ever ask anyone whether a hybrid

16   would be included as an electric vehicle?

17          A.     It was never a concern until

18   Ms. Bradley's, and at that point we had the CAPS 2.0

19   system.

20          Q.     Why was it never a concern until

21   Ms. Bradley?

22          A.     It's the first hybrid vehicle I had ever

23   purchased.

24          Q.     All right.  Let's turn to her transaction.

25   Do you recall the transaction with Ms. Bradley when

Case 5:13-cv-00114-MFU-JGW   Document 60-2   Filed 09/17/14   Page 9 of 38   Pageid#: 505

1  she bought a Honda hybrid?

2      A.    More so than most any transaction I've

3  ever done.

4      Q.    Okay.  Tell me what you recall about that

5  transaction with Ms. Bradley.

6      A.    I recall that -- to my recollection, she

7  had worked at JMU, she was looking for a vehicle that

8  got good gas mileage, something reliable.  She was

9  very interested in a Civic.  She was very interested

10  in having an extended warranty.  Her big concern was

11  whether or not we could get her approved for

12  financing.

13      Q.    Did she tell you why that was?

14      A.    Because of her past credit.

15      Q.    Do you remember -- well, strike that.

16            Were you the person involved in showing

17  vehicles to Ms. Bradley?

18      A.    Yes, sir.  I did everything for

19  Ms. Bradley.

20      Q.    Okay.  And what did you show her?

21      A.    Well, she liked that Honda Civic, so

22  that's the vehicle that we started out with.

23      Q.    And again, you've told me that that was

24  the first hybrid vehicle that you had purchased --

25      A.    Yes.

Case 5:13-cv-00114-MFU-JGW  Document 60-2  Filed 09/17/14  Page 10 of 38  Pageid#: 506

1      Q.    -- while you were under Armstrong Auto
2   Sales, Inc.?
3      A.    The first and last.
4      Q.    Okay.  And was there any discussion -- did
5   you have any discussion with Ms. Bradley during the
6   time that you were showing her the Civic hybrid about
7   the battery system?
8      A.    Not that I recall.  It's not something
9   that I was very familiar with.  When I had sold new
10  Hondas, they didn't have hybrids.
11     Q.    Did you tell her that she needed to get a
12  warranty?
13     A.    No, sir.
14     Q.    Did she tell you that she wanted to have a
15  warranty?
16     A.    She told me she wouldn't buy the vehicle
17  unless it could have a warranty.
18     Q.    And did she tell you why?
19     A.    No, sir.  That was just a great concern to
20  her.
21     Q.    Did you look at any documents to determine
22  whether you could put a warranty on this vehicle?
23     A.    No, sir, like I said, with the CAPS 2.0,
24  the way that we were instructed was to enter the VIN
25  in, and it would tell us whether we could or could

1    not put a warranty on the vehicle.

2        Q.    Okay.  So when you're on the lot talking

3    to her about this vehicle, what was the discussion

4    about whether a warranty was or was not available?

5        A.    I told her that we would go inside and we

6    would put the VIN into the CAPS system.  If it said

7    you could have a warranty, then you could.  And if it

8    says you couldn't, you couldn't.

9              So that's when we went into my office and

10   we put the VIN in, and it says it was eligible for a

11   warranty, and she decided to purchase the vehicle.

12       Q.    Okay.  Had you already talked about price?

13       A.    We had talked about the selling price of

14   the car and the payment and down payment, I do

15   believe.  I know we talked about the price of the

16   car.  The payment and down payment, I don't know if

17   we put the VIN in first to make sure it could get a

18   warranty or not.

19       Q.    Did you have any discussion with her about

20   you financing -- you personally financing the

21   vehicle?

22       A.    No, sir.

23       Q.    Did you have any discussion with her about

24   payments?

25       A.    What her payments would be?

1      Q.     Yes.

2      A.     Yes, sir.

3      Q.     And do you remember any of that

4  discussion?

5      A.     No, but, I mean, I know I would have told

6  her what her payment was.  I don't think she would

7  have bought it without knowing her payment.  So I

8  know we went over interest rate payment and down

9  payment.

