```
 1              UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF VIRGINIA
 2                  HARRISONBURG DIVISION

 3

 4   WYNN'S EXTENDED CARE, INC.,

 5        Plaintiff and
          Counter-Defendant,        Case No. 5:13-cv-00114
 6

 7   v

 8

 9   PENNY L. BRADLEY,

10        Defendant and
          Counter-Plaintiff.
11   _____/

12              The 30(b)(6) deposition of DANIEL
     ULATOWSKI, corporate representative of CREDIT
13   ACCEPTANCE CORPORATION, taken pursuant to Notice of
     Taking Deposition before Nancy Kirchoff, Certified
14   Shorthand Reporter, a Notary Public within and for the
     County of Livingston, State of Michigan, at 355 S. Old
15   Woodward Avenue, Suite 100, Birmingham, Michigan, on
     Thursday, September 11, 2014, at or about 1:15 p.m.
16

17    THIS DEPOSITION TRANSCRIPT AND/OR CERTAIN EXHIBITS
       THERETO CONTAIN CONFIDENTIAL MATERIAL SUBJECT TO
18                      PROTECTIVE ORDER.

19

20   APPEARANCES:

21        JORDAN COYNE LLP
          By: Virginia Sadler
22        10509 Judicial Drive
          Suite 200
23        Fairfax, VA  22030
          (703) 246-0900
24        Appearing by Telephone on behalf of
                  Plaintiff/Counter-Defendant
25
```

De SCRIBE REPORTING, INC.
1-877-733-DEPO

Page 1

1 notice. What did you do to prepare for number 2?
2 A        Viewed the information provided me by the
3 corporate office.
4 Q        Did that show any communications between Credit
5 Acceptance Corporation and Wynn's Extended Care about
6 the service contract sold in the Bradley transaction?
7 A        It looks like there was a communication in
8 August of 2012.
9 Q        For clarity sake, when I'm talking about any
10 communications, I don't mean any communications after
11 the end of February, 2013, when other communications
12 may have occurred because of the letters that were
13 going back and forth. I'm talking up through February,
14 2013, the end of February of 2013, okay?
15 A        Okay.
16 Q        So what was the communication in August?
17 A        Per Wynn's, VSC has been declined due to
18 vehicle model is ineligible, 100 percent credit has
19 been applied.
20 Q        What's the date of that entry?
21 A        August 31, 2012, 3:11 p.m.
22 Q        When that says, "Per Wynn's," how did that
23 communication come in from Wynn's?
24 A        I don't know the answer to that question.
25 Q        Do you know how to find the answer to that

1  question?

2  A      I do not.

3  Q      Were there any other communications between

4  Credit Acceptance Corporation and Wynn's about any

5  credit or rebate for that service contract

6  cancellation?

7  A      Based on the information I have, not to my

8  knowledge.

9  Q      Did you look in the financial transaction

10 records between Wynn's and Credit Acceptance

11 Corporation to see when the credits were made between

12 the two companies?

13 A      I did not. It's common practice for that to

14 happen, but I did not look into specific details for

15 that.

16 Q      Describe the common practice, please.

17 A      Based on my understanding, when this type of

18 transaction happens, Wynn's will give us their portion

19 of what was receipted to them back and we will take the

20 necessary steps to make the customer whole.

21 Q      How does that happen?

22 A      How does what happen?

23 Q      How does the money transfer?

24 A      Because we do a lot of business with Wynn's,

25 often times just credited against other accounts coming

1 back and forth in terms of netting out the dollar
2 amounts.
3 Q      Have you ever reviewed those records to know
4 what they look like where the netting of the dollar
5 amount occurs?
6 A      I don't believe I have.
7 Q      Did you try and review those records to prepare
8 to respond to 2?
9 A      No, I did not.
10 Q     Would those records first show a request to
11 Wynn's for a credit?
12            MR. RIDEOUT: Objection, form. If you
13 understand it, you can answer it.
14 A     Can you restate the question, please?
15 Q     In the normal practice, how does the
16 information exchange between Wynn's and Credit
17 Acceptance Corporation?
18 A     Typically, we are notified, like in this case,
19 we would have been notified by Wynn's that they
20 declined or was an ineligible vehicle and they would
21 take the necessary steps to credit us back.
22 Q     Would you have to send request for that credit,
23 would you send like a credit request or some sort of --
24 A     I don't know. I don't believe so.
25 Q     Would you initially have sent money to Wynn's?

