claims, which amount includes a ceding allowance equal to the state, county, municipal, city or other governmental premium taxes ("State Premium Taxes") paid or payable by Wynn's on the Reserve.

4. **State Premium Taxes.** It is agreed and understood that State Premium Taxes, as defined within the definition of Reserves, vary by state, may not be due in all states, but when applicable is approximately 2.5% of the Reserve. It is the expectation of Credit Acceptance that the remaining portion of the Reserve (approximately 97.5%) will be the amount available to the Wynn's for the administration of claims under the Agreement. Wynn's shall notify Credit Acceptance of any material variation in the State Premium Taxes causing the amount available to Wynn's for claims to be modified. Should a state increase its State Premium Tax, Wynn's shall notify Credit Acceptance of the change. Any such variation that causes the amount available to Wynn's for claims to be reduced shall require the prior written approval of Credit Acceptance. Credit Acceptance's approval will not be unreasonably withheld.

5. (A) **Profit Sharing Plan.**

> Redacted by Wynn's Extended Care, Inc
> As delivered to Bradley's counsel on 9-8-14, 6:09 p.m.

> Redaction by Wynn's Extended Care, Inc
> As delivered to Bradley's counsel on 9-8-14, 6:09 p.m.

Second Amendment to
2008 Program Agreement

Page 4 of 9

Confidential Material
Under Protective Order

Wynn's 000041

Ex B.

Redaction by Wynn's Extended Care, Inc
As delivered to Bradley's counsel on 9-8-14, 6:09 p.m.

5. **Reports.** Each month Wynn's shall deliver to Credit Acceptance, in a form and at such times as are mutually agreeable to Credit Acceptance and Wynn's, complete reports of current Service Contract activity specific as to dealers and accounts and an activity summary of each Credit Acceptance dealer, including a state by state breakdown, in a format mutually agreeable by the parties. Wynn's shall deliver to Credit Acceptance by the fifteenth (15th) of each month, in a form mutually agreeable to the parties, a monthly report, which sets forth all Service Contracts issued or cancelled during the previous month and a historical claims paid report.

Redaction by Wynn's Extended Care, Inc
As delivered to Bradley's counsel on 9-8-14, 6:09 p.m.

Confidential Material
Under Protective Order

Wynn's 000042

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

WYNN'S EXTENDED CARE, INC.,

    Plaintiff,

v.                                       CIVIL ACTION NO. 5:13-cv-00114-MFU

PENNY L. BRADLEY,

    Defendant.

## CONFIDENTIAL DISCLOSURE

Pursuant to the Court's Order of September 11, 2014, Wynn's provides the following statement describing the profit Wynn's receives and its calculation pursuant to the Program Agreement:

For service contracts that are purchased by consumers through financing with Credit Acceptance Corporation, Wynn's receives payment pursuant to the Program Agreement between Wynn's and Credit Acceptance Corporation. A retail cost set by the rate sheet is charged to the customer. From the retail cost, Wynn's receives an administrative fee of $80.00 per contract and a reserve amount corresponding to the particular contract price. The reserve amount is placed in a reserve fund for any losses arising under an accepted application for a service contract. Wynn's only income from the sale of an accepted application is the $80.00 administrative fee. Wynn's receives no other fees or income under the terms of the Program Agreement.

CONFIDENTIAL MATERIAL
UNDER PROTECTIVE ORDER

Ex C

I hereby affirm, under penalty of perjury, that the foregoing Confidential Disclosure are true and correct to the best of my knowledge and based on the business records of Wynn's Extended Care, Inc.

WYNN'S EXTENDED CARE, INC.

