UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

WYNN'S EXTENDED CARE, INC.,
      Plaintiff and Counter-defendant

v.                             Case Number: 5:13-cv-00114

PENNY L. BRADLEY,
      Defendant and Counter-plaintiff.

## BRADLEY'S MEMORANDUM IN OPPOSITION TO WYNN'S MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

Penny L. Bradley (Bradley) opposes Wynn's Extended Care, Inc., (Wynn's) Motion for Summary Judgment because, at minimum, material issues of fact remain in dispute. Furthermore, as set forth in Bradley's Motion for Partial Summary Judgment (Doc. 55) and her Memorandum in Support (Doc. 56), she is entitled to summary judgment on her behalf on two issues: that Wynn's is liable for the misrepresentations by Armstrong Auto, Inc., (Armstrong) regarding the Wynn's contract, and that Wynn's violated the Virginia Consumer Protection Act (VCPA).

Regarding summary judgment, no material facts are in dispute that Wynn's authorized Armstrong to offer its contracts for sale, that Wynn's expects potential customers to ask such authorized car dealers which Wynn's contract is right for them, and that Wynn's expects dealers like Armstrong to determine which Wynn's contract is right for the consumer. A week after Armstrong offered and Bradley accepted Wynn's coverage, Wynn's voided the contract because the car was never eligible. Then, Wynn's instructed Bradley to take any questions about its action to Armstrong. Furthermore, no material facts are in dispute that, after the service contract was declared void, Bradley did

1

not receive a full rebate posted to her account balance.  Material facts are in dispute about the terms of the actual contract between Armstrong and Wynn's, the profit sharing plan between Wynn's and Credit Acceptance Corporation (CAC), how money flowed between Wynn's, CAC and Armstrong and when, and what Armstrong told Bradley when she inquired about the letter.

Additionally, several discovery issues remain outstanding as of the date of the filing of this Opposition. These are Bradley's Motion for Sanctions, Doc. 76, Bradley's Motion for Sanctions, Doc. 71, and Wynn's Objections to Ruling of Magistrate Judge, Doc. 54.  Bradley is unable to fully respond to Wynn's Motion for Summary Judgment until she is either provided the discovery that Wynn's was ordered to provide, or these Motions decided and the outcome known.  For that reason, Bradley requests permission to amend her Opposition once those Motions are decided, and after whatever further discovery Wynn's will provide is made available to her.

Finally, Bradley has requested permission to add a new allegation regarding the inflated price of the service contract.  The current summary judgment briefing does not address that claim, and if Bradley's Motion to Amend is granted, then any summary judgment ruling on this motion should not affect that claim.

## ARGUMENT

### SUMMARY JUDGMENT MUST BE DENIED BECAUSE MATERIAL FACTS REMAIN IN DISPUTE

As more fully set forth below, many material facts continue to be in dispute between the parties.  Additionally, other facts which are not in dispute show that at minimum a jury issue is raised on the amount of damages to be awarded.  Thus summary judgment to Wynn's should not be granted.

2

**A.    Bradley disputes many of the facts that Wynn's identified as undisputed.**

Using the numbers provided by Wynn's as part of its Local Rule 56(b) separate statement of facts, Bradley contends the following are either disputed or not material.

**2.    Whether Wynn's, through an agent, solicited Armstrong to enter into the Dealer Agreement is both disputed and not material**.  Armstrong admits that he entered into a contract with Wynn's, and the only parties to that contract were Wynn's and Armstrong.  The contract was brought to him by a Mr. Railey, who is an employee of CAC. (Armstrong Deposition, Doc. 60-2, 35:10-23).  The contract is obviously a form contract as shown by the last lines of the third page. (Wynn's Dealer Agreement, Doc. 60-6).  Mr. Brooks, President of Wynn's has acknowledged this contract was entered into on Wynn's behalf.  (Brooks Declaration, Doc. 60-3).  Nowhere does Wynn's assert that Mr. Railey was not authorized by Wynn's to present this contract to Armstrong and obtain Armstrong's consent to it.  Because Wynn's ratified Mr. Railey's actions, an issue of fact exists whether this contract was presented to Armstrong by an agent of Wynn's. This fact is not material because Wynn's and Armstrong agree this is their contract.

**3.    Whether Armstrong has the power to bind Wynn's to a service contract is disputed and is a legal conclusion**.  Armstrong can legally bind Wynn's either through actual agency, apparent agency or agency by estoppel.  For actual agency, Wynn's consented in writing to give Armstrong the power to "sell Wynn's service contracts." (Dealer Agreement Doc. 60-6, Paragraph 1(B)(1)).  This Dealer Agreement is written consent by Wynn's for Armstrong to act as its agent for the limited purposes of selling Wynn's service contracts. Wynn's confirmed this authority at its deposition by stating "The dealer is an agent in the way of selling the product on behalf of CAC and

3

Wynn's . . . ." (Wynn's Corporate Deposition, Exhibit 1 attached, 139:5-7). The complete argument necessary to show that Armstrong could legally bind Wynn's through apparent agency is set forth in Bradley's Memorandum in Support of Motion for Summary Judgment (Doc. 56), and incorporated here by reference. The agency by estoppel argument is developed further below and identifies the facts on which it relies.

4. **Whether Armstrong had the authority to accept applications for Wynn's and bind Wynn's to a contract is disputed.** Armstrong can legally bind Wynn's either through actual agency, apparent agency or agency by estoppel. For actual agency, Wynn's consented in writing to give Armstrong the power to "sell Wynn's service contracts." (Dealer Agreement Doc. 60-6, Paragraph 1(B)(1)). This Dealer Agreement is written consent by Wynn's for Armstrong to act as its agent for the limited purposes of selling Wynn's service contracts. Wynn's confirmed this authority at its deposition by stating "The dealer is an agent in the way of selling the product on behalf of CAC and Wynn's . . . ." (Wynn's Corporate Deposition, Exhibit 1 attached, 139:5-7). The complete argument necessary to show that Armstrong could legally bind Wynn's through apparent agency is set forth in Bradley's Memorandum in Support of Motion for Summary Judgment (Doc. 56), and incorporated here by reference. The agency by estoppel argument is developed further below and identifies the facts on which it relies.

5. **Whether Armstrong must submit applications to CAC or to Wynn's is disputed.** Wynn's requires Armstrong to "remit to Administrator funds representing the Dealer Cost relating to each Wynn's Service Contract sold by the Dealer within thirty (30) days after the end of the month in which Dealer sells the Wynn's Service Contract, along with a properly executed copy of such Wynn's Service Contract." (Dealer

4

Agreement Doc. 60-6, Paragraph 1(C)(1)). This process allows thirty to sixty days after a sale of a contract to pass before Wynn's receives this information. Armstrong can sell Wynn's service contracts even without going through CAC. (Wynn's Corporate Deposition, Exhibit 1 attached, 131:9-133:18).

6. **Whether Wynn's provided training to Armstrong or directed him to provide information to customers is disputed.** Under the Dealer Agreement, Armstrong agreed to "market Wynn's Service Contracts pursuant to the Program and faithfully perform its duties in compliance with Administrator's instructions and procedures." (Dealer Agreement Doc. 60-6, Paragraph 1(B)). Wynn's provided Armstrong with a consumer brochure that instructs potential car purchasers at Armstrong's lot to ask Armstrong which Wynn's contract is right for them. (Doc. 56-4, Dealer Kit brochure that states potential customers are to "Ask your dealer about the plan that is right for you"; Doc. 56-3, Wynn's Response to Bradley's Interrogatories, Number 2 that states this was provided to Armstrong). The brochure is to be given to consumers (Wynn's Corporate Deposition, Exhibit 1 attached, 113:12-24), and Wynn's expects it could be read (116:15-18), and Wynn's expects those customers to ask the dealer which plan is right for them. (117:23-25).

7. **Whether Wynn's controls the manner in which Armstrong is to provide information to customers is disputed**. Under the Dealer Agreement, Armstrong agreed to "market Wynn's Service Contracts pursuant to the Program and faithfully perform its duties in compliance with Administrator's instructions and procedures." Armstrong is to provide Wynn's contracts to customers "only on forms provided by Administrator and in accordance with Administrator's procedures."

5

Armstrong is to sell Wynn's contracts "subject to Administrator's programs, coverages, rules, regulations, and fees." (Dealer Agreement Doc. 60-6, Paragraph 1(A), 1(B) and 1(B)(1)(c). Thus, Wynn's and Armstrong have contracted for this power by Wynn's to control Armstrong.

**8.    Whether Wynn's has provided Armstrong with a rate chart with vehicle eligibility information is subject to dispute.**    Under the Dealer Agreement, Wynn's was to provide Armstrong with a "Dealer Cost and Rate Chart." (Dealer Agreement Doc. 60-6, Paragraph 1(B)(2)).    That "Dealer Cost and Rate Chart" is the subject of Bradley's Motion for Sanctions, Document 71, and this Motion is to be heard on October 7, 2014.    Wynn's has never provided Bradley with that "Dealer Cost and Rate Chart" and what is on that chart is unknown to her.    Furthermore, given that Wynn's agrees that Armstrong Auto could sell service contracts outside of any involvement with CAC and on hybrid vehicles (Wynn's Corporate Deposition, Exhibit 1, 131:9-133:18), the Retail Rate Chart that has been presented does not and cannot be the complete chart. Also, the particular chart referenced by Wynn's is not its chart, and it does not know who prepared it, and the chart includes a competitor's numbers also. (Id. 104:20-105:24).

**11-A.    Whether Armstrong's commission is paid by CAC or is a commission he is allowed by Wynn's to retain from what he sells is disputed but not material.** That Armstrong's commission in this transaction was a flat fee is not disputed, and neither is that Wynn's administrative fee was $80.00.    Under the Dealer Agreement, Armstrong is to retain the difference between the Dealer Cost and the cost at which the service contract is sold. (Doc. 60-6, Paragraph 1(C)).    The Dealer Agreement "contains the entire agreement of the parties" and "future changes must be made in writing and

6

signed by both parties." (Doc. 60-6, Paragraph 5(B)). Nothing in the Dealer Agreement discusses CAC paying back to Armstrong Auto the flat fee commission that Wynn's allows Armstrong to retain. Although disputed, the method by which Armstrong actually obtains the dollars of his flat fee commission is not material to the issues in dispute.

**11-B.** **Whether Wynn's received anything more than its $80.00 administrative fee is disputed.** Although Wynn's administrative fee was $80.00, whether it received additional revenue through its secret profit sharing agreement with CAC is disputed. Wynn's has a secret profit sharing agreement with CAC and refuses to provide the terms of that agreement or even the underlying formula to Plaintiff. (See Bradley Motion for Sanctions (Doc. 76), and Memorandum in Support of Motion for Sanctions, (Doc. 77), Section I, and supporting Exhibits. Furthermore, at its corporate deposition, Wynn's was instructed by counsel not to summarize how the profit-sharing worked. (Wynn's Corporate Deposition, Exhibit 1, 89:22-90:23). When the corporate designee was asked what he was told about the sworn statement he signed that should have explained the CAC-Wynn's secret profit sharing plan, he was again instructed not to answer. (151:20-152:5)(Referencing Deposition Exhibit 22 which is the sworn statement discussed in Doc. 77, Section I, and its Exhibit C). Wynn's and CAC have a secret profit sharing plan and it refuses to divulge how that plan works. Because Wynn's will not let Bradley know how the plan works, Wynn's cannot offer evidence that its secret profit sharing plan with CAC did not provide other compensation to it.

**13.** **Whether Bradley told Armstrong that she wanted an extended service contract is disputed.** As set forth by Wynn's own evidence, Armstrong testified as follows: "She told me she wouldn't buy the vehicle unless it could have a warranty."

7

(Doc. 60-2, 57:14-17). A service contract and a warranty are two fundamentally different consumer protections. For instance, a warranty covers any problems with the vehicle especially in existence at the time of sale, but as shown by the Exclusions section of the Wynn's service contract, a service contract ordinarily can and does exclude pre-existing conditions. (Doc. 60-6, pg. 2, Exclusions, A (5)).

14. **Whether a hybrid is an electric vehicle is disputed.** Armstrong testified that hybrids are not electric vehicles. (Doc 60-2, Armstrong corporate deposition 55:7-14). Furthermore, Wynn's corporate representative testified that if a car only has an electric engine it is an electric car, but that if it has both electric and gas engines, it is a hybrid. (Wynn's Corporate Deposition, Exhibit 1, 107:11-108:7). Finally, nothing in the service contract states hybrid vehicles are not covered (Doc. 60-6).

15. **Whether Armstrong does not display any Wynn's insignia is disputed.** Armstrong has the Wynn's Service Contract forms on its premises, and presents them to consumers like Bradley. (See Doc. 60-6). The most prominent image on the front page is Wynn's insignia at the very top, "Wynn's Plus" followed by the SM designation. At http://www.inta.org/TrademarkBasics/FactSheets/Pages/TrademarkSymbolsFactSheet. Aspx is an explanation that the SM designation is a notice of the claim of trademark.

16. **Whether Bradley took action in reliance on the belief that Armstrong represented Wynn's is disputed.** Wynn's reference to page 42 of Bradley's deposition (Doc. 60-1) does not say she did not take any action based on a belief about Armstrong and Wynn's relationship. Instead, starting on page 41, Bradley explains that she read the letter and did what it said: she contacted Armstrong. She also explains on page 42 that she knew she was not going to purchase a car without the coverage, and that she did not

8

understand that Wynn's was different than Armstrong.  On page 43, she explains why she believed Armstrong's representations that the letter was sent in error.  That Bradley "wasn't sure" of the precise legal description of the relationship between Armstrong and Wynn's (Doc. 60-1, 42:5-8), does not elevate that unknown into a undisputed fact about she believed.  The facts show she believed that Armstrong had the ability to determine whether her car was eligible, to sell her Wynn's coverage, and to explain Wynn's letter.

**22.      Whether Armstrong prevented Bradley from reading the Wynn's document before she signed it is disputed.**  Armstrong prevented Bradley from reading this document by handing it to her as part of large stack of so many documents  that she was incapable of reading that many pages. (Doc. 60-1, 25:21-26:2).  Armstrong merely showed her where to sign and quickly flipped them over. (26:5-12).  Armstrong has acknowledged he gave her the eighteen documents in the following order:

1. Receipt No. 2560
2. Bill of Sale
3. Buyer's Order, with Additional Conditions of Sale on back
4. Agreement to Provide Insurance
5. Odometer Disclosure Statement
6. Disclosure Notice
7. Buyer's Guide
8. Application for Certification of Title and Registration
9. Disclosure Form
10. Consent and Authorization Form
11. Multi-State application
12. Credit Report Authorization Form
13. GAP Acceptance of Coverage
14. Buyer's Disclosure and Agreement for Starter Interruption Device
15. GAP Addendum
16. Truth in Lending Disclosure Acknowledgement
17. Retail Installment Contract
18. Wynn's Service Contract
19. Virginia Reassignment of Title Form

(Deposition of Armstrong May 29, 2014, attached as Exhibit 2, 143:19-5-146:2, cross referenced with deposition exhibit list pg. 5-6). As explained by Armstrong, the first action he took was to take Bradley's downpayment. (148:16-21). He then obtained her signature on the documents in the order presented. (149:5-150:7). Most importantly, by the time she was shown the service contract first page, she had already paid her downpayment, and had signed the Buyer's Order and the Retail Installment Contract; on each she specifically had contracted to buy coverage which she thought was a warranty. Thus, Armstrong prevented her from having any opportunity to view the text of the Wynn's contract until she had already contracted to buy it and paid money towards it.

24. **Whether Bradley executed the Retail Installment Contract to get financing from CAC is disputed.** By the terms of the Retail Installment Contract in the upper right hand corner, she executed this credit contract to get financing from Armstrong, the creditor-seller. (Doc. 60-5). Also, because the interest rate was greater than the 12% allowed under Va. Code § 6.2-303, Bradley could not have obtained financing from CAC at 24.99% because CAC does not meet an exception. Armstrong is allowed to charge above 12% because he meets the exception in Va. Code § 6.2-311.

25. **Whether Wynn's was forwarded $735.00 is disputed.** That the insurance reserve for claims and state insurance premium taxes was $655.00 is not disputed. The account records underlying the supporting evidence put forth by Wynn's are the subject of Bradley's Motion for Sanctions (Doc. 76). Bradley was prohibited from exploring this area at Wynn's deposition because Wynn's designee was unprepared, and nothing in the account records that have been sealed by Order of this Court show any breakdown of any dollar amount nor any connection to Bradley's transaction. Wynn's

10

also testified that the Dealer Cost for the Bradley service contract was greater than $735.00 by a significant amount. (Wynn's Corporate Deposition, Exhibit 1, 185:7-18). Thus, under Paragraph 1(C)(1) of the Dealer Agreement (Doc 60-6), an amount significantly greater than $735.00 was to be sent to Wynn's.

26. **Whether Wynn's issued a refund of $735.00 is disputed.** The account records underlying the supporting evidence put forth by Wynn's are the subject of Bradley's Motion for Sanctions (Doc. 76). Bradley was prohibited from exploring this area at Wynn's deposition because Wynn's designee was unprepared, and nothing in the account records that have been sealed by Order of this Court show any breakdown of any dollar amount nor any connection to Bradley's transaction. Wynn's also testified that the Dealer Cost for the Bradley service contract was greater than $735.00 by a significant amount. (Wynn's Corporate Deposition, Exhibit 1, 185:7-18). Thus, under Paragraph 1 (C)(1) of the Dealer Agreement (Doc 60-6), an amount significantly greater than $735.00 was to be sent back by Wynn's.

27. **Whether Armstrong received any payments related to the Wynn's service contract is disputed.** The Wynn's contract amount was included in the total sale price on the Buyer's Order (Doc. 60-4) and the RISC (Doc. 60-5), and Bradley paid the downpayment to Armstrong. The downpayment was related to the Wynn's contract to the same extent as its relation to the other items included in the purchase price. Neither the Buyer's Order nor the RISC have any carve-out provision that make the downpayment not related to the Wynn's contract.

29. **Whether Wynn's referred Bradley to Armstrong because Armstrong was in the best position to provide information and assistance to Bradley is**

11

**disputed.** First, whether Armstrong was in the best position is a statement of opinion, not fact. Actually, Wynn's knew that Armstrong had already misrepresented the Wynn's eligibility because it had to void the contract arranged by Armstrong. It also knew that, like any car dealer, Armstrong was looking for profitable ways to sell cars, and Wynn's had represented that its service contract provided such opportunity for profit. (Doc. 56-2, Wynn's Dealer Kit; Doc. 56-3, Wynn's Response to Bradley' Interrogatories, Number 2 that states this was provided to Armstrong). Therefore, Wynn's knew that Armstrong was seeking to use the Wynn's service contract for his own profit but was in error about the eligibility of the contract he selected. Wynn's takes no steps to correct such errors by dealers (Wynn's Corporate Deposition, Exhibit 1 attached, 138:13-24). Furthermore, it took no specific steps to ensure that what happened to Bradley did not happen again. (Wynn's Corporate Deposition, Exhibit 1 attached, 138:5-11). Other than allowing Armstrong "options" for how to respond to Bradley, Wynn's knows of no instructions it provided the errant Armstrong for how to answer Bradley's question. (Wynn's Corporate Deposition, Exhibit 1 attached, 137:18-138:1). Given that Wynn's made no effort to confirm that it had corrected Armstrong's error, and given that Armstrong was seeking to use the Wynn's contract for his own profit, and given that Bradley would only have bought the car if it had extended coverage, Armstrong was the worst choice to provide information and assistance to Bradley. Wynn's could have chosen a disinterested and correctly informed person rather than Armstrong, and why it chose Armstrong is a disputed issue of fact.

**B.     Bradley's additional facts that show Wynn's is not entitled to summary judgment and that a jury should decide the issue of damages.**

Below Bradley sets forth additional material facts, some disputed and others not disputed, that show why Wynn's is not entitled to summary judgment in its favor.

1.     For the Wynn's coverage, Bradley was charged $1,580.00, plus $39.50 in tax, for a total of $1,619.50. (Buyer's Order, Doc. 60-4, and Retail Installment Contract, Doc. 60-5).

2.     If the service contract was not included in the transaction, the amount financed would have been less. (Armstrong Corporate Deposition, Exhibit 3, 124:5-125:8 and 126:23 to 127:18).

3.     Subtracting $1,619.50 from the amount financed of $13,339.00 gives an amount financed of $11,719.50. (A mathematical computation under Federal Rules of Evidence, Rule 201, of which the Court can take judicial notice).

3.     The presence of the service contract had no effect on the interest rate. (Armstrong Corporate Deposition, Exhibit 3 at 124:13-17).

4.     If the service contract was not included either the monthly payment would have been less or Armstrong would have shortened the term of the loan. (Armstrong Corporate Deposition, Exhibit 3 at 124:21-125:8).

5.     If Armstrong had extended credit of $11,719.50 at 24.99% interest to be paid in monthly payments of $401.93, then 44 payments plus a final monthly payment of $536.48 would have been due. (Exhibit 4, Armstrong Admission by counsel; see also amortization chart in Exhibit 4 which under FRE 201 the Court may judicially notice.  It shows 44 payment lines, each of which is a mathematical computation that multiplies the prior balance by the .2499/12 (the annual interest rate for one month) and then subtracts that number from $410.93 to allocate the proper amount to interest and to principal).

13

6.     The total of payments she would have owed under the Retail Installment Contract without the service contract and without lowering the monthly payment would have been $18,221.40. (Amortization chart attached to Exhibit 4 that sums 44 payments of $401.93 plus a final payment of $536.48).

7.     After CAC applied whatever money was exchanged between it and Wynn's to Bradley's account, CAC showed the total of payments as having been reduced from $22,910.01 to $20,196.33, with no change in the payment amount. (Exhibit 7, CAC letter sent February 15, 2013).

8.     CAC has a secret profit-sharing plan with Wynn's and Wynn's refuses to provide the formula. (Memorandum in Support of Motion for Sanctions, (Doc. 77), Section I, and supporting Exhibits presented to Court in envelope and currently awaiting ruling on sealing; Wynn's Corporate Deposition, Exhibit 1 attached, 90:2-91:3).

9.     CAC and Wynn's communicate electronically to exchange information and money. (Declaration of R. Steven Brooks, Doc. 60-3, Para. 11, 13, and 14).

10.     CAC knows of no supervision, oversight, or training it provided to Armstrong regarding selling Wynn's service contracts other than providing him a rate sheet. (CAC Corporate deposition, Exhibit 5, 47:18-48:19).

11.     CAC did not monitor how Armstrong sold Wynn's service contracts. (CAC Corporate deposition, Exhibit 5, 47:22-23).

12.     Wynn's provides no ongoing monitoring or guidance to dealers like Armstrong about how to sell its service contracts.   (Exhibit 6, Wynn's Response to Bradley' Interrogatories, Number 12).

14

13.     The only training provided to Armstrong by Wynn's was the Dealer Kit and a rate sheet. (Doc. 56-3, Wynn's Response to Bradley's Interrogatories, Number 2).

14.     Bradley did what she was instructed to do by the August 28th letter (Doc. 60-7) and contacted Armstrong with her questions. (Exhibit 8, Bradley Deposition, 41:10-42:4).

15.     Armstrong told her that the letter was a glitch in the computer system and that she should ignore it. (Exhibit 8, Bradley Deposition, 35:2-11; 42:15-43:19).

16     Bradley believed what Armstrong told her because he was in the business. (Exhibit 8, Bradley Deposition, 43:7-22).

17.     In February of 2013, Bradley still believed she had a service contract on her car. (CAC Corporate deposition, 10:12-11:20).

18.     Wynn's refused to identify the number of times in the past three years that its dealers have sold service contracts on ineligible vehicles. (See Objection to Ruling of Magistrate Judge, Doc. 54, and the full briefing on this issue to be heard on Tuesday, October 7, 2014).

19.     Wynn's has done nothing to solve the problem of dealers like Armstrong selling service contracts on ineligible vehicles because it believes that what occurred in the Bradley transaction is what it wanted to occur and that it has no other responsibility . (Exhibit 6, Wynn's Response to Bradley's Interrogatories, Number 10 and 11; Wynn's Corporate Deposition, Exhibit 1, 138:5-139:25).

20.     Wynn's did not refund the taxes that Bradley paid on the service contract. (Exhibit 6, Wynn's Response to Bradley's Interrogatories, Number 10, and 11; Wynn's Corporate Deposition, Exhibit 1, 185:7-18).

21.     Armstrong did not refund the taxes that Bradley paid on the service contract. (Armstrong Corporate Deposition, Exhibit 3, 106:22-25).

22.     Armstrong did not provide Bradley with any documentation about the taxes paid. (Armstrong Corporate Deposition, Exhibit 3, 128:14-129:3).

**C.     Wynn's is not entitled to summary judgment under Rule 56 because material facts remain in dispute and because the facts that are not in dispute do not defeat any of Bradley's claims.**

### Standard of Review

Summary judgment shall be granted when there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); s*ee Laber v. Harvey*, 438 F.3d 404 (4th Cir. 2006), *citing Celotex Corp. v. Catrett* 477 U.S. 317, 324 (1986). The court must inquire "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Creighton v. Emporia Credit Service, Inc.*, 981 F. Supp. 411, 415 (E.D. Va. 1997), quoting *Anderson,* 477 U.S. at 251-52, 106 S. Ct. at 2512, 91 L. Ed. 2d 202 (1986). Disposition by summary judgment is appropriate only when the record taken as a whole could not lead a rational trier of fact to find for the non-moving party. *U.S. v. National Financial Services, Inc*., 98 F.3d 131, 135 (4th Cir. 1996).

**1.     Wynn's is liable for Armstrong's misrepresentations regarding the Wynn's contract that Armstrong offered to sell Bradley.**

Virginia law recognizes that when an entity allows another to present and explain its contract to a consumer, that entity is liable for the misrepresentations of the person it used to explain its contract.

> With regard to the second main issue, Nationwide argues that it is an innocent principal and cannot be held responsible for Huffman's misrepresentation. We cannot accept this contention. Nationwide argues

16

that only by its direct participation can it be held liable for its agents' conduct. We have long adhered to the rule that "a principal is bound by representations of his agent, made either in the scope of his employment or in furtherance of the object for which he is employed." *Cerriglio v. Pettit,* 113 Va. at 542, 75 S.E. at 307. In *Jefferson Stand. Ins. Co*., we explained that the rule is one of public policy and convenience; we said that

> "in no other way could there be any safety to third persons in their dealings, either directly with the principal, or indirectly with him through instrumentality of agents. In every such case, the principal holds out his agent, as competent, and fit to be trusted; and thereby, in effect, he warrants his fidelity and good conduct in all matters within the scope of the agency."

181 Va. at 834, 27 S.E.2d at 202 (quoting J. Story, Commentaries on the Law of Agency § 452 (9th ed. 1882)). We reaffirmed our view on this subject in *Dudley*.

In this case, Huffman was held out as Nationwide's agent. He was so listed in the local telephone directory. He used Nationwide's letterhead. He was sent to Patterson's business by Nationwide to explain the new policy to Patterson. He was acting within the scope of his employment in representing to Patterson the extent of the coverage provided by the policy.

For all the foregoing reasons, the judgment appealed from will be affirmed.

*Nationwide Ins. Co. v. Patterson*, 229 Va. 627, 632, 331 S.E.2d 490, 493 (1985).

Under the law of agency "[a]n agent represents his principal in an act intended, or calculated to result in the creation of a voluntary primary obligation or undertaking." *Virginia Iron, Coal & Coke Co. v. Odle's Adm'r*, 128 Va. 280, 287, 105 S.E. 107, 109 (1920) (quoting Huffcut on Agency (2d Ed.) § 4)(*see also Dimos v. Stowe, 193 Va. 831, 838-39, 71 S.E.2d 186, 190-91 (1952).* "Agency is a fiduciary relationship resulting from one person's manifestation of consent to another person that the other shall act on his behalf and subject to his control, and the other person's manifestation of consent so to act." *Reistroffer v. Person*, 247 Va. 45, 48, 439 S.E.2d 376, 378 (1994)(reversing trial court's upholding of a demurrer because whether an agency relationship was to be resolved by the presentation of facts). "The power of control is an important factor in

17

determining whether an agency relationship exists." *Id.* Direct evidence of the right to control another is not indispensable to a proof of agency because agency shall be determined from the facts and circumstances of each case. *See Acordia of Virginia v. Genito Glenn, LP*, 560 S.E.2d 246, 251, 263 Va. 377 (2002).

The Virginia Supreme Court has explained the difference between the apparent authority of an agent and agency by estoppel.

> Initially, we note the difference between the terms "apparent authority" and "apparent or ostensible agency." The former concerns the "[a]uthority that a third party reasonably believes an agent has, based on the third party's dealings with the principal, even though the principal did not confer or intend to confer the authority." Black's Law Dictionary 142 (8th ed.2004). In *Bardach Iron & Steel Co. v. Charleston Port Terminals*, 143 Va. 656, 673, 129 S.E. 687, 692 (1925), we stated:

> [A]s between the principal and agent and third persons, the mutual rights and liabilities are governed by the apparent scope of the agent's authority, which is that authority which the principal has held the agent out as possessing, or which he has permitted the agent to represent that he possesses, in which event the principal is estopped to deny that the agent possessed the authority which he exercised.

> *Accord Wright v. Shortridge*, 194 Va. 346, 352-53, 73 S.E.2d 360, 364 (1952). The definition of the term "apparent authority" presupposes the existence of an agency relationship and concerns the authority of the agent. *See Morris v. Dame,* 161 Va. 545, 572-73, 171 S.E. 662, 672 (1933) (discussing whether a servant who is driving a vehicle for his master has ostensible authority by virtue of the employment to allow another person to ride in the vehicle for a purpose having no connection with the master's business).

> In contrast, the term "apparent or ostensible agency" (sometimes also called "agency by estoppel," *see Chandler v. Kelley,* 149 Va. 221, 232, 141 S.E. 389, 392 (1928)), means "[a]n agency created by operation of law and established by a principal's actions that would reasonably lead a third person to conclude that an agency exists." Black's Law Dictionary 67 (8th ed.2004); *see also Title Ins. Co. of Richmond, Inc. v. Howell,* 158 Va. 713, 724, 164 S.E. 387, 391 (1932) ("[o]ne who permits another to hold himself out as agent and appears to acquiesce in that assumption of authority is bound thereby"); *Hardin v. Alexandria Ins. Co.,* 90 Va. (15 Hans.) 413, 416-17, 90 Va. 413, 18 S.E. 911, 911-13 (1894) (insurance

18

company held individual out to the public at large as the company's agent through whom all transactions with the company had to pass); *Gallagher v. Washington County Sav., Loan & Bldg. Co.,* 125 W.Va. 791, 25 S.E.2d 914, 919 (1943) (quoting Restatement (First) of Agency § 8, cmt. a: "`[a]n apparent agent is a person who, whether or not authorized, reasonably appears to third persons, because of the manifestations of another, to be authorized to act as agent for such other'"). In this case, we are concerned with the concept of apparent or ostensible agency.

*Sanchez v. Medicorp Health System,* 618 S.E.2d 331, 333, 270 Va. 299 (2005); *see also Mosell Realty Corp. v. Schofield,* 183 Va. 782, 33 S.E.2d 774, 777 (1945)(quoting Fletcher Cyclopedia Corporations, Perm. Ed, Vol. 2, § 449, p. 257)

Bradley has proffered facts that show that Armstrong was Wynn's actual agent for selling Wynn's service contracts. Wynn's 30(b)(6) deponent confirmed that Armstrong was the agent for the sale of the service contract. Additionally, under *Acordia* and *Reistroffer,* Wynn's can be found liable for Armstrong's misrepresentations because Wynn's had the contractual power to control Armstrong. In both *Acordia* and *Reistroffer* the Virginia Supreme Court held that the determination of whether an agency relationship existed was for the fact finder because the facts were disputed. Based on the disputed facts about the relationship, summary judgment cannot be granted to Wynn's.

Even if Armstrong was not expressly granted authority through that agency to contract with Bradley, Bradley has offered proof that doing so was within Armstrong's apparent authority. First, Wynn's holds all its dealers as the person to select the proper coverage. In the Bradley transaction, Armstrong was the only person to whom she could ask questions about coverage and the person through whom all communications had to pass. He answered those questions for her. Based on these facts, at minimum, a jury issue is raised about what it appeared that Armstrong had authority to do for Wynn's.

19

Finally, Bradley has also offered facts showing through the doctrine of "agency by estoppel" Armstrong should be considered Wynn's agent. Wynn's held Armstrong out as the person on whom customers should rely to select the Wynn's plan right for them. Even after Armstrong erred, Wynn's specifically directed Bradley to take any questions to him. Therefore, at minimum a material issue of fact has been raised about Armstrong's agency by estoppel status.

The bare statement in the contract between Armstrong and Wynn's regarding not establishing an agency relationship does not control whether, as to third persons, Armstrong can be Wynn's agent. "It is well settled that one may be the agent of another as to third persons, although the relation of principal and agent does not exist. The contract between the parties is not alone to determine the question of agency when the rights of third persons are involved, but that is to be considered along with other facts and circumstances given in evidence which bear upon the question of agency." *Bloxom v. Rose*, 151 Va. 590, 598, 144 S.E. 642, 643 (1928) (citing *McIntyre v. Smyth*, 108 Va. 736, 62 S.E. 930 (1908). "When an agreement, considered as a whole, establishes an agency relationship, the parties cannot effectively disclaim it by formal 'consent'. '(T)he relationship of the parties does not depend upon what the parties themselves call it, but rather in law what it actually is.'" *Murphy v. Holiday Inns, Inc*., 216 Va. 490, 492-93, 219 S.E.2d 874, 876 (1975)(citing *Chandler v. Kelley*, 149 Va. 221, 231, 141 S.E. 389, 391-92 (1928) and *Thaxton v. Commonwealth*, 211 Va. 38, 43, 175 S.E.2d 264, 268 (1970)).

Lastly, Wynn's can find little shelter in the *Sanchez* result. In *Sanchez,* the Virginia Supreme Court did not say the doctrine of apparent agency can never be used to establish vicarious liability for an independent contractor but instead stated it could find

"no reason to do so in the specific context presented in this case." 618 S.E.2d at 335.

*Sanchez*, a medical malpractice case, does not include an express admission of agency by the principal, nor advertising brochures by the principal telling the public to rely on the agent, nor a specific letter stating the same thing, nor that the only interaction the victim had with the principal was through the agent.

### 2. Bradley has proffered evidence of each of the elements of fraud and constructive fraud.

On each of the elements of fraud, Bradley has shown at minimum a material issue of fact exists. Paragraphs 82 through 89 of Bradley's counterclaim sets forth the fraud claim before the Court. Bradley has provided evidence that Wynn's agent told her that her car was eligible for coverage as a way to induce her buy the car. She relied on that misrepresentation and nothing in any document she was presented at the time of sale told her that a hybrid was not covered. She was harmed because she paid for this and never received a full refund to her credit account and never received back the taxes she paid.

A second fraud has been shown by the evidence by Armstrong's statements about the August 28 letter. Because Wynn's said to take questions to Armstrong, Bradley did so and reasonably relied on what she was told. She then paid several payments on the credit contract even though she never wanted a car without extended coverage.

For both these frauds, Wynn's has taken no steps to address this situation or stop it from occurring. Despite the frequency of its occurrence, it lets its agents do exactly what Armstrong did.

Consequently, at minimum material issues of fact remain in dispute about the fraud and constructive fraud claims.

**3. Bradley has proffered evidence that Wynn's violated the VCPA regarding the Wynn's contract that Armstrong offered to Bradley.**

As remedial legislation, the VCPA should be applied to suppress unfair practices committed by suppliers on the consuming public. As expressly stated, the VCPA "is remedial legislation to promote the fair and ethical standards of dealings between suppliers and the consuming public." Va. Code § 59.1-197. The statutes passed by the General Assembly must be read so as to "promote the ability of the enactment to remedy the mischief at which it is directed." *Natrella v. Board of Zoning Appeals*, 231 Va. 451, 461, 345 S.E.2d 295, 301 (1986) (quoting *Jones v. Conwell*, 227 Va. 176, 181, 314 S.E.2d 61, 64 (1984)).

Wynn's assertion that it did not violate the VCPA is based on it disclaiming responsibility for Armstrong's statements. The agency discussion above applies to the VCPA claim and rebuts that defense.

Wynn's assertion that Bradley must prove all the elements of fraud to recover under the VCPA is not accurate. The VCPA claim is different than a claim for fraud. The Virginia Supreme Court has already ruled that a VCPA claim involves different elements of proof than a fraud claim even when on the same facts and involving the same misrepresentation. *Wilkins v. Peninsula Motor Cars, Inc.*, 266 Va. 558, 587 S.E.2d 581, 584 (2003) (stating that "this case involves causes of action with different elements of proof and potentially duplicative damage awards."). Thus, the VCPA can be violated without proving all the elements of fraud. *See Surprenant v. Board For Contractors,* 30 Va. App. 165, 171-72, 516 S.E.2d 220, 223 (1999)(finding a violation of the VCPA even though finding no common law fraud).

Among other practices, the VCPA prohibits suppliers from engaging in the following conduct:

> 5. Misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits;
> . . .
> 8. Advertising goods or services with intent not to sell them as advertised, or with intent not to sell at the price or upon the terms advertised.
> In any action brought under this subdivision, the refusal by any person, or any employee, agent, or servant thereof, to sell any goods or services advertised or offered for sale at the price or upon the terms advertised or offered, shall be prima facie evidence of a violation of this subdivision. This paragraph shall not apply when it is clearly and conspicuously stated in the advertisement or offer by which such goods or services are advertised or offered for sale, that the supplier or offeror has a limited quantity or amount of such goods or services for sale, and the supplier or offeror at the time of such advertisement or offer did in fact have or reasonably expected to have at least such quantity or amount for sale;
> . . .
> 14. Using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction;

A jury could find that Wynn's, through its agent, violated Va. Code Ann. § 59.1-200(A)(5), (8) and (14) by misrepresenting the benefits of the Wynn's contract to Bradley, by offering the coverage when it would not be honored and was not honored, by misrepresenting that coverage was provided, and by stating the August 28 letter should be ignored. The Buyer's Order and the Retail Installment Sale Contract both show that the coverage was offered and accepted and the charge included in the total sale price. Because no dispute exists that the car was ineligible for this coverage, the undisputed facts show that Wynn's, through its agent, violated the VCPA.

As for the damage that resulted, Bradley paid for coverage she did not receive and was stuck in a car that she only wanted if it had coverage. Wynn's and Armstrong admit that the taxes on that contract were never refunded, and CAC's records show that a full

23

rebate was never provided. Instead of having a total of payments of been $18,221.40, after whatever money was sent by Wynn's, she had a total of payments of $20,196.33. Thus, she ended up paying more money for a car without any coverage than if no coverage had ever even been offered.

Bradley has also presented evidence of willfulness because Wynn's knows that these situations occur and does nothing to stop them.

**4.      At minimum, material issues of fact have been presented about the Magnuson-Moss Warranty Act claim.**

As recognized by the Virginia Supreme Court in *Sanchez v. Medicorp Health System,* 618 S.E.2d 331, 335, 270 Va. 299 (2005), Virginia has "applied the theory of apparent or ostensible agency in cases involving contract claims." Thus, whether as actual agent, agent with apparent authority, or through ostensible agency, Armstrong's actions could result in a service contract which Wynn's had to honor. Furthermore, as recognized by Wynn's, the Magnuson-Moss Act provides a civil action for damages for a service contractor to fail to comply "with any obligation under this title" or "under a service contract." 15 U.S.C. § 2310(d). The obligation to tell the truth is surely such an obligation and Wynn's chosen spokesperson about the proper service contract for Bradley and about its August 28 letter did not tell the truth. Accordingly, Bradley has also presented evidence of a violation of the Magnuson-Moss Act.

**5.      No basis exists for Wynn's to receive summary judgment on the punitive damages claim or the willfulness element of the VCPA claim.**

Bradley disagrees that the standard for punitive damages from *Hogg v. Plant*, 145 Va. 175, 180 (1926) should be inserted into the VCPA willfulness element. The VCPA "is remedial legislation to promote the fair and ethical standards of dealings between

suppliers and the consuming public." Va. Code § 59.1-197. "[I]t is a universal rule that statutes . . . which are remedial in nature, are to be 'construed liberally, so as to suppress the mischief and advance the remedy,' as the legislature intended." *Board of Sup. v. King Land Corp.*, 238 Va. 97, 103, 380 S.E.2d 895, 898-89 (1989)(*citing Shumate's Case*, 56 Va. (15 Gratt.) 653, 661 (1860)); *see also* 17 Michie's Jurisprudence, Statutes, § 72. The *Hogg* punitive damages standard opens the door to an award of up to $350,000.00 and is applicable to any Virginia tort claim and any defendant; on the contrary, the "willful" element of the VCPA applies only to sellers, and only opens the door to the lesser of three times actual damages or an additional $500.00. The more appropriate standard for "willfulness" in such a consumer protection statute is the meaning given to simple recklessness or gross negligence. *See Safeco Ins. Co. v. Burr*, 551 U.S. 47, 57-59 (2007). That standard is met if a defendant knew or had reason to know of facts that created an unjustifiably high risk of violating the statute. *See id.* at 68-69.

Under federal law, the punitive damages analysis includes whether "the conduct involved repeated actions or was an isolated incident" and whether "the harm was the result of intentional malice, trickery, or deceit, or mere accident." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003). The total evidence about the transaction, including that Wynn's has done nothing to solve a known problem but instead claims all happened as it should have, and its refusal to identify the frequency of this occurrence raises an issue of fact regarding punitive damages for a jury to decide.

**CONCLUSION**

For the reasons stated above, Bradley requests Wynn's Motion for Summary Judgment be denied in its entirety.

25

PENNY L. BRADLEY

By:  s/Thomas D. Domonoske

Thomas D. Domonoske VSB #35434
461 Lee Avenue
Harrisonburg, VA 22802
540-442-7706

Timothy E. Cupp  VSB No. 23017
Shelley Cupp Schulte, P.C.
1951-D Evelyn Byrd Avenue
P.O. Box 589
Harrisonburg VA  22803-0589
Phone: (540) 432-9988
Facsimile:  (804) 278-9634
e-mail: cupp@scs-work.com

## CERTIFICATE OF SERVICE

I, Thomas D. Domonoske, certify that a true copy of this Opposition was delivered by electronic filing via ECF to all counsel of record on this  6th day of October, 2014.

 /s Thomas D. Domonoske
Thomas D. Domonoske