# PENNY L. BRADLEY

v.

# ARMSTRONG AUTO SALES

Deposition of

*Travis W. Armstrong*

*May 29, 2014*



Statewide Coverage in Virginia     National and International Scheduling

| | | |
|---|---|---|
| 590 Neff Avenue, Suite 2000 | 1020 Ednam Center, Suite 002 | 205 34th Street, #1601 |
| Harrisonburg, VA 22801 | Charlottesville, VA 22903 | Virginia Beach, VA 23452 |
| (540) 801-0288 | (434) 296-3111 | (757) 227-4241 |

## Page 1

```
 1   ARBITRATION ADMINISTERED BY JAMS ARBITRATION
 2   BEFORE THE HON. FREDERICK N. SMALKIN (RET.)
 3
 4   _____
 5   PENNY L. BRADLEY,            )
 6                                )
 7        Claimant,               )
 8                                )
 9   v.                           )Ref. No.
10                                )1410006374
11   ARMSTRONG AUTO SALES, INC.,  )
12   TRAVIS ARMSTRONG,            )
13   CREDIT ACCEPTANCE CORPORATION,)
14                                )
15        Respondents.            )
16   _____
17           Deposition of TRAVIS W. ARMSTRONG
18                Harrisonburg, Virginia
19                Thursday, May 29, 2014
20                     10:12 a.m.
21                    Pages 1 - 195
22   Reported by:   Karen L. Hart, RMR, CRR
```

ORIGINAL

## Page 2

```
 1        Deposition of TRAVIS W. ARMSTRONG held at
 2   the law offices of:
 3
 4
 5        BotkinRose PLC
 6        3190 Peoples Drive
 7        Harrisonburg, Virginia 22801
 8        (540) 437-0019
 9
10
11        Pursuant to Notice before Karen L. Hart,
12   Registered Merit Reporter, Certified Realtime
13   Reporter, and Notary Public for the Commonwealth of
14   Virginia.
```

## Page 3

```
 1              A P P E A R A N C E S
 2
 3   ON BEHALF OF THE CLAIMANT:
 4        TOM DOMONOSKE, ESQUIRE
 5        461 Lee Avenue
 6        Harrisonburg, VA 22802
 7        (540) 442-7706
 8        -- and --
 9        TIMOTHY E. CUPP, ESQUIRE
10        CUPP & CUPP
11        1951 Evelyn Byrd Avenue, Suite D
12        Harrisonburg, VA  22801
13        (540) 432-9988
14
15   ON BEHALF OF THE RESPONDENTS ARMSTRONG AND
16   ARMSTRONG AUTO SALES, INC.:
17        LINDSAY C. BRUBAKER, ESQUIRE
18        BOTKINROSE PLC
19        3190 Peoples Drive
20        Harrisonburg, VA  22801
21        (540) 437-0019
22        lbrubaker@botkinrose.com
```

## Page 4

```
 1          A P P E A R A N C E S    (Cont'd)
 2
 3   ON BEHALF OF THE RESPONDENT CREDIT ACCEPTANCE
 4   CORPORATION:
 5        MARTIN C. BRYCE, ESQUIRE
 6        (Via Videoconference and Telephonically)
 7        BALLARD SPAHR LLP
 8        1735 Market Street, 1st Floor
 9        Philadelphia, PA  19103
10        (215) 864-8238
11        bryce@ballardspahr.com
12
13
14
15   Also Present:  Penny Bradley
```

```
 1                    C O N T E N T S
 2
 3   EXAMINATION OF TRAVIS W. ARMSTRONG                  PAGE
 4         By Mr. Domonoske                                 9
 5         By Mr. Bryce                                   153
 6         By Ms. Brubaker                                181
 7         By Mr. Domonoske                               192
 8
 9                      E X H I B I T S
10               (Attached to the transcript)
11               DESCRIPTION                             PAGE
12   Exhibit 1   GAP Addendum                              67
13   Exhibit 2   Buyer's Order                             67
14   Exhibit 3   Additional Conditions of Sale             67
15   Exhibit 4   Odometer Disclosure Statement             67
16   Exhibit 5   Application for Certificate of
17               Title and Registration                    67
18   Exhibit 6   Certificate of Title for a Vehicle        67
19   Exhibit 7   Issue Temp Tag Receipt                    67
20   Exhibit 8   Buyer's Disclosure and Agreement
21               for Starter Interruption Device
22               and GPS                                   67
23   Exhibit 9   Truth in Lending Disclosure
24               Acknowledgement                           67
25   Exhibit 10  Disclosure Form                           67
```

Hart

www.hartreporting.com
scheduling@hartreporting.com

Toll Free
(877) 907-4278

Case 5:13-cv-00114-MFU-JGW  Document 88-1  Filed 10/06/14  Page 3 of 7  Pageid#: 832

```
 1                    E X H I B I T S

 2                       (Continued)

 3                  DESCRIPTION                          PAGE

 4       Exhibit 11   Consent and Authorization Form      67

 5       Exhibit 12   Multi-State Application             67

 6       Exhibit 13   Credit Report Authorization Form    67

 7       Exhibit 14   GAP Acceptance of Coverage          67

 8       Exhibit 15   Information Page                    67

 9       Exhibit 16   Bill of Sale                        67

10       Exhibit 17   Receipt No. 2560                    67

11       Exhibit 18   Agreement to Provide Insurance      67

12       Exhibit 19   Buyer's Guide                       67

13       Exhibit 20   Disclosure Notice                   67

14       Exhibit 21   Retail Installment Contract         67

15       Exhibit 22   Wynn's Service Contract

16                    Application, dealer copy            67

17       Exhibit 23   Wynn's Service Contract

18                    Application, customer copy          67

19       Exhibit 24   Step 5:  Submit the deal            67

20       Exhibit 25   Step 4:  Work the deal              67

21       Exhibit 26   Step 4:  Work the deal              67

22       Exhibit 27   Qualification Form                  67

23       Exhibit 28   Funding Status/Fax Cover Page       67

24       Exhibit 29   Letter re warranty ineligibility    67

25       Exhibit 30   Transaction Report, 4-16-13         67
```



Page 141

1 or they did service work with them. Sure, they're
2 out of their warranty, but can we take care of them
3 because they are a good customer or a repeat
4 customer.
5  Q.  Do you use e-mail?
6  A.  I do, yes, sir.
7  Q.  Do you use e-mail with your MAM?
8  A.  They e-mail us as far as kind of giving us
9 monthly updates or weekly updates and things like
10 that. I'm not personally a big e-mailer. I'm more
11 of a text or call person.
12  Q.  Do you text your MAM?
13  A.  Yes, I do.
14  Q.  Have you texted him or e-mailed him
15 anything about the Bradley transaction?
16  A.  We have spoken about it. I don't think
17 I've e-mailed or texted him about it specifically.
18 No, sir, not that I recall.
19  Q.  Have you e-mailed or texted him anything
20 about the pilot program?
21  A.  When we were doing it?
22  Q.  Yes.
23  A.  I just told him we were looking forward to
24 it and excited about it.
25  Q.  Were there any e-mails or texts about when

Page 142

1 you stopped using the pilot program?
2  A.  Well, I don't think we stopped using the
3 pilot program. I'm pretty sure it just rolled right
4 into the new program.
5     Like, there was the old program and then
6 the pilot program, and then that just rolled right
7 into the new one. So there wasn't -- we didn't go
8 back to using the old one.
9  Q.  But the new program looks different than
10 the pilot program?
11  A.  Somewhat. I mean, a lot of similarities,
12 but yes, sir.
13  Q.  When you talked with your MAM about the
14 Bradley transaction, what did he say?
15  A.  Gosh, I'm trying to remember. It's been
16 quite some time ago.
17     I believe he just explained to me that the
18 application that Ms. Bradley had done for the
19 warranty was an application, so it would have been
20 sent in and seen if it was covered or not covered,
21 and that it wasn't covered, and she was notified of
22 that within seven days.
23     And, you know, that's basically how -- I
24 guess, how it's done if there is an issue.
25  Q.  Where is he based out of?

Page 143

1  A.  He lives in Culpeper, I believe. But no,
2 like I said, he's not with them anymore. He covers
3 like a pretty large area, but that's where he lives.
4     They don't have an office like they go to.
5 They work out of their house.
6  Q.  Where does your current MAM live?
7  A.  I don't know, to be honest. Like I said,
8 I just met him the first time last Wednesday. I'm
9 not sure where he lives. I think maybe in the
10 Winchester area, but I'm not positive.
11  Q.  If you look at, as just sort of a whole
12 packet, Exhibits 1 through 23, most of these
13 documents are documents you got Penny Bradley to
14 sign?
15  A.  Yes, sir.
16  Q.  In that signing process, do you get all
17 the documents printed out at one time and bring them
18 to her?
19  A.  What I do when I prepare for a delivery is
20 I print all the documents ahead of time. Then I sit
21 down and sign all of them myself, and I highlight
22 where each customer needs to sign.
23     Then I'll bring her in and turn it around
24 and go over it page by page with them and show them
25 what they need to sign, make sure they understand all

Page 144

1 the information.
2  Q.  Do you have a set order that you put them
3 in?
4  A.  Yes, sir.
5  Q.  Could you take the documents, Exhibit 1
6 through 21, and reorder them?
7  A.  Sure.
8  Q.  And the ones that have her signature.
9 Actually, 1 through 23.
10     And Exhibit 1 is the front of 22 and 23,
11 so you can only -- you don't have to use Exhibit 1.
12 You don't have to use Exhibit 22. 23 will be fine.
13  A.  Like I said, this is -- this is some older
14 paperwork, so I'm going to do it to the best of my
15 recollection. It's not what we're using right now.
16
17     (Discussion off the record)
18
19     THE WITNESS: This is pretty close.
20 BY MR. DOMONOSKE:
21  Q.  Tell us what you just did. I understand
22 that you're doing it from memory because some of the
23 documents have changed.
24  A.  Yes, sir. So what I'm trying to do is put
25 these in order based on how I do my deliveries. And

Page 145

1  my papers are in the same order. I do it the same
2  way every single time.
3      Like I said, once in a while something
4  could be different. Like, not everyone gets a
5  warranty and not everyone gets GAP. But generally,
6  it's the way they print it out off of my computer, so
7  they're pretty much always in the same order.
8      Q.  All right. What I'd like for you to do is
9  go through, and you can just read us the document
10 numbers.
11     A.  Exhibit or document number?
12     Q.  I'm sorry. The exhibit numbers, the order
13 you put them in.
14     A.  Exhibit numbers, sure. Exhibit 17,
15 Exhibit 16, Exhibit 2, Exhibit 3, Exhibit 18, Exhibit
16 4, Exhibit 20, Exhibit 19, Exhibit 5, Exhibit 10,
17 Exhibit 11, Exhibit 12, Exhibit 13, Exhibit 14,
18 Exhibit 8, Exhibit 1, Exhibit 9, Exhibit 21, Exhibit
19 22, Exhibit 23.
20     And, actually, some of these we didn't
21 need, but this would work. You can do this --
22 Exhibit 6 can be the last one, and I'll explain that
23 in a minute.
24     Q.  Okay. And for Exhibit 6, what you're
25 doing is you're using the title as a placeholder for

Page 146

1  your Virginia Reassignment of Title form?
2      A.  Yes, sir, you're correct.
3      Q.  Assuming or pretending that I'm
4  Ms. Bradley, if -- when you would then call her in
5  with this stack of documents, can you just very
6  quickly demonstrate to me how the signing process
7  goes?
8      A.  Sure. Can I borrow your pen?
9      Q.  Don't mark on them.
10     A.  Yeah, I won't mark on them. Put a cap on
11 it.
12     Okay. So the first thing I'll show you is
13 this is your receipt showing your down payment of
14 $1,300. You've paid all that in full on today's
15 date, so you have no balance. Your down payment is
16 paid in full. I haven't had one of these in a while.
17     This is our information, your information
18 and the vehicle information, selling price. This is
19 your sales tax, processing fee, your tax, title --
20 tags -- excuse me -- your service contract and your
21 GAP insurance, which brings you to this total, minus
22 your down payment. This is the balance that you
23 would be financing.
24     Does all that make sense?
25     Q.  Yes.

Page 147

1      A.  If it doesn't or any time you don't
2  understand anything, just stop me and we'll go over
3  it again. And you'll sign everywhere that I've
4  marked in yellow.
5      Q.  All right. Now, I'm going to stop you.
6  What you've just done is you first showed me Exhibit
7  17.
8      A.  Yes, sir.
9      Q.  Does that mean that Ms. Bradley would have
10 already given you the down payment?
11     A.  It generally -- now, if not, like, let's
12 say -- I don't know. She's taking the vehicle. She
13 has to bring her down payment in the next day or
14 something like that, or maybe she has half of it now,
15 and she has to wait. She took it out of the ATM, and
16 she has to go back tomorrow and get the other half.
17 We'll make a note on here, and we'll say paid this
18 amount on this day or then, you know, paying the
19 balance tomorrow, whichever it is.
20     Q.  I'll ask a very specific question. By the
21 time you showed this to Ms. Bradley in her
22 transaction, had you already gotten a check from her?
23     A.  I don't believe so, no. Generally, I
24 don't -- I don't get any money from the customer
25 until we sit down and go over the paperwork,

Page 148

1  generally.
2      Q.  Well, you started with the receipt, but
3  actually, you had not yet gotten the check?
4      A.  No, what I would do is, when I turned it
5  around, I would say, okay, let's go ahead and get
6  your down payment taken care of. And then I would
7  take her money, and then I would say, okay, here's
8  your receipt for that.
9      Q.  Okay.
10     A.  That's generally how I do it. I don't
11 usually -- I don't like taking their money until I
12 have the receipt ready to give to them.
13     Q.  Right.
14     A.  Now, some customers will give it to you
15 right upfront, so it's case by case.
16     Q.  Yeah. So with Ms. Bradley, the first
17 thing you got would have been the down payment check,
18 and then you went to the receipt?
19     A.  Yes, sir.
20     Q.  Then you flipped this document back
21 towards you?
22     A.  Yes, sir.
23     Q.  And you showed --
24     A.  Well, I usually sit it over here. Okay.
25 I sit them off to the side.

### Page 149

1  Q. Sit them off to the side.
2  A. Uh-huh.
3  Q. Then you would set that document off to
4  the side.
5      Then you showed me Exhibit 17. Would you
6  get Ms. Bradley to sign right then --
7  A. Yes, sir.
8  Q. -- on Exhibit 17?
9  A. Yes, that's what I'd tell her. I'd say,
10 you know, you need to sign here. Everywhere that's
11 yellow is where I'll have you sign.
12 Q. All right.
13 A. And I highlight it, so they don't sign in
14 the wrong spot or something like that.
15 Q. So then if I'm Ms. Bradley, you still have
16 these documents on the table in the stack?
17 A. Yes, sir.
18 Q. And I sign right there --
19 A. Well --
20 Q. -- on Exhibit 16?
21 A. Most people will take it over to them and
22 sign it.
23 Q. So they sign and then --
24 A. Hand it back to me, and I put it over
25 here.

### Page 150

1  Q. Okay.
2  A. And then we'll move on to the next one.
3  Q. Okay. And for each of the documents, you
4  then take them up in that order, and you get her
5  signature on the document before you move on to the
6  next one?
7  A. Yes, sir.
8  Q. I notice that in these documents, there's
9  Exhibit 13, which is the Credit Report Authorization
10 Form.
11 A. Yes, sir.
12 Q. By the time this is happening, won't her
13 credit report already have been pulled?
14 A. Yes, sir.
15 Q. But then this is authorization for the
16 pull that had previously happened?
17 A. From my understanding, when you give
18 someone your information verbally, you are giving
19 them permission to pull your credit report.
20 Q. I'm not disagreeing with you on the law.
21 A. That's just, yeah, from my understanding.
22 So I guess this is the procedure they do.
23 Q. I'm just making sure I understand the
24 process --
25 A. Yes, sir.

### Page 151

1  Q. -- by which you get the signatures on the
2  document.
3  A. Yes, sir.
4  Q. All right. Now, I want to go back to when
5  you've prepared those documents and you have those in
6  front of you.
7  A. Okay.
8  Q. Is it your practice to give any of those
9  documents to the customer to review before you start
10 the signing process?
11 A. That's completely up to the customer.
12 When I turn it around and give it to them to sign,
13 that's their time that they read it over. Some
14 customers choose to and some don't. That's up to the
15 customer themselves.
16 Q. All right.
17 A. I don't just hand it to them and say,
18 here, you know, look through all this, no. I try to
19 go over each document with them individually. So
20 that way, if there's an issue with that document, I
21 can explain it to them.
22 Q. What if a customer said, I want to take
23 these documents and go home and review them before
24 signing them?
25 A. I've never had anyone ask that. I would

### Page 152

1  probably say, I can't give you these, but I can make
2  you a copy, but I can't give you my originals because
3  if you lose them, you know -- but, sure, I can give
4  you a copy of them.
5  Q. So if they ask, you'd give them a copy
6  that they could take with them to review?
7  A. Sure.
8  Q. The last thing is, some of the documents
9  are different lengths.
10 A. Yes.
11 Q. For instance, I have a copy of the retail
12 installment sales contract, which is twice the length
13 of that normal -- and I have a copy of the Wynn's.
14 How are these in the stack in terms of the length?
15 Are they folded?
16 A. No, just like this. And then we go to
17 them as we get to them.
18 Q. All right. And the way you demonstrated
19 is there's just some of the documents that are much
20 longer in the stack and come down, and then they have
21 signatures on various places on them?
22 A. Yes, sir.
23 Q. They're not all the same length?
24 A. No, sir.
25      MR. DOMONOSKE: All right. I have no

Hart
www.hartreporting.com
scheduling@hartreporting.com
Toll Free
(877) 907-4278

Case 5:13-cv-00114-MFU-JGW Document 88-1 Filed 10/06/14 Page 7 of 7 Pageid#: 836