1        IN THE UNITED STATES DISTRICT COURT

2        WESTERN DISTRICT OF VIRGINIA

3        HARRISONBURG DIVISION

4  _____

5  WYNN'S EXTENDED CARE, INC.,    )

6  Plaintiff and Counter-Defendant, )Case Number

7  v.                  )5:13-cv-00114

8  PENNY L. BRADLEY,         )

9  Defendant and Counter-Plaintiff. )

10  _____

11

12        Deposition of 30(B)(6) CORPORATE

13  REPRESENTATIVE OF ARMSTRONG AUTO SALES, INC.

14        BY TRAVIS W. ARMSTRONG

15        Harrisonburg, Virginia

16      Wednesday, September 3, 2014

17           9:15 a.m.

18         Pages 1 - 165

19      Reported by:  Karen L. Hart, RMR, CRR

20

21

22

23

24

25

```
 1                  Deposition of TRAVIS W. ARMSTRONG held at

 2      the law offices of:

 3

 4

 5                  BotkinRose, PLC

 6                  3190 Peoples Drive

 7                  Harrisonburg, Virginia 22801

 8                  (540) 437-0019

 9

10

11                  Pursuant to Notice before Karen L. Hart,

12      Registered Merit Reporter, Certified Realtime

13      Reporter, and Notary Public for the Commonwealth of

14      Virginia.

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                   A P P E A R A N C E S
 2    ON BEHALF OF THE PLAINTIFF AND COUNTER-DEFENDANT:
 3              VIRGINIA M. SADLER, ESQUIRE
 4              JORDAN COYNE
 5              10509 Judicial Drive, Suite 200
 6              Fairfax, VA  22030
 7              (703) 246-0900
 8              v.sadler@jocs-law.com
 9
10    ON BEHALF OF THE DEFENDANT AND COUNTER-PLAINTIFF:
11              TIMOTHY E. CUPP, ESQUIRE
12              SHELLEY CUPP SCHULTE
13              1951 Evelyn Byrd Avenue, Suite D
14              Harrisonburg, VA  22801
15              (540) 432-9988
16              cupplaw@comcast.net
17
18    ON BEHALF OF TRAVIS ARMSTRONG AND ARMSTRONG AUTO
19    SALES, INC.:
20              LINDSAY C. BRUBAKER, ESQUIRE
21              BOTKINROSE PLC
22              3190 Peoples Drive
23              Harrisonburg, VA  22801
24              (540) 437-0019
25              lbrubaker@botkinrose.com
```

```
1                    C O N T E N T S

2

3      EXAMINATION OF TRAVIS W. ARMSTRONG            PAGE

4            By Mr. Cupp                             6

5            By Ms. Sadler                           131

6            By Mr. Cupp                             152

7            By Ms. Sadler                           163

8

9                      E X H I B I T S

10               (Attached to the transcript)

11               DESCRIPTION                         PAGE

12     Exhibit 1   Printout from Virginia State

13                 Corporation Commission website    11

14     Exhibit 2   Corporate deposition notice       12

15     Exhibit 3   Wynn's Extended Care dealer

16                 agreement                         34

17     Exhibit 4   Retail rate card                  50

18     Exhibit 5   Retail installment contract       64

19     Exhibit 6   Wynn's Plus used vehicle service

20                 contract/application              71

21     Exhibit 7   Buyer's order                     75

22     Exhibit 8   Letter to Bradley, 8/28/12        109

23     Exhibit 9   Copy of Wynn's claims procedure   111

24     Exhibit 10  Copy of Wynn's repair facility

25                 claim procedure                   112
```

```
1                    E X H I B I T S

2                      (Continued)

3              DESCRIPTION                    PAGE

4    Exhibit 11  Copy of Wynn's vehicle service

5                contract protection          114

6    Exhibit 12  Copy of Wynn's document      114

7    Exhibit 13  Copy of Wynn's vehicle service

8                contract protection          117

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                P R O C E E D I N G S

2                TRAVIS W. ARMSTRONG,

3       having been duly sworn, testified as follows:

4        EXAMINATION BY COUNSEL FOR DEFENDANT AND

5                    COUNTER-PLAINTIFF:

6   BY MR. CUPP:

7        Q.    Good morning, Mr. Armstrong.

8        A.    Good morning, sir.

9        Q.    My name is Tim Cupp, and I represent Penny

10  Bradley in the case that currently is pending against

11  Wynn's Extended Care, Inc. in the United States

12  District Court for the Western District of Virginia.

13          I'm going to be asking you some questions

14  as the designated representative of Armstrong Auto

15  Sales, Inc., and if there are any questions I ask you

16  this morning that you don't understand, please let me

17  know because I want to make sure that we have

18  accurate answers to the questions that I present.

19       A.    Yes, sir.

20       Q.    I know that you have been deposed on at

21  least one other occasion, and it was in the

22  arbitration with Ms. Bradley and Credit Acceptance

23  Corporation and your company, Armstrong Auto Sales.

24  Do you recall that?

25       A.    Yes, sir.

1    the contract to see if they credited it, because it

2    wouldn't be credited now.

3        Q.    You know that she cancelled the contract;

4    she gave notice of cancellation of the contract;

5    right?

6        A.    No, sir.  What do you mean?

7        Q.    In February, after she retained counsel,

8    she gave notice of cancellation of the contract.

9            MS. SADLER:  Object to the extent it calls

10    for a legal conclusion.

11    BY MR. CUPP:

12        Q.    Are you aware of that?

13        A.    I don't believe I -- I mean, that could

14    have been something she asked for, but I don't think

15    I was made aware of that.

16        Q.    Well, you received a letter from my office

17    at the end of February; right?

18        A.    I believe so, yes, sir.

19        Q.    And how did you take that letter?  Do you

20    remember what it said?

21        A.    I don't at this point, no, sir.

22        Q.    And you never had any discussion with

23    anyone about how to rebate the taxes in relation to

24    the service contract?

25        A.    No, sir.

1    Q.    And to your knowledge, no taxes were ever

2    rebated or credited back to Ms. Bradley?

3    A.    Not to my knowledge, no, sir.  They

4    haven't been rebated or credited to anyone, to my

5    knowledge.

6    Q.    So now I'm going back to the question

7    about the service contracts and how often in the last

8    three calendar years a Wynn's service contract was

9    initially included in a vehicle sale at Armstrong.

10   Can you give me that number?

11   A.    We can get it if we take a break.

12        MR. CUPP:  Okay.  Let's take a break

13   because I'm about ready to move through this.  I

14   think I'm getting close to the end.

15        (Pause.)

16   BY MR. CUPP:

17   Q.    What I'm interested in is how often in the

18   last three calendar years a Wynn's service contract

19   was initially included in a vehicle sale at

20   Armstrong --

21   A.    Okay.

22   Q.    -- and the number of those transactions

23   where the vehicle was ineligible for coverage because

24   it was a hybrid.  And I understand we already know

25   that.

```
 1    we may have had one Mazda Tribute hybrid that was
 2    traded in, I think.  I'd have to look to be sure, but
 3    very, very, very few.  It's not something that I go
 4    out and purchase.
 5         Q.    So looking at Exhibit 5, if you would --
 6    that's the retail installment sales contract -- under
 7    the truth in lending disclosures, it talks about the
 8    annual percentage rate of 24.99 percent.
 9         A.    Yes, sir.
10         Q.    And then the amount financed of 13,339.
11    Do you see those numbers?
12         A.    Yes.
13         Q.    So if the service contract was not in this
14    transaction, and therefore the amount financed would
15    have been reduced accordingly, would there have been
16    a different interest rate?
17         A.    No, sir.
18         Q.    So the interest rate was something that
19    was set by credit history?
20         A.    Yes, sir.
21         Q.    Okay.  How about the monthly payment
22    amount?  Would that have changed?
23         A.    Well, sure, if you had a lower amount
24    financed and a given rate over a set amount of time,
25    you would have a lower payment.
```

1    Q.    And that would be governed by whether or

2    not you were going to leave the number of payments

3    the same?

4    A.    The same.  Sure.  I mean, we could have

5    shortened the term and raised the payment.  She would

6    have paid less interest because it would have been a

7    shorter term.  You know, there's a lot of different

8    ways to work it.

9    Q.    So you have the ability to make the

10   determination about, you know, if you're at a certain

11   interest rate and you have a certain principal

12   balance due over a period of time, you can determine

13   how to get somebody's payments around a certain

14   figure; right?

15   A.    We have the leeway to do that.  But it

16   doesn't always work to our advantage.  I may lower

17   someone's interest rate and it would give me less of

18   an advance.  I may raise it and it gives me less of

19   an advance.  I may shorten their term and it gives me

20   less of an advance.  I may raise their term and it

21   gives me less of an advance.

22        It's really -- you just have to play with

23   it.  And Credit Acceptance gives you the flexibility

24   to do as you wish, but that doesn't mean that they're

25   going to reward you for doing what you wish.

1    Q.    When you say an advance, that means the

2  payment that they make very shortly after the

3  transaction has been finalized?

4    A.    How much money we would get upfront once

5  the deal is done, yes, sir.

6    Q.    So with the Bradley transaction, how much

7  time was it before you saw money in your -- in

8  Armstrong Auto's account?

9    A.    We looked at this the other day.  I don't

10  remember how long it took to get funded.  I do

11  remember the amount of money we got was about 300

12  more than we paid for the vehicle, and we never

13  received another dime off of the car or from Penny

14  Bradley.

15    Q.    When you say the amount of money you

16  received on the car, you mean from Credit Acceptance?

17    A.    From Credit Acceptance.

18    Q.    You already had 1,300.

19    A.    Yes, as for a down payment.  Once we took

20  out her tax, title, tags and all the expenses that we

21  had, that was our initial profit on the car was

22  around 3 or $400, I believe.

23    Q.    Were you the one making the determination

24  about the numbers such as the sales -- the total

25  sales price?

1      A.    Yes, sir.  I had control over all numbers.

2      Q.    And you didn't have to get into the Credit

3  Acceptance system, did you, in order to find out what

4  those numbers would be?

5      A.    The sale price, no, sir.  But the rate and

6  term and payment was through Credit Acceptance.

7      Q.    If the service contract had not been in

8  the transaction, would that have changed the sale

9  price?

10      A.    No, sir.

11      Q.    That was simply a cost of the transaction;

12  right?

13      A.    The service contract?

14      Q.    Yes.

15      A.    Yes, sir.

16      Q.    And so therefore that would change the

17  amount financed?

18      A.    Yes, sir.

19      Q.    When did you actually pay the state taxes

20  for the Wynn's service contract sold to Ms. Bradley?

21      A.    I believe the end of that month.  I think

22  we provided you a copy of that.  I don't have the

23  exact date.

24      Q.    I remember you did provide something to

25  me, and it appeared that it was in January of 2013.

1          A.     Could have been.  We --

2                 MS. SADLER:  Can I see that?

3                 MR. CUPP:  Let me have that back.  You

4     know what?  I'm not sure if that's subject to --

5                 THE WITNESS:  I believe you're correct

6     that --

7                 MR. CUPP:  -- any kind of confidentiality

8     or not.

9                 THE WITNESS:  At that time we didn't have

10    anyone really taking care of that.  We hired an

11    accounting firm to come in at the end of the year,

12    and they got all of our stuff straight.

13    BY MR. CUPP:

14         Q.     And you never sought a rebate of any of

15    those taxes paid?

16         A.     No, sir.

17         Q.     And you never told Ms. Bradley she could

18    seek a rebate?

19         A.     No, sir.

20         Q.     Did you provide her with any documentation

21    about when you -- until this litigation arose, did

22    you provide her with any documentation about taxes or

23    when you had paid taxes?

24         A.     That's not something we provide the

25    customers.  I mean, I guess technically it would have

1    been Penny's responsibility to have paid it, but

2    that's something that we did for her since she was

3    the one who purchased the warranty, not us.

4         Q.    Look at Exhibit 7, the buyer's order.  Do

5    you see you charged $250 for a processing fee?

6         A.    Yes, sir.

7         Q.    That's because you processed the things

8    such as the payments --

9         A.    No, sir.  It is illegal to charge a

10   processing fee to handle a customer's taxes and tags

11   and stuff for them.  A processing fee simply covers

12   my cost of the office personnel that I have,

13   paperwork, fax machines, computers, things like that.

14        Q.    Okay.  But you didn't have anybody else

15   working on this transaction; right?

16        A.    I did have other people working for me at

17   the time, yes, sir, but I did this transaction.  Now,

18   there's other people that worked that put the deals

19   together and got them funded that did the tag work

20   and things like that.

21        Q.    Who are those people?

22        A.    That was Terri Stephens, S-t-e-p-h-e-n-s.

23        Q.    Is that a man or a woman?

24        A.    Woman.

25        Q.    T-e-r-r-i?