UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

WYNN'S EXTENDED CARE, INC.,
Plaintiff and
Counter-Defendant, Case No. 5:13-cv-00114

v

PENNY L. BRADLEY,

Defendant and
Counter-Plaintiff.
_____________________________________/

The 30(b)(6) deposition of DANIEL ULATOWSKI, corporate representative of CREDIT ACCEPTANCE CORPORATION, taken pursuant to Notice of Taking Deposition before Nancy Kirchoff, Certified Shorthand Reporter, a Notary Public within and for the County of Livingston, State of Michigan, at 355 S. Old Woodward Avenue, Suite 100, Birmingham, Michigan, on Thursday, September 11, 2014, at or about 1:15 p.m.

THIS DEPOSITION TRANSCRIPT AND/OR CERTAIN EXHIBITS THERETO CONTAIN CONFIDENTIAL MATERIAL SUBJECT TO PROTECTIVE ORDER.

APPEARANCES:

JORDAN COYNE LLP
By: Virginia Sadler
10509 Judicial Drive
Suite 200
Fairfax, VA 22030
(703) 246-0900
Appearing by Telephone on behalf of
Plaintiff/Counter-Defendant

APPEARANCES (CONTINUED):

THOMAS D. DOMONOSKE (VSB No. 35434)
461 Lee Avenue
Harrisonburg, VA 22802
(540) 442-7706
tomdomonoske@earthlink.net
Appearing on behalf of
Defendant/Counter-Plaintiff

SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
By: Patrick G. Rideout
Four Times Square
New York, NY 10036
(212) 735-2702
patrick.rideout@skadden.com
Appearing on behalf of Witness

CREDIT ACCEPTANCE
By: Gregg Elzey
25505 West 12 Mile Road
Southfield, MI 48034-8334
(248) 353-2700x5530
gelzey@creditacceptance.com
Appearing on behalf of Witness

TABLE OF CONTENTS

| WITNESS | PAGE NUMBER |
| --- | --- |
| DANIEL ULATOWSKI/CREDIT ACCEPTANCE CORPORATION | |
| Direct Examination by Mr. Domonoske | 4 |

EXHIBITS

| EXHIBIT NUMBER | MARKED |
| --- | --- |
| 1 - Corporate Deposition Designation(Before Deposition) | |
| 2 - Retail Installment Contract | 16 |
| 3 - Used Vehicle Service Contract/Application | 23 |
| 4 - Protective Order | 56 |
| 5 - Redactions | 84 |

Birmingham, Michigan
Thursday, September 11, 2014
At or about 1:15 p.m.

- - -

D A N I E L   U L A T O W S K I

corporate representative for CREDIT ACCEPTANCE CORPORATION, after having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. DOMONOSKE:

Q Can you say your name and spell it for the court reporter so we can have it on the record?
A Daniel Ulatowski, D-A-N-I-E-L, last name is Ulatowski, U-L-A-T-O-W-S-K-I.
Q Mr. Ulatowski, do you understand that you are giving testimony today on behalf of Credit Acceptance Corporation?
A Yes.
Q Do you work for Credit Acceptance Corporation?
A Yes, I do.
Q What is your position?
A Chief Sales Officer.
Q And how long have you had that position?
A It's a good question. Not long. I don't remember the exact date.

different issues.

A Would you like to restate the question?

Q Sure. Do you know when the first communications with Ms. Bradley by CAC was about the service contract?

A Based on the information I have, February 13, 2013.

Q Let's take up 5.

MR. RIDEOUT: You mean on the deposition notice?

MR. DOMONOSKE: Yes.

Q 5 asked about the computer account records that show communications with February, 2013, so I went to five based on your answer right there. What do those records show about those communications in February of 2013?

MR. RIDEOUT: I will just object to the form, but you can answer.

A I can read you the note from February 13, 2013, at 12:20 p.m.

Q Sure.

A "Maker called and stated that she spoke with Wynn's and was told that she doesn't have a service contract. She is stating that the dealer hasn't refunded the money back for that service, advised that

a letter was mailed out on 8/28/12, stating that her vehicle is not eligible for coverage and a credit of $2,713.68 was applied to her account on 8/31/12. Requested payment history. She stated that she may be taking legal action against the dealer as he told her to disregard the letter and told her that when he contacted Wynn's, he was told that they wouldn't cover the parts she needs for her repairs. Advised of next AP draft and self-service options."

Q Were there any other account records in February of 2013 about the service contract?

A It looks like there was one other in February of 2013.

Q What did that one say?

A It said, "She needs to postpone next payment, maker said needs repairs on unit, needs to stop auto pay. Said the dealer is giving her hard time over warranty, she is going to seek out legal advice. Maker stopped February auto pay and will do OTO on 1st for 200 and on 15th, 201.93.

Q And were there any other records about communications with Ms. Bradley about the service contract?

A Not to my knowledge.

Q Let's go on to number 2 on the deposition

that was one of the hooks, if you will, for the dealer. So when we did launch CAPS 2.0, they would be part of the pilot group that got access to it.

Q Was there a time period where dealers could choose between accessing CAPS 2.0 and accessing the prior system?

A My understanding is, yes, that is correct.

Q And do you know the overlap of that time period?

A My understanding is 30 days.

Q And was that in October of 2012?

A I don't know.

Q After 30 days, was the prior system then no longer available?

MR. RIDEOUT: Object to the form of the question. You can answer it.

A My understanding is that's correct.

Q Did CAC provide any monitoring of Armstrong Auto's sale of Wynn service contracts?

MR. RIDEOUT: Objection.

A I don't understand the question.

Q Did they monitor how Armstrong Auto was selling service contracts?

A No.

Q Did they send anyone to supervise or guide him

in the sale of service contracts?

MR. RIDEOUT: Objection, form of the question. Is they Wynn's?

MR. DOMONOSKE: Wynn's.

Q Did Credit Acceptance send anyone to supervise or guide Armstrong Auto Sales in the sales of service contracts?

MR. RIDEOUT: Objection.

MS. SADLER: Objection, relevance, foundation.

A Our market area managers would have trained Armstrong on CAPS and they would have referenced the rate sheet.

Q Other than that, did they provide any sort of supervision or monitoring of his sale of service contracts?

A I don't know.

MS. SADLER: Objection, foundation, relevance.

Q Do you know when Mr. Raley stopped being the market area manager for Armstrong Auto Sales?

A I do not know.

Q Do you know who his market area manager is now?

A I do not.

Q Do you know when Mr. Raley stopped working for