```
 1                UNITED STATES DISTRICT COURT

 2            FOR THE WESTERN DISTRICT OF VIRGINIA

 3                    HARRISONBURG DIVISION

 4   - - - - - - - - - - - - - - - - - - - -

 5       WYNN'S EXTENDED CARE, INC.,

 6                  Plaintiff,

 7       -vs-                          Civil Action No.

 8                                     5:13-cv-00114

 9       PENNY L. BRADLEY,

10                  Defendant.

11   - - - - - - - - - - - - - - - - - - - -

12                                  August 29, 2014

13                                  Harrisonburg, Virginia

14   Deposition of

15                    PENNY BRADLEY,

16   the Defendant, was called for examination by counsel on

17   behalf of the Plaintiff, pursuant to notice, taken in

18   the law offices of SHELLEY, CUPP & SCHULTE, 1951 Evelyn

19   Byrd Avenue, Suite D, Harrisonburg, Virginia, commencing

20   at 10:39 a.m., before Robin Creswell, a Notary Public in

21   and for the Commonwealth of Virginia, when there were

22   present on behalf of the respective parties:
```

```
 1    APPEARANCES:

 2        For the Plaintiff:

 3              VIRGINIA M. SADLER, ESQUIRE

 4              JORDAN, COYNE & SAVITS, L.L.P.

 5              10509 Judicial Drive, Suite 200

 6              Fairfax, Virginia 22030

 7              (703) 246-0900

 8

 9      For the Defendant:

10              TIMOTHY E. CUPP, ESQUIRE

11              SHELLEY, CUPP & SCHULTE

12              1951 Evelyn Byrd Avenue

13              Suite D

14              Harrisonburg, Virginia 22801

15              (540) 432-9988

16

17

18

19

20

21

22
```

1                    C O N T E N T S

2

3        WITNESS                              PAGE

4    PENNY BRADLEY

5    Examination by Ms. Sadler              4, 90

6    Examination by Mr. Cupp                79

7

8

9

10

11                   E X H I B I T S

12       EXHIBIT                              PAGE

13   Bradley Exhibit #1                       13

14   Bradley Exhibit #2                       15

15   Bradley Exhibit #3                       39

16   Bradley Exhibit #4                       84

17   Bradley Exhibit #5                       87

18   Bradley Exhibit #6                       88

19

20

21

22

```
 1  Thereupon,
 2                      PENNY BRADLEY,
 3  the defendant, having been duly sworn, was examined and
 4  testified as follows:
 5            EXAMINATION BY MS. SADLER:
 6   Q.    All right.  So Ms. Bradley, I'm Virginia Sadler.
 7  I represent Wynn's Extended Care in this lawsuit that
 8  you have filed.
 9            Could you state your full name for the record?
10   A.    Yes, ma'am.  Penny Lynn Bradley.
11   Q.    What was the first name?
12   A.    Penny.
13   Q.    Penny?  Okay.  And what's your current address?
14   A.    252 Saginaw Lane.
15   Q.    Could you spell that?
16   A.    S-A-G-I-N-A-W Lane, Stanley.
17   Q.    Okay.  All right.  Stanley, Virginia, I assume.
18  What's your ZIP Code there?
19   A.    22851.
20   Q.    All right.  Have you ever had your deposition
21  taken before?
22   A.    No, ma'am.
```

 1   received a letter.

 2           And I said well, I did receive some kind of

 3   letter, and I talked to Mr. Armstrong about that.  And

 4   Mr. Armstrong told me oh, you can just ignore that

 5   letter because everyone gets one of those.  It's some

 6   kind of glitch with the computer system, something about

 7   running the tags through the DMV.  When they run the

 8   tags through the DMV, that causes that letter to

 9   generate.

10           He was like nope, you don't have to worry about

11   that.  So --

12     Q.   When -- when was this phone call that you placed

13   to Wynn's?

14           I guess in -- if you bought the car in August,

15   was it like a month after that?

16     A.   I'm trying to remember.  It was when I started

17   having problems, and I kept working with him.

18     Q.   Uh-huh.

19     A.   When I kept working with him and he kept saying

20   that he was going to fix it, and then he never would fix

21   it.  And then I ended up finally calling him.

22           Because he said he had called them.  And they

 1   said that they don't think that they were going to be

 2   able to cover the battery.

 3            And I was like well, I want to give them a call,

 4   why wouldn't they cover the battery because I have a

 5   warranty.

 6       Q.   Okay.

 7       A.   And he said well, the warranty -- the warranty

 8   is not going to cover the battery, so I'm going to have

 9   to fix that for you.  But yet, he never would so --

10       Q.   Did he tell you how much he was going to charge

11   you to fix it for you?

12       A.   Oh, no.  He wasn't going to charge me.

13       Q.   Oh, he wasn't?

14       A.   No.  He said -- he even said that he was going

15   to have his friend from the Honda dealership run it

16   through the Honda -- wherever he has the friend in

17   Staunton somewhere try to run it through their system to

18   say that it had less mileage than it had so that he

19   could get it fixed.

20       Q.   What would the mileage have had to do with it?

21   Do you know?

22       A.   Evidently, there's some kind of mileage

1  fix it if it costs $7,000, we can't fix it.

2    Q.   How did you know how much it cost?  Because

3  Armstrong --

4    A.   Travis told me that.  Yeah, he had told me that

5  when I was telling him that I wanted a warranty.

6         And he was like yeah, that's a good idea because

7  those batteries in those things are terribly expensive,

8  they cost around $7,000.  I said yikes.

9         Yeah, I definitely wanted the warranty.

10   Q.   Tell me a little bit about the conversation you

11 had with Mr. Armstrong when he said -- let me just give

12 you this so we can make it an exhibit.

13        (Thereupon, the document was marked Bradley

14        Exhibit #3 for identification.)

15        BY MS. SADLER:

16   Q.   I hand you -- or the court reporter handed you

17 Exhibit 3.

18        You mentioned a letter that you had gotten

19 earlier.  Is this the letter you were referring to?

20   A.   Yes, ma'am, it is.

21   Q.   And the second page is a blown-up copy of a

22 receipt for mailing.  Is that your signature?

1   A.   It is. Yes, ma'am.

2   Q.   When you got this letter, had you already had

3   problems with the battery at that point? Had the light

4   come on?

5   A.   No. No. I don't believe so.

6   Q.   How long after you got this letter did the light

7   come on?

8   A.   I'm trying to remember. It went a little while.

9   It may have been maybe a week or so.

10  Q.   Okay. But no more than like a month?

11  A.   I don't believe so. It's hard for me to

12  remember from two years ago.

13  Q.   Yeah. And it looks like I think the date on

14  this letter is August 28th.

15       But I think you got it September 8th. Does --

16  do you remember getting it about a week after it was

17  dated -- or signing for it, at least?

18  A.   It's hard for me to remember.

19  Q.   I will ask you a different question.

20       Did you have to go pick this up at the post

21  office --

22  A.   Yes.

```
 1    Q.    -- because it was certified?

 2    A.    Yes.

 3    Q.    You did?  Okay.

 4    A.    Yes.

 5    Q.    Had you received a couple of notices in the mail

 6   that you had a certified?

 7    A.    I believe I had only seen one notice.

 8    Q.    And then did you go pick it up a few days later?

 9    A.    I did.  Yes, ma'am.

10    Q.    Okay.  When you got this letter, did you read

11   it?

12    A.    Yes.

13    Q.    And did you know that it came from Wynn's?

14    A.    No.  It doesn't say it come from Wynn's.

15    Q.    Okay.  Who did you think it came from?

16    A.    Well, I wasn't sure who it came from.  It didn't

17   really say.

18          All it says is administrative office.  I just

19   saw this part where it says please contact your selling

20   dealership with any questions.

21    Q.    Okay.

22    A.    So I called -- I called Travis.
```

```
 1   Q.   Did you -- when you signed Exhibit 2, did you
 2   understand that Wynn's was a different company from the
 3   company selling you your car?
 4   A.   No.  No, I didn't.
 5   Q.   Did you think Travis Armstrong worked for
 6   Wynn's?
 7   A.   I wasn't sure.  I just know I was getting my
 8   warranty that I wanted.
 9   Q.   Okay.
10   A.   And I wasn't going to purchase the car without
11   one.
12   Q.   So you didn't know one way or another if he
13   worked for Wynn's or not?
14   A.   No.
15   Q.   So when you got this letter that's Exhibit 3,
16   what did you do?
17   A.   I called Travis.
18   Q.   How long after you got the letter did you call
19   him?
20   A.   Immediately.
21   Q.   Okay.  And tell me about that conversation.
22   A.   I said Travis, I've got this letter saying
```

 1  something about the vehicle listed on the vehicle

 2  service agreement is ineligible.

 3         And he was like oh, you got one of those.  Oh,

 4  that happens all of the time.  And I was like well, I

 5  just want to make sure that I have my warranty and

 6  everything that you supposedly gave me.

 7         He was like oh, yeah, oh, yeah, you don't have

 8  to worry about that.  That's just -- and I was like

 9  well, why did I get that letter.  And he said well,

10  that's just a computer glitch.  That happens all of the

11  time.  It's something about when they run the tags

12  through the DMV.

13   Q.   Did that make sense to you?

14   A.   It didn't make a whole lot of sense.  But I

15  trusted what he said to me.

16         I mean he does sell cars.  So I figured, you

17  know, he knew what he was talking about when he tells me

18  that this happens all of the time and it's a computer

19  glitch.  Because I guess computer glitches do happen.

20   Q.   After you talked to him, did you call the number

21  on the letter?

22   A.   No.  I just did what it told me to do and called