10     Q.     Did you initially tell her that her

11 payments would be $600 a month?

12     A.     No.  I don't believe so.  I don't believe

13 I've ever had a payment of $600 a month.

14     Q.     Was there anyone else helping you on this

15 transaction?

16     A.     I don't think so.  I mean, I'm thinking

17 back to that day and I remember seeing Ms. Bradley

18 sitting across from me and working the numbers.  In

19 fact, I don't believe she bought the car the first

20 day she came in.  I feel like she had come back; like

21 she wanted to go home and think about it and came

22 back.  But I could be wrong.  For some reason, I have

23 that feeling.  I don't think she just came in and

24 signed the papers and bought the car right away.

25     Q.     Did you give her papers -- understanding

1    BY MR. CUPP:

2         Q.     So I'm handing you what's been marked as

3    Exhibit 5 to the Armstrong Auto deposition.  And just

4    for the record, there's an Exhibit A sticker on here.

5    That is from -- an exhibit from a complaint, so you

6    can ignore that.  This is Exhibit 5 to your

7    deposition.

8              And I'll ask you to look at this

9    multi-page document and tell me if you can identify

10   it.

11        A.     I can.

12        Q.     What is it?

13        A.     The retail installment contract.

14        Q.     And specifically, it's the one with

15   Ms. Bradley for the purchase of the Civic hybrid?

16        A.     Yes, sir.

17        Q.     Okay.  How did you determine where to set

18   the down payment?

19        A.     It's determined in the CAPS system.

20        Q.     So you're not the one that sets what the

21   down payment has to be?  That's Credit Acceptance?

22        A.     I have control over that, but it's --

23   basically what we do is we can adjust the down

24   payment in order to give us more or less profit.

25   Now, a greater down payment doesn't always mean

1    Exhibit 6 to your company's deposition.  I'll ask you
2    to look at that and tell me if you can identify it.
3        A.    That looks like the paper that we were
4    just talking about, yes, sir.
5        Q.    And did you understand that this was a
6    warranty contract from Wynn's?
7        A.    Yes, sir.
8        Q.    And it was with Ms. Bradley?
9        A.    Yes, sir.
10       Q.    On page 1 of Exhibit 6, it says authorized
11   representative of selling dealer.  Is that your
12   signature?
13       A.    Yes, sir.
14       Q.    And I know it's kind of light, but that
15   would be your signature; right?
16       A.    It looks like my signature, yes, sir.
17       Q.    So this was a carbon copy, right,
18   Exhibit 6?
19       A.    Well, I honestly --
20       Q.    This is a copy of a carbon copy, in other
21   words?
22       A.    I don't remember for sure.  When they
23   started the 2.0, some papers would print and some
24   papers were carbon copies.  I don't recall which were
25   which because they were switching.

Case 5:13-cv-00114-MFU-JGW  Document 60-2  Filed 09/17/14  Page 15 of 38  Pageid#: 511

1    those first two pages as two separate pages.

2    Actually, that's all one page; isn't it?

3        A.    If I'm not mistaken, I believe at the time

4    it was, because it looks like here you can see where

5    it was cut off.  So I believe it was one long

6    contract, yes, sir.

7             MR. CUPP:  All right.  Okay.  And just for

8    the record, since you mentioned this other document,

9    I'll go ahead and have this identified.

10

11            (Armstrong Deposition Exhibit No. 7 was

12   marked for identification and attached to the

13   transcript.)

14

15   BY MR. CUPP:

16       Q.    I'm handing you, Mr. Armstrong, what's

17   been marked as Exhibit 7 to the Armstrong Auto

18   deposition.  Is this the buyer's order with

19   Ms. Bradley?

20       A.    Yes, sir.

21       Q.    And this is a document that you indicated

22   you show her first, right?

23       A.    Yes, sir.

24       Q.    Okay.  And that's your signature at the

25   bottom of page 1?

Case 5:13-cv-00114-MFU-JGW   Document 60-2   Filed 09/17/14   Page 16 of 38   Pageid#: 512

1    A.    Yes, sir.

2    Q.    So then you show her that those numbers --

3    A.    This --

4    Q.    Let me finish my question.  You show her

5    that the numbers on Exhibit 7 correlate to those put

6    on Exhibit 5; right?

7    A.    Yes, sir.

8    Q.    Okay.  Going back to Exhibit 6, the Wynn's

9    contract, did you get her -- I believe you indicated

10   that you got her to sign there on page 1 of

11   Exhibit 6?

12   A.    Yes, sir.

13   Q.    Okay.  And under the coverage term, it

14   says 24 months, 24,000 miles.  Is that what you

15   offered her?

16   A.    Yes, sir.

17   Q.    All right.  Did you have any discussion

18   with her at all about the terms of this document?

19   A.    No, sir.

20   Q.    What did you tell her this document was,

21   Exhibit 6?

22   A.    That this was her contract and application

23   for her extended warranty.

24   Q.    Okay.  And so what did it mean to be her

25   contract and application?

Case 5:13-cv-00114-MFU-JGW  Document 60-2  Filed 09/17/14  Page 17 of 38  Pageid#: 513

1    A.    This is what we would send in to Credit

2  Acceptance, and then they send it to Wynn's to start

3  their extended service plan.  And I also explained to

4  her, I do believe, like I tell everyone, your

5  warranty does not take effect until Wynn's receives

6  this paperwork.  Just because we sign it here and

7  send it to Credit Acceptance, until Wynn's actually

8  receives it in their hand, it's not done, because

9  they have no knowledge of it until they receive it,

10  obviously.

11    Q.    All right.  And so upon receiving it, then

12  it becomes the contract; is that what you understood?

13    A.    Once they review it and accept it, then it

14  would become the contract, yes, sir.

15    Q.    Did you tell her any of that?

16    A.    I did tell her that, like I said, it would

17  not be effective until they received it.

18    Q.    So those are the words you used?

19    A.    I do believe so, yes, sir.

20    Q.    Okay.  And did you go over the terms as to

21  what was covered or not covered?

22    A.    No, sir.  I give that to her and let her

23  read anything she wants.

24    Q.    All right.

25    A.    I don't go through and read each one to

Case 5:13-cv-00114-MFU-JGW   Document 60-2   Filed 09/17/14   Page 18 of 38   Pageid#: 514

1  them, no, sir.

2      Q.    How long did it take you to have the

3  conversation about Exhibit 6 with Ms. Bradley?

4      A.    I mean, it's not very long.  I give them

5  the paper and let them read it, and then they sign

6  it.  If they have any questions, I answer it for

7  them.

8      Q.    Do you remember giving -- how long did it

9  take her to read it?

10     A.    I don't recall.

11     Q.    Did she read it?

12     A.    I don't recall.

13     Q.    Did you tell her she could read it?

14     A.    Yes, sir.

15     Q.    When did you do that?

16     A.    Every time -- as soon as we start the

17  contract, I tell my customers -- the way I do it

18  every single time -- do you understand everything

19  that we went over in this?  Anytime I'm explaining

20  something and you don't understand it, please stop me

21  and we'll go over it again.  You are more than

22  welcome to read every single piece of paper front to

23  back, and if you have any questions, ask.

24     Q.    Did she read this document?

25     A.    I do not recall.

Case 5:13-cv-00114-MFU-JGW  Document 60-2  Filed 09/17/14  Page 19 of 38  Pageid#: 515

1     Q.     Okay.

2     A.     She had that ability.  Whether she did, I

3   do not recall.

4     Q.     All right.  Have you ever read this

5   document, Exhibit 6?

6     A.     I believe, since this case, I have.

7     Q.     All right.  As of August 21, 2012, had you

8   read this contract?

9     A.     No, sir.

10    Q.     How did you know that the contract was not

11  effective until it was received by Wynn's?

12    A.     Mr. Railey had told me that, that the

13  contract doesn't go into effect right when you sign

14  it, that it has to get to them.  The reason they do

15  that is if -- let's say a deal gets kicked back, for

16  some reason something doesn't come through.  Well,

17  then they don't have to go and cancel the warranty

18  because they haven't ever sent it out.  So they don't

19  send it until everything is finalized.

20    Q.     And so is it your testimony -- well,

21  strike that.

22           What do you mean by a deal getting kicked

23  back?

24    A.     Let's say Ms. Bradley comes in and I say,

25  I need your paycheck stubs and your bank statement in

Case 5:13-cv-00114-MFU-JGW  Document 60-2  Filed 09/17/14  Page 20 of 38  Pageid#: 516

1      Q.      Okay.  In any event, you said that you

2   would have a friend look at it?

3      A.      Yes, sir.

4      Q.      Did she -- was it during that conversation

5   that she told you that there was some issue with the

6   service contract?

7      A.      You know, I don't believe so.  I believe

8   she just told me she had an issue with her car and I

9   told her we would check it and see because it could

10  have been something simple that you wouldn't even

11  need the warranty for.  And I contacted the gentleman

12  at Honda and he came by in the evening and checked

13  her car, and that's when he told me that it was the

14  hybrid battery.  And that's when I told Ms. Bradley

15  that it was the hybrid battery, that we would have to

16  turn it in to a warranty.

17             And -- you know, I'm trying to remember, I

18  don't even believe she told me she didn't have a

19  warranty.  I'm not positive, but I think we called in

20  and they had told me she didn't have a warranty.

21  That's when we went through checking and said, well,

22  here, she does, we filled everything out, and then

23  come to find out the warranty had been cancelled the

24  first week after she had purchased the vehicle.

25      Q.      And when you said you think you called in

1    and they said no warranty, who did you call to?

2         A.    To Wynn's.

3         Q.    And did you do that or did somebody else

4    at your company do that?

5         A.    That should have been Peggy Schoenduby.

6    She was running our service center at the time.

7         Q.    And forgive me, because I've forgotten,

8    but is she some relative of yours?

9         A.    Mother.

10        Q.    Your mother.  Okay.  All right.  I'm

11   sorry.

12        A.    No problem.

13        Q.    So she was working there at the North Main

14   Street location?

15        A.    We had a different location at that time.

16   It was -- it was Leray Circle.  I don't remember the

17   number.  But we had a service center there for a

18   year.

19        Q.    So I see, looking back at Exhibit 3, you

20   had an opportunity to provide -- or maybe it's not in

21   Exhibit 3, but is it true that you had -- as

22   Armstrong Auto, had an opportunity to provide the

23   repairs that were contemplated under the Wynn's

24   service contract?

25        A.    Are you asking if we could do the repairs

Case 5:13-cv-00114-MFU-JGW   Document 60-2   Filed 09/17/14   Page 22 of 38   Pageid#: 518

1    Ms. Bradley about the service contract, to your

2    knowledge?

3         A.    Not to my knowledge.  I don't believe he

4    was involved at the time.

5         Q.    All right.  Do you remember any other

6    contacts, communications with Ms. Bradley?

7         A.    Not other than the ones that I had

8    explained to you, no, sir, I don't believe so.

9         Q.    At the time of the closing, August 21, you

10   expected her -- Ms. Bradley to believe that she had a

11   service contract on the vehicle; right?

12        A.    We both were under that assumption, yes,

13   sir.

14        Q.    When you found out that Ms. Bradley did

15   not have a service contract that applied to this

16   Honda Civic hybrid, did she have the option of

17   cancelling the sale?

18        A.    When I found out or when she originally

19   found out?

20        Q.    At any time.

21        A.    I found out six months and 16,000 miles

22   later.  Obviously at that time, no, she would not be

23   able to cancel the sale.  When she found out a week

24   later, I do believe she could have cancelled the

25   sale.

1    miles on the vehicle in a very short amount of time.

2        Q.    And you knew that that's why she wanted to

3    get the vehicle, because she put a lot of miles on

4    cars.

5        A.    Not because of that.  Because she wanted

6    good gas mileage was her main concern.  We never

7    really discussed how many miles she drove.

8        Q.    Did you ever tell her that she could

9    cancel the sale?

10       A.    She never asked me, no, sir.

11       Q.    Would you have given her her money back?

12       A.    Yes, sir.

13       Q.    How about in February of 2013, would you

14   have given her her money back?

15       A.    Knowing what I know now or at that point?

16   I guess that's a big difference.  I mean, my thing

17   is, Ms. Bradley is an adult.  She came in to purchase

18   a vehicle on her own free will.  She knew the

19   contract was cancelled.  She had the ability that she

20   could have cancelled her deal with Credit Acceptance.

21   She chose to continue to drive the vehicle.  Then,

22   when she had an issue, then she wanted to raise a

23   fuss about it.

24            You know, I think Ms. Bradley brought a

25   lot of this on herself.  And I did try to help her

Case 5:13-cv-00114-MFU-JGW   Document 60-2   Filed 09/17/14   Page 24 of 38   Pageid#: 520

1    even at that point.  We were doing all we could for

2    her.  Unfortunately, you know, she's just one of

3    those people that wants everyone to give her

4    something.  That's my personal opinion.

5         Q.    How do you know that she knew the contract

6    had been cancelled?

7         A.    She received a letter.  It was sent to her

8    residence.  I don't know personally that she took it

9    out and read it.  Maybe she didn't.  I don't know

10   that for a fact.

11        Q.    How do you know that she received a

12   letter?

13        A.    Credit Acceptance told me that the letter

14   was mailed to her residence.

15        Q.    When did they tell you that?

16        A.    Once everything started, when this

17   started.

18        Q.    Are there any other communications that

19   Armstrong Auto Sales had with Wynn's about the

20   service contract sold in the Bradley transaction that

21   you haven't talked to me about?

22        A.    No, sir.  As I stated earlier, I don't

23   recall ever having a conversation with Wynn's ever,

24   since I've been in business.

25        Q.    But your mother did?

1    A.    She would have called about the warranty,

2  yes, sir.

3    Q.    Right.

4          Other than her conversation, are you aware

5  of anyone else who had a conversation with Wynn's

6  about the service contract sold in the Bradley

7  transaction?

8    A.    I'm not aware of anyone else, no, sir.

9    Q.    Did you ever call Wynn's to find out why

10  the problem happened?

11    A.    Why the problem happened or why the

12  contract was cancelled?

13    Q.    Why the problem happened.

14    A.    The problem with her vehicle?

15    Q.    Your first response was better.  No, why

16  the vehicle --

17    A.    Why the service contract was not accepted?

18    Q.    Why the vehicle was ineligible.

19    A.    Was denied?  No, sir.  Like I said, I

20  wasn't made aware of that until six months later.  At

21  that point, there was really nothing to discuss.

22    Q.    Did they ever call you to find out what

23  had happened after they sent the letter?

24    A.    No, sir, not to my knowledge.

25    Q.    Did you ever have any discussion about

Case 5:13-cv-00114-MFU-JGW  Document 60-2  Filed 09/17/14  Page 26 of 38  Pageid#: 522

1              (Armstrong Deposition Exhibit No. 13 was

2    marked for identification and attached to the

3    transcript.)

4

5    BY MR. CUPP:

6        Q.    The last document that we were provided in

7    the dealer kit was Exhibit 13.  And I'll ask if you

8    ever saw that document before today?

9        A.    No, sir.

10       Q.    Were you ever directed or instructed to

11   provide any information other than the copy of the

12   Wynn's service contract to customers?

13       A.    No, sir.

14       Q.    Were you ever told anything about how to

15   sell the Wynn's service contract?

16       A.    No, sir.

17       Q.    And at the time in August of 2012, the way

18   you were learning that a service contract could be

19   sold for a particular car was by entering it into the

20   CAPS 2.0 system?

21       A.    I'm sorry.  You said as of?

22       Q.    As of August when this transaction with

23   Ms. Bradley occurred.

24       A.    Yes, sir.  Yes, sir.

25       Q.    Are you aware of whether Wynn's -- at the

Case 5:13-cv-00114-MFU-JGW  Document 60-2  Filed 09/17/14  Page 27 of 38  Pageid#: 523

1    don't know --

2        A.    I don't know how much they send them, no,

3    sir.  Huh-huh.

4        Q.    I think we've touched on this, but I just

5    want to make sure that I've covered everything on

6    this issue, Mr. Armstrong.  At the time of

7    Ms. Bradley's transaction, tell me all the steps that

8    you were to take prior to including a Wynn's service

9    contract in a sale transaction.

10       A.    The first thing would be to enter the VIN

11   number and make sure that the car was eligible

12   through CAC to have a warranty.  If it was, then we

13   would print off all the paperwork and have all the

14   paperwork signed.  Then we would collect all that

15   paperwork and send it to CAC.  Then CAC would send it

16   to Wynn's with the payment to start the warranty.

17       Q.    And by "all that paperwork," you're

18   referring to the contract form?

19       A.    Well, everything that would be needed to

20   complete a sale, not just what Wynn's would need, but

21   in order for CAC to complete the sale, everything

22   that they would need as well.

23       Q.    Oh, okay, because the deal actually was

24   conditional?

25       A.    Yes, sir.

1  for any purpose whatsoever, but is an independent

2  contractor."

3       A.    Yes, ma'am.

4       Q.    Did you understand that you were not an

5  employee of Wynn's?

6       A.    Yes, ma'am.

7       Q.    Did you ever represent yourself to anyone

8  as being an employee of Wynn's?

9       A.    No, ma'am.

10      Q.    Did you ever represent to Ms. Bradley that

11  you were somehow an agent of Wynn's Extended Care?

12      A.    No, ma'am.

13      Q.    You mentioned, with respect to the taxes,

14  that you submitted those on behalf of Ms. Bradley

15  to -- was it to the state?

16      A.    Yes, ma'am.

17      Q.    You indicated that she would have had the

18  obligation -- technically she would have had that

19  obligation; is that right?

20      A.    I believe --

21            MR. CUPP:  Object to the form.

22            THE WITNESS:  I believe so, yes, ma'am.

23  BY MS. SADLER:

24      Q.    Would she have been the one that needed to

25  collect a rebate from the state then, as far as you

Case 5:13-cv-00114-MFU-JGW  Document 60-2  Filed 09/17/14  Page 29 of 38  Pageid#: 525

1  know?

2           MR. CUPP:  Objection, calls for

3  speculation.

4  BY MS. SADLER:

5      Q.    If you know.

6      A.    I would believe so, but I don't know for

7  sure.

8      Q.    Does Wynn's Extended Care have any

9  ownership in your auto dealership?

10     A.    No, ma'am.

11     Q.    Can Wynn's Extended Care -- I'm just going

12  to refer to it as Wynn's, the defendant in this case.

13          Does Wynn's have any ability to hire

14  anyone at Armstrong?

15     A.    No, ma'am.

16     Q.    Do they have any authority to fire anyone

17  at Armstrong?

18     A.    No, ma'am.

19     Q.    Did you have any ability to modify the

20  terms of a service contract through Wynn's?

21     A.    How so?

22     Q.    Any modification, what was covered, not

23  covered.

24     A.    Oh, no, ma'am.  No, ma'am.  No.  I mean,

25  we can choose the term, but I can't modify anything

Case 5:13-cv-00114-MFU-JGW   Document 60-2   Filed 09/17/14   Page 30 of 38   Pageid#: 526

1    that they already have.

2        Q.    And you don't set the prices on that

3    exhibit -- the rate sheet --

4        A.    No, ma'am.  4.

5        Q.    Yeah, Exhibit 4.

6        A.    No, ma'am.

7        Q.    I think you were asked a couple of

8    questions about the rate sheet.  In the ineligible

9    vehicle section, you testified that you didn't

10   understand a hybrid to be an electric vehicle.  Did

11   you ever call anyone at Wynn's regarding what

12   constituted an eligible versus ineligible vehicle?

13       A.    No, ma'am.

14       Q.    And prior to starting up with CAC, had you

15   sold any outside service contracts on cars before?

16       A.    No, ma'am.

17       Q.    My understanding is that you had Ms. -- to

18   complete the transaction, Ms. Bradley had to sign a

19   number of documents.  Did you do anything to prevent

20   her from reading through any of the documents?

21       A.    No, ma'am, not at all.

22       Q.    Did you encourage her to read the

23   documents?

24       A.    I told her that she could.

25       Q.    If she had wanted to take the documents

Case 5:13-cv-00114-MFU-JGW  Document 60-2  Filed 09/17/14  Page 31 of 38  Pageid#: 527

1    home and look through them, would she have been able

2    to do that?

3         A.    Sure.  Some people do.

4         Q.    Would she have been able to sit at your

5    dealership and read through the contracts?

6         A.    Of course.  A lot of people do.

7         Q.    If you had known that the vehicle that

8    Ms. Bradley was purchasing was not covered under this

9    Wynn's extended service contract, would you have sold

10   her the service contract?

11        A.    No, ma'am, not at all.  I wouldn't have

12   been able to.

13          To the best of my knowledge, out of 142

14   Wynn's warranties we've done, this is the only one

15   that has been rejected to my knowledge.

16        Q.    If you look at Exhibit 8 -- you were asked

17   a number of questions about this letter.  At any

18   point in time did you tell Ms. Bradley to ignore this

19   letter?

20        A.    No, ma'am.

21          MR. CUPP:  Object to the foundation.

22   BY MS. SADLER:

23        Q.    At any point in time did you ever tell

24   Ms. Bradley that any information that she didn't have

25   a service contract was incorrect?

Case 5:13-cv-00114-MFU-JGW  Document 60-2  Filed 09/17/14  Page 32 of 38  Pageid#: 528

1    purchase the car back, give her all of her money back

2    at no discount.  If she would have come to me

3    personally and asked me to purchase the car back at

4    that time -- I mean, I would have made her an offer,

5    but there would have been a discount based on

6    condition and mileage, yes, ma'am.

7    BY MS. SADLER:

8        Q.    You mentioned a set amount that you

9    received for selling a service contract.  To your

10   knowledge, did Armstrong Auto ever receive payment

11   for selling this particular contract?

12       A.    For Ms. Bradley's?

13       Q.    Correct.

14       A.    No, ma'am.

15       Q.    Take a look at Exhibit 6.  Let me ask you

16   this:  When you were selling these, did you have hard

17   copies of Exhibit 6 at your dealership or is it you

18   printed it off of the system?  How did that work?

19       A.    I'm pretty sure it was hard copies, and

20   the same thing with the contract; we fed it through

21   the Okidata and it was carbon copied.

22       Q.    Okay.  And so it would have been a

23   multi-page or --

24       A.    Yes, ma'am.

25       Q.    -- a longer document?

Case 5:13-cv-00114-MFU-JGW  Document 60-2  Filed 09/17/14  Page 33 of 38  Pageid#: 529

1    you have any knowledge of any computer glitch?

2         A.    No, ma'am, that -- no, not at all.

3         Q.    Anything with the DMV running plates that

4    would be considered a computer glitch in your car

5    dealership?

6         A.    No, ma'am.  Let me see.  If this came from

7    you-all's office, I assume, then anything with DMV

8    wouldn't affect you, so no, that wouldn't even make

9    sense.

10        Q.    Did Ms. Bradley ever ask you to replace

11   the battery in the hybrid?

12        A.    She didn't ask me to replace it.  She did

13   ask me to help her fix the vehicle.  So I guess in a

14   way she asked me to replace it.

15        Q.    Did anyone at Wynn's ever instruct you to

16   sell VSCs on ineligible cars?

17        A.    No, ma'am.

18        Q.    Did anyone at Wynn's ever encourage you to

19   do that?

20        A.    No, ma'am.

21        Q.    Is there any benefit to Armstrong Auto to

22   sell a vehicle service contract on an ineligible

23   vehicle?

24        A.    No, ma'am, that would actually be bad for

25   us.  We could put the customer out in a car, have him

1    I'll just go back through my notes.

2

3              (Discussion off the record.)

4

5    BY MS. SADLER:

6        Q.    Was there anyone at the time that was

7    helping you run the numbers on Ms. Bradley's

8    transaction?

9        A.    No, ma'am.

10       Q.    Anyone that was printing the contracts or

11   gathering information for Ms. Bradley to sign?

12       A.    No, ma'am.  I did it all.

13       Q.    Do you have any recollection of

14   Ms. Bradley speaking to anyone else at the dealership

15   while you were there?

16       A.    I mean, someone could have been outside

17   with her and she could have been -- just general

18   conversation, but nothing concerning the actual

19   purchase of the vehicle.

20       Q.    And as far as you're concerned, it's not

21   worthwhile from a financial position to always

22   include a service contract because the risk may

23   outweigh the benefit to Armstrong Auto?

24       A.    Yes, ma'am.  As I stated earlier, we've

25   done -- about 10 percent of our sales have gotten

1    extended service plans.

2        Q.    And have you ever been charged for an --

3    have you ever been fined by anyone for an ineligible

4    vehicle under a service contract?

5        A.    No, ma'am.  We've never had any fines or

6    penalties from the Motor Vehicle Dealer Board since

7    we've been in business.

8        Q.    And you've never been charged by Wynn's

9    for anything; have you?

10       A.    No, ma'am.

11       Q.    Did you continue to use the rate sheet

12   that's Exhibit 4 when you transitioned to the pilot

13   program?

14       A.    No, ma'am, I was told not to use that any

15   longer; use the -- to put the VIN in.

16       Q.    Right.  Who told you that?

17       A.    Arnie Railey.

18       Q.    When Ms. Bradley was at the dealership,

19   did you do anything to hold yourself out to her as

20   being a representative of Wynn's?

21       A.    No, ma'am.

22       Q.    Did you make any representations at all to

23   Ms. Bradley as to what was covered under the terms of

24   the VSC?

25       A.    No, ma'am.

1    Q.    If she had come back to you when she got

2  the August 28th letter, Exhibit 8, and shown it to

3  you, would you have purchased the vehicle back from

4  her at that point?

5    A.    Yes, ma'am.

6    Q.    Did Ms. Bradley ever represent to you that

7  she thought you were an agent of Wynn's?

8    A.    No, ma'am, not at all.

9    Q.    Did she ever represent to you that she

10  thought you were a Wynn's employee?

11    A.    No, ma'am.

12    Q.    Do you have any signage up at the

13  dealership that says Wynn's on it?

14    A.    I don't believe so.

15        MS. SADLER:  I don't have any other

16  questions.

17        MR. CUPP:  I just have a few follow-ups.

18

19      EXAMINATION BY COUNSEL FOR DEFENDANT AND

20            COUNTER-PLAINTIFF:

21  BY MR. CUPP:

22    Q.    Ms. Sadler -- Mr. Armstrong, Ms. Sadler

23  asked you a few questions about the timing of -- your

24  testimony about the pilot program.

25    A.    Yes, sir.

Case 5:13-cv-00114-MFU-JGW  Document 60-2  Filed 09/17/14  Page 37 of 38  Pageid#: 533

1    what you can and can't do with Wynn's service

2    contracts?

3         A.    No, just common knowledge.  I mean, you

4    know, I can't change the Constitution either.  I

5    can't change something that I don't control.

6         Q.    Did you ever make the statement to Penny

7    Bradley, I am not an agent of Wynn's?

8         A.    No, sir.  I also never made the statement

9    that I was.

10        Q.    You told her you were selling a Wynn's

11   service contract, though, didn't you?

12        A.    I told her that if we put the VIN in and

13   it was allowed, that then she could purchase one,

14   yes, sir.

15        Q.    And you included that and charged her for

16   it; right?

17        A.    Yes, sir.

18        Q.    Exhibit 3, the dealer agreement -- I just

19   want to make sure I understand your testimony.

20   Ms. Sadler asked you a question about 1B(6) --

21        A.    Yes, sir.

22        Q.    -- of this agreement.  I believe you said

23   you didn't remember reading this agreement; right?

24        A.    I don't recall, no, sir.

25        Q.    So any understanding that you gained from

Case 5:13-cv-00114-MFU-JGW   Document 60-2   Filed 09/17/14   Page 38 of 38   Pageid#: 534