1  A     Yes.
2  Q     And in that communication with Wynn's where you
3  send them the money, how does Wynn's get told there is
4  a credit, there is a service contract that's been sold?
5  A     We advise them.
6        MS. SADLER:  I'm going to object to the
7  characterization of his testimony.
8        MR. RIDEOUT:  You can answer the
9  question.
10 A     We advise them.  So through communication
11 channels, we let them know that we a have a service
12 contract.
13 Q     Describe those communication channels.
14 A     We have information that's originated in our
15 system.  Once we know that the deal has been struck, we
16 let them know that that particular deal had a vehicle
17 service contract on it from Wynn's.
18 Q     And is that done electronically?
19 A     Yes.
20 Q     And how soon after the deal is struck do you do
21 that?
22 A     I don't know of the exact timing.
23 Q     Does it require intervention of a person to do
24 that or does the system do that automatically?
25 A     The system does it automatically is my

1  Q      For whatever reason, if they put a hold on it,
2  do they notify Wynn's about the vehicle service
3  contract that's part of the deal?
4  A      My understanding is Wynn's gets notified
5  electronically after the fact.
6  Q      Okay. So that's after the decision has been
7  made to pay the dealer?
8         MR. RIDEOUT: I'm just going to object to
9  the form. You can answer.
10 A      My understanding is after the deal has been put
11 on the books, so to speak --
12 Q      Yes.
13 A      The system knows to electronically take that
14 day's work and ship it to Wynn's.
15 Q      And I just want to be clear, we are on the
16 record, that put on the books is something that happens
17 after there was a hold, if there was a hold?
18 A      It happens -- if they pay the dealer
19 immediately, it gets put on the books. If they hold
20 it, it gets put on the books. So in both cases, it's
21 on the books. So the system knows that there's a deal,
22 a retail installment contract and associated documents
23 in the system at that time.
24 Q      All right. So could Wynn's be told there's a
25 Vehicle Service Contract that's been sold while the

1  deal is still put on hold waiting for documents?
2  A    Yes.
3  Q    Is that when Credit Acceptance sends the money
4  to Wynn's for the Vehicle Service Contract?
5  A    No.
6  Q    When do they send the money to Wynn's for the
7  Vehicle Service Contract?
8  A    I don't know exactly.
9  Q    Is there a set number of days?
10 A    I don't know.
11 Q    Do you know how it's done?
12     MR. RIDEOUT: I will object to the fact
13 that this has been asked and answered, but you can
14 answer it again.
15 A    I do not.
16 Q    But at some point in the Bradley transaction,
17 there was a communication between CAC and Wynn's where
18 the money was sent?
19 A    Yes, I believe that's true.
20 Q    And then at some point after that, there was a
21 communication that asked for the money to come back?
22     MR. RIDEOUT: Objection to the extent it
23 mischaracterizes the prior testimony.
24 Q    If I have mischaracterized your testimony,
25 please correct me.

1 A     You want to restate the question, please?

2 Q     At some point after August 21st, CAC sent money
3 to Wynn's for the Bradley transaction, is that correct?

4 A     Yes.

5 Q     Then at some point, did Wynn's send money back
6 to CAC for the Bradley transaction?

7 A     Yes, I believe that is the case.

8 Q     And for CAC to send the money -- I'm sorry, for
9 Wynn's to send the money back to CAC, did CAC have to
10 request it?

11 A     Not necessarily, no.

12 Q     Do you know why?

13 A     Because Wynn's initiated -- in this case for
14 example, they let us know that it had been declined,
15 then they would have initiated it and not Credit
16 Acceptance.

17 Q     And as part of the Bradley transaction in
18 forming the Bradley transaction, did CAC ever check
19 with Wynn's to see whether the vehicle was eligible?

20 A     State that one more time.

21 Q     As part of the Bradley transaction, did CAC
22 ever check with Wynn's to see whether the vehicle was
23 eligible for the service contract?

24 A     I don't believe we did, no.

25 Q     Can we turn to item 1 of Exhibit 1?