By _____
Name: Alfred Armenteros
Title: Senior Vice President

JORDAN COYNE LLP
10509 Judicial Drive, Suite 200
Fairfax, Virginia 22030
(Tel.) (703) 246-0900
(Fax) (703) 591-3673

By _____
Virginia M. Sadler, VSB No. 48736
*Counsel for Wynn's Extended Care, Inc.*

CONFIDENTIAL MATERIAL
UNDER PROTECTIVE ORDER

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of Wynn's Extended Care, Inc.'s Confidential Disclosure was e-mailed, this 12th day of September, 2014, to:

>Timothy E. Cupp, Esquire
>CUPP & CUPP, P.C.
>1951-D Evelyn Byrd Avenue
>P.O. Box 589
>Harrisonburg, Virginia 22803-0589
>(Tel.) (540) 432-9988
>(Fax) (540) 432-9557
>E-Mail: cupplaw@comcast.net
>
>Thomas D. Domonoske, Esquire
>461 Lee Avenue
>Harrisonburg, Virginia 22802
>(Tel.) (540) 442-7706
>E-Mail: tomdomonoske@earthlink.net

*Counsel for Penny L. Bradley*

Virginia M. Sadler

CONFIDENTIAL MATERIAL
UNDER PROTECTIVE ORDER

WYNN'S CORPORATE DEPOSITION, SEPTEMBER 15, 2014, MIAMI, FLORIDA

**Examination by Bradley's counsel**

ARMENTEROS, FRANK, (Pages 83:1 to 84:16)

```
                          83
 1  Q   How do Wynn's determine the pricing of its
 2  service contracts?
 3         MS. SADLER:  Objection relevance, I'm
 4     going to instruct the witness not to answer
 5     this is way beyond the scope of your notice--
 6         MR. ARMENTEROS:  I have no knowledge of--
 7  BY MR. DOMONOSKE::
 8     Q   You have to make sure your lawyer is done.
 9     A   I am not involved in pricing structure.
10     Q   Do you know anything about the price and
11  the service contract for the service contracts sold
12  through CAC?
13         MS. SADLER:  Objection, same objections,
14     relevance.
15         MR. ARMENTEROS:  I've seen the rate
16     charts.
17         MS. SADLER:  I'm going to place an
18     objection to the last question as well as
19     relevance.
20         MR. ARMENTEROS:  I have seen - I have seen
21     the rate charts.
22  BY MR. DOMONOSKE::
23     Q   Do you know how those rate charts were
24  determined?
25     A   No.

                          84
 1         MS. SADLER:  Same objections.
 2  BY MR. DOMONOSKE::
 3     Q   How did Wynn's determine what vehicles
 4  were eligible for service contracts?
 5         MS. SADLER:  I'm going to instruct the
 6     witness not to answer if you want to pursue
 7     this line.  That's not relevant to your
 8     litigation.  You are asking about proprietary
 9     information and that's way beyond the scope of
10     your deposition notice.
11         MR. ARMENTEROS:  So, I' not answering.
12         MS. SADLER:  And plus you are asking about
```

13   the methods used to set prices for contracts.
14   If you'd like to ask a different question you
15   may but that has no bearing on this particular
16   case.

ARMENTEROS, FRANK, (Pages 102:11 to 103:19)

                    102
11  Q   Look at Exhibit Fourteen ad Fifteen,
12  please. Looking at Exhibit Fourteen where it says
13  "Posted date 10/29", what happened on 10/29?
14      A   I have no idea this is the first time I
15  see this.
16      Q   Look on item fifteen do you see where it
17  says "Posted date 9/11"?
18      A   Yes.
19      Q   What happened on 9/11?
20      A   9/11 of which year?
21      Q   If you look up at the top I believe 2012,
22  because it says this is September 1st 2012 through
23  September 30th 2012.
24      A   Again the same answer. I don't know what
25  this document is for.

                    103
1   Q   I'd like for you to take a few minutes and
2   look at these two documents and you can also see if
3   looking at Exhibits Nine through Thirteen help, and
4   I'd like you to take as long as you need to see if
5   you can figure out what those two line items refer
6   to.
7       A   Which two line items?
8       Q   On Exhibit Fourteen.
9       A   Uh-huh.
10      Q   The line item 10/29, and on Exhibit
11  Fifteen the line item 9/11, and you can reference
12  Exhibits Nine through Thirteen and I'd like you to
13  take as long as you need to see if you can identify
14  what happened on 9/11 and what happened on 9/29, and
15  we can go off the record while you do that.
16      A   I don't need any time.
17      Q   All right.
18      A   I have no idea what occurred and I'm not
19  going to guess.

ARMENTEROS, FRANK, (Pages 131:4 to 133:24)

131

4  Q  Turning to item nine of Exhibit One. At
5  the time of the Bradley transaction did your company
6  provide a service contract on a hybrid vehicle?
7  I'll reword that question.
8     A  Okay.
9     Q  I'm not asking for a legal conclusion that
10 would happen in the Bradley transaction. At the
11 time of the Bradley transaction did your company
12 made available for consumers a service contract on a
13 hybrid vehicle?
14    A  Not on the CAC program.
15    Q  Outside of the CAC program?
16       MS. SADLER: Objection relevance.
17       MR. ARMENTEROS: Yes.
18 BY MR. DOMONOSKE::
19    Q  How much would it cost?
20       MS. SADLER: Objection relevance.
21       MR. ARMENTEROS: I have no idea.
22 BY MR. DOMONOSKE::
23    Q  How would you find out the cost?
24       MS. SADLER: Objection relevance.
25       MR. ARMENTEROS: This vehicle would never

132

1  qualify.
2  BY MR. DOMONOSKE::
3     Q  Al right. What would this hybrid vehicle
4  not qualify for the hybrid service contract that was
5  potentially available through Wynn's?
6     A  Mileage number one, age number two.
7     Q  What hybrid vehicles did you cover?
8     A  New vehicles only.
9     Q  Does new refer to brand new or was new
10 like within two or three years old?
11       MS. SADLER: Objection calls for
12    speculation.
13       MR. ARMENTEROS: Depending on the program.
14 BY MR. DOMONOSKE::
15    Q  So, at the time of the Bradley
16 transaction, what was the age limit for vehicles
17 that had been already sold once and they were
18 hybrids?
19    A  Don't know the answer to that.
20    Q  Do you know the cost?

21    A   No.
22    Q   Could Armstrong Auto have sold for your
23 company such a service contract?
24        MS. SADLER: Objection relevance, calls
25    for speculation.

                  133
1         MR. ARMENTEROS: I have no idea.
2  BY MR. DOMONOSKE::
3     Q   What kind of dealer would be allowed to
4  sell such service contracts?
5         MS. SADLER: Objection relevance, calls
6     for speculation.
7         MR. ARMENTEROS: Cannot speculate which
8     one.
9  BY MR. DOMONOSKE::
10    Q   Do they have to be associated with certain
11 finance company?
12        MS. SADLER: Objection relevance.
13 BY MR. DOMONOSKE::
14    Q   If Armstrong Auto wanted to sell contracts
15 directly for your company could Armstrong Auto do
16 that?
17        MS. SADLER: Objection relevance.
18        MR. ARMENTEROS: Yes.
19 BY MR. DOMONOSKE::
20    Q   If Armstrong auto would signed up TO sell
21 contracts directly for your company would that
22 include the ability to sell on hybrid vehicle?
23        MS. SADLER: Objection relevance.
24        MR. ARMENTEROS: Don't know the answer.


ARMENTEROS, FRANK, (Pages 134:7 to 137:9)

                  134
7  BY MR. DOMONOSKE::
8     Q   For item thirteen, is there any connection
9  in the last four years between the control group of
10 Wynn's employees officers and director and the
11 Service Contract Industry Counsel, The Florida
12 Service Agreement Association and the Guaranteed
13 Asset Protection Alliance?
14        MS. SADLER: Objection to form.
15        MR. ARMENTEROS: We are a founding member
16    of the organization.

17  BY MR. DOMONOSKE::
18     Q    And when you say "We" who do you mean?
19     A    The company.
20     Q    All right. Lets' take them up
21  individually. The Service Contract Industry
22  Counsel, is your company a founding member of that?
23     A    Yes.
24          MS. SADLER: Object to relevance.
25  BY MR. DOMONOSKE::

                    135
1      Q    The Florida Service Agreement Association,
2   is your company a founding member of that?
3      A    Yes.
4      Q    And The Guaranteed Asset Protection
5   Alliance, is your company a founding member of that?
6      A    Yes.
7      Q    For the Service Contract Industry Counsel,
8   how many of your officers and directors are part of
9   that group?
10     A    Don't know the answer.
11     Q    Are you?
12     A    No.
13     Q    Is Mr. Brooks?
14     A    Yes.
15     Q    And, for your company, how many of the
16  officers and directors are members of the Florida
17  Service Agreement Association?
18     A    Don't know the answer.
19     Q    Is Mr. Brooks?
20     A    Yes.
21     Q    And for your company, how many of the
22  officers and directors are member of the Guaranteed
23  Asset Protection Alliance?
24          MS. SADLER: Objection relevance.
25          MR. ARMENTEROS: Don't know.

                    136
1   BY MR. DOMONOSKE::
2      Q    Is Mr. Brooks?
3      A    Yes.
4      Q    Are you?
5      A    No.
6      Q    Do you know of any other officers or
7   directors of your company that have a connection to
8   the Service Contract Industry Counsel?

9    A    No.
10         MS. SADLER: Same objection.
11  BY MR. DOMONOSKE::
12    Q    Do you know what Mr. Brooks' position is
13  with the Service Industry Counsel?
14    A    No.
15         MS. SADLER: Objection relevance.
16  BY MR. DOMONOSKE::
17    Q    Do you know what Mr. Brooks' position is
18  with the Florida Service Agreement Association?
19         MS. SADLER: Same objection.
20         MR. ARMENTEROS: No.
21  BY MR. DOMONOSKE::
22    Q    Do you know if Mr. Brooks' position is
23  with the Guaranteed Asset Protection Alliance?
24         MS. SADLER: Same objection.
25         MR. ARMENTEROS: No.

                   137
1   BY MR. DOMONOSKE:
2     Q    Did you do anything to find out to prepare
3   to respond to item thirteen?
4     A    Read it.
5     Q    Other than reading it did you do anything
6   to answer that question?
7     A    No.
8     Q    Did you ask Mr. Brooks?
9     A    No.

ARMENTEROS, FRANK, (Pages 141:24 to 148:3)

                   141
24  BY MR. DOMONOSKE::
25    Q    I'd like you to quickly review Exhibit

                   142
1   Twenty One and if you like to read it word for word
2   we can take the time and you can read it word for
3   word, but I'd like you to at least look at each
4   page.
5          MS. SADLER: I'm just going to note for
6     the record is not a complete copy of the
7     document.
8   BY MR. DOMONOSKE::
9     Q    Have you familiarized yourself with the
10  document?

11  A  Yes, Sir.
12  Q  Have you seen it before?
13  A  No, yesterday was the first time.
14  Q  In preparation for today's deposition did
15 you review a contract between your company and
16 Credit Acceptance Corporation?
17  A  I didn't have access to the contract until
18 Sunday.
19  Q  Did you review it?
20  A  Yes, Sir.
21  Q  Was this included in what you reviewed?
22  A  This is what I reviewed.
23  Q  Lets' go back. Have you seen this
24 document before?
25  A  Yes, yesterday.

143
1  Q  If you look on Exhibit Eight, there's a
2 list of redactions. Did the document you reviewed
3 on Sunday have redactions to it?
4  A  Yes, Sir.
5  Q  Did they have black redactions?
6  A  Yes, Sir.
7  Q  Did they have black redactions reflected
8 on Exhibit Eight?
9     MS. SADLER: Objection calls for
10    speculation.
11    MR. ARMENTEROS: I have to see the full
12    document in order to.
13 BY MR. DOMONOSKE::
14  Q  This particular document, did it have
15 redacted material on it?
16  A  Yes, Sir.
17  Q  If you look on Exhibit Eight where it
18 talks about page 28, 29, and page 29, do you see
19 where it says program amendment number five?
20  A  Uh-huh.
21  Q  Do you see that the document I've handed
22 you has that information, has redactions in both
23 those paragraphs?
24  A  Says page 28 and 29--
25  Q  I don't know what the page number

144
1 references I do know that the paragraph.
2  A  Oh, okay, cause there's no page 28 or 29.

3   Q   I understand. So the documents you
4 reviewed on Sunday, do they have the same portions
5 of the contract redacted out in big black?
6   A   Yes, Sir.
7   Q   Before Sunday had you seen this document?
8       MS. SADLER: Objection asked and answered
9     object to form.
10      MR. ARMENTEROS: No.
11 BY MR. DOMONOSKE::
12  Q   Where it says profit sharing plan,
13 paragraph five A, do you know what's on the profit
14 sharing plan?
15      MS. SADLER: Objection paragraph has been
16    redacted pursuant to the court order. You been
17    provided the disclosure you don't get to
18    circumvent the court order by asking him to
19    summarize the section. I think we covered this
20    before lunch.
21      MR. DOMONOSKE: I asked him if he knows
22    what's in it; I haven't asked him to summarize
23    it yet. He can answer. Do you know what's on
24    paragraph 5A?
25      MR. ARMENTEROS: No.

145
1 BY MR. DOMONOSKE::
2   Q   Above paragraph six on the next page, do
3 you know what information is there?
4       MS. SADLER: Same objection.
5       MR. ARMENTEROS: Same answer, no.
6 BY MR. DOMONOSKE::
7   Q   Below paragraph six do you know what
8 information is there?
9       MS. SADLER: Same objection.
10      MR. ARMENTEROS: No.
11 BY MR. DOMONOSKE::
12  Q   Item three on paragraph one asks about any
13 profit sharing related to any service contracts.
14      MS. SADLER: Are you noting the disclosure
15    statement or the--
16 BY MR. DOMONOSKE::
17  Q   No, Item three of Exhibit One. Ask by any
18 profit sharing related to any service contracts.
19 Did you do anything to be prepared to answer the
20 questions about that area today?
21      MS. SADLER: I'm going to object to the

```
22   extent it would call for communications with
23   counsel. You can answer if you did anything
24   independent beyond communications.
25        MR. ARMENTEROS: I'm not familiar with the
```

146

```
1    profit sharing.
2  BY MR. DOMONOSKE::
3    Q   I'd like you to read Exhibit Twenty Two,
4  the first two pages please; you can read it to
5  yourself. Did you read it?
6    A   Yes.
7    Q   Have you seen it before?
8    A   I've seen it, yes.
9    Q   And did you see it when you signed it?
10   A   Yes, Sir.
11   Q   When did you sign it?
12   A   I signed it on Friday night.
13   Q   Does Exhibit Twenty-Two accurately
14 summarize the redacted text of Exhibit Twenty One in
15 paragraph five and paragraph six?
16        MS. SADLER: Objection relevance you were
17   directed to provide specific information by The
18   Court.
19 BY MR. DOMONOSKE::
20   Q   You can answer the question.
21   A   At the time of the signature I knew the
22 document that I was - the confidential disclosure
23 was accurate and true.
24 BY MR. DOMONOSKE::
25   Q   I'm asking if this document accurately
```

147

```
1  summarizes the redacted text on Wynn's Forty-One and
2  Forty, which are part of Exhibit Twenty One?
3        MS. SADLER: Objection calls for
4    speculation.
5        MR. ARMENTEROS: I haven't seen the
6    redacted document.
7  BY MR. DOMONOSKE::
8    Q   Does that mean you don't know?
9    A   I know we only get the $80 that's for sure
10 that I know.
11   Q   Yes or no question.
12   A   Yes, I know we only get $80.
13   Q   Is your answer that yes, Exhibit Twenty
```

14 Two accurately summarizes paragraph 5A and the
15 redactions on six?
16          MS. SADLER: Objection asked and answered.
17          MR. ARMENTEROS: No.
18 BY MR. DOMONOSKE::
19    Q   All right. 'Cause you don't know do you?
20    A   I haven't seen that.
21    Q   Who asked you to sign Exhibit Twenty Two?
22          MS. SADLER: Objection to the extent that
23    calls for communications with counsel and
24    relevance.
25          MR. ARMENTEROS: Do I have to?

                    148
1 BY MR. DOMONOSKE::
2    Q   Who gave you Exhibit Twenty Two to sign?
3    A   Mathew Brooks.

ARMENTEROS, FRANK, (Pages 151:20 to 153:24)
                    151
20   Q   Back on Exhibit Twenty Two when you were
21 asked to sing this on Friday, what were you told?
22          MS. SADLER: Objection o the extent that
23    calls for communications with counsel.
24 BY MR. DOMONOSKE::
25    Q   By Mathew.

                    152
1          MS. SADLER: Objection Mathew Brooks is
2    corporate counsel for Wynn's you would be
3    seeking privilege communication instruct the
4    witness not to answer.
5          MR. ARMENTEROS: No, answer.
6 BY MR. DOMONOSKE::
7    Q   Did you talk about Exhibit Twenty Two with
8 anyone other than counsel?
9          MS. SADLER: To the extent that calls for
10    communications with counsel same objection.
11 BY MR. DOMONOSKE::
12    Q   Other than counsel in the room and Mr.
13 Mathew Brooks, did you talk about Exhibit Twenty Two
14 with anyone?
15    A   No.
16    Q   Were you by yourself?
17    A   Yes.
18    Q   Did he handed delivered it to you did he

19 email it to you?
20     MS. SADLER: Objection relevance.
21     MR. ARMENTEROS: E-mail.
22 BY MR. DOMONOSKE::
23   Q   What time of day?
24     MS. SADLER: Objection relevance.
25     MR. ARMENTEROS: Passed 5:00.

### 153
1 BY MR. DOMONOSKE::
2   Q   Do you normally work pass 5:00 on a
3 Friday?
4     MS. SADLER: Objection relevance.
5     MR. ARMENTEROS: I'm the VP of the company
6   sometimes I work all night.
7 BY MR. DOMONOSKE::
8   Q   How long did you spend reviewing Exhibit
9 Twenty Two before you signed it?
10     MS. SADLER: Objection relevance.
11     MR. ARMENTEROS: Not long.
12 BY MR. DOMONOSKE::
13   Q   It's after 5:00 on a Friday did you spent
14 an hour reviewing Exhibit Twenty Two before you
15 signed it?
16     MS. SADLER: Objection relevance.
17     MR. ARMENTEROS: Definitely not an hour.
18 BY MR. DOMONOSKE::
19   Q   Did you review any other documents before
20 you signed it?
21     MS. SADLER: Objection relevance to the
22   extent that calls for communications with
23   counsel and work product.
24     MR. ARMENTEROS: No.

**Examination by Wynn's counsel**

ARMENTEROS, FRANK, (Page 167:1 to 167:6)

### 167
1 Q   All right, just a few more questions. To
2 your knowledge you were asked some questions bout a
3 calculation or formula for profit sharing, is there
4 any formula or calculation for profit sharing
5 between CAC and Wynn's?
6   A   If there is I don't know about it.

### Examination by Bradley's counsel

ARMENTEROS, FRANK, (Pages 183:8 to 185:18)

### 183

8   BY MR. DOMONOSKE::
9     Q   Okay. So, for number eight where the
10  specific item included "Dealer costs for the
11  particular contract, what were the dealer cost?
12        MS. SADLER: Objection asked and answered.
13  BY MR. DOMONOSKE::
14    Q   In the Bradley transaction, what was the
15  dealer cost, what was the number?
16    A   I don't remember the number.
17    Q   How would you know the number?
18        MS. SADLER: Objection, asked and
19  answered.
20        MR. ARMENTEROS: By looking at the chart.
21  BY MR. DOMONOSKE::
22    Q   Which chart?
23        MS. SADLER: Objection, asked and
24  answered.
25        MR. ARMENTEROS: I don't know which chat.

### 184

1     I don't know what the dealer received he could
2     have that chart.
3   BY MR. DOMONOSKE::
4     Q   I want to be clear. Do you know the
5   dealer cost in the service contract in the Bradley
6   transaction?
7         MS. SADLER: Objection asked and answered.
8         MR. ARMENTEROS: The dealer cost is the
9     moneys excluding the dealer portion.
10  BY MR. DOMONOSKE::
11    Q   Do you know what the dealer portion was?
12    A   No.
13    Q   No further questions.

### Examination by Wynn's counsel

14  BY MS. SADLER::
15    Q   On exhibit Twenty-Four, does that show you
16  what the dealer portion is of a dealer through the
17  CAC program?

18   A   For that particular time? Yes.
19   Q   Okay. I don't have any more questions.

### Examination by Bradley's counsel

20  BY MR. DOMONOSKE::
21   Q   I have a follow up question. What is the
22  dealer's potion?
23   A   We are not mistaken is 368.
24   Q   Are you agreeing that that says 368
25  Virginia, per your copy?

              185
1     MS. SADLER: Which column are you pointing
2  to?
3     ARMENTEROS: The additional.
4     MS. SADLER: 385.
5     MR. ARMENTEROS: 385.
6  BY MR. DOMONOSKE::
7   Q   Okay. So if we wanted to know the dealer
8  cost in the Bradley transaction we would subtract
9  385 from what number?
10   A   The retail.
11   Q   AND what was the retail cost?
12   A   1580.
13   Q   All right. Would you agree that 1580
14  minus 385 is $1195?
15   A   Yes.
16   Q   So, that's the dealer cost in the
17  transaction.
18   A   Yes.

# WellsOne® Account

Account number:  ■ October 1, 2012 - October 31, 2012 ■ Page 1 of 2



**Questions?**

Call your Customer Service Officer or Client Services
1-800-AT WELLS (1-800-289-3557)
5:00 AM TO 6:00 PM Pacific Time Monday - Friday

*Online:* wellsfargo.com

*Write:* Wells Fargo Bank, N.A. (182)
PO Box 63020
San Francisco, CA 94163

WYNN'S EXTENDED CARE INC
OPERATING ACCOUNT
6303 BLUE LAGOON DR STE 225
MIAMI FL 33126-6004

## Account summary
### WellsOne® Account

| Account number | Beginning balance | Total credits | Total debits | Ending balance |
|---|---|---|---|---|
| | | | | |

## Credits
**Electronic deposits/bank credits**

| Effective date | Posted date | Amount | Transaction detail |
|---|---|---|---|

Redaction by Wynn's Extended Care, Inc
As delivered to Bradley's counsel on 9-8-14, 6:09 p.m.

10/29 ... Credit Acceptance Achbatch 102912 T101 Wynns Extended Care

Total electronic deposits/bank credits

Total credits

**Confidential Material
Under Protective Order**

Sheet Seq = 0181531
Sheet 00001 of 00002

Wynn's 000006

Ex E

# WellsOne® Account


Account number: ▮▮▮▮  September 1, 2012 - September 30, 2012 ■ Page 1 of 2


WELLS FARGO

WYNN'S EXTENDED CARE INC
OPERATING ACCOUNT
6303 BLUE LAGOON DR STE 225
MIAMI FL 33126-6004

**Questions?**

Call your Customer Service Officer or Client Services
1-800-AT WELLS (1-800-289-3557)
5:00 AM TO 6:00 PM Pacific Time Monday - Friday

Online: wellsfargo.com

Write: Wells Fargo Bank, N.A. (162)
PO Box 63020
San Francisco, CA 94163

## Account summary
### WellsOne® Account

| Account number | Beginning balance | Total credits | Total debits | Ending balance |
|---|---|---|---|---|
|  |  |  |  |  |

## Credits
**Electronic deposits/bank credits**

| Effective date | Posted date | Amount | Transaction detail |
|---|---|---|---|
|  | 09/11 |  | Credit Acceptanc Achbatch 091112 1101 Wynn's Extended Care |

Redaction by Wynn's Extended Care, Inc
As delivered to Bradley's counsel on 9-8-14, 6:09 p.m.

Total electronic deposits/bank credits

Total credits

**Confidential Material
Under Protective Order**

Sheet Seq = 0184443
Sheet 00001 of 00002

Wynn's 000007


Ex F