IN THE CIRCUIT COURT

OF THE 11TH JUDICIAL CIRCUIT

IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO.: 13-CV00114


WYNN'S EXTENDED CARE INC.,

    Plaintiff,

Vs.

PENNY L. BRADLEY.

    Defendant.

_____/


DEPOSITION

OF

FRANK ARMENTEROS


**TAKEN AT:**

19 West Flagler Street Suite 902

Miami, Florida 33130


September 15th, 2014

10:00 a.m. to 4:25 p.m.


**Downtown Reporting** Bradley Ex 1

1

2                          **APPEARANCES:**

3

4            On Behalf Of the Defendant:

5            THOMAS DOMONOSKE, Esquire

6            1951 D Evelyn Byrd Avenue

7            P.O.BOX 589

8            Harrisonburg, VA 22803

9            540-432-9634

10

11           On Behalf Of the Plaintiff:

12           VIRGINIA SADLER, Esquire

13           10809 Judicial Drive Suite 200

14           Fairfax Virginia 22030

15           703-246-0900

16

17           SCOTT JABLONSKI, Esquire

18           11900 Biscayne Blvd Suite 700

19           Miami, Florida 33181

20           305-895-0300

21

22                          INDEX

23   Deposition of ALFRED ARMENTEROS          Page

24   Direct Examination by Mr. Domonoske       03

25

**Downtown Reporting**

b5279c86-cf19-4945-af97-c9870bab9a3f

1    (Thereupon, the following proceeding was had:)

2        **THE COURT REPORTER:**  Do you swear that the

3    testimony you are about to give will be the

4    truth, the whole truth and nothing but the

5    truth?

6        **MR. ARMENTEROS:**  I Swear.

7              DIRECT EXAMINATION

8  BY MR. DOMONOSKE:

9    Q    Good morning.  Please state your full name

10  for the Court Reporter, please.

11    A    **Alfred Armenteros.**

12    Q    And whom do you work for Mr. Armenteros?

13    A    **Wynn's Extended Care.**

14    Q    Have you ever had your deposition taken

15  before?

16    A    **Yes, years ago.**

17    Q    Do you understand that your answers are

18  under oath?

19    A    **Yes.**

20    Q    Do you understand that your answers have

21  to be spoken so that the Court Reporter can take

22  them down, rather than with the shake of the head?

23    A    **Yes, Sir.**

24    Q    If at any point during the day you need a

25  break please tell me you need a break, if you need

b5279c86-cf19-4945-af97-c9870bab9a3f

1    BY MR. DOMONOSKE::

2        Q    Do you know what the contract with Credit

3    Acceptance Corporate says about the training of car

4    dealers in the sale of the service contracts?

5        **A    Yes.**

6        Q    What does it say?

7        **A    This -- at this moment with the revision**

8    **of 2010, it became -- the CAC will promote if**

9    **necessary our service contract, if they choose to.**

10       Q    What does promote mean?

11       **MS. SADLER:**  Objection calls for a legal

12       conclusion.  Document speaks for itself.

13       **MR. ARMENTEROS:**  Make it available to the

14       dealer.

15    BY MR. DOMONOSKE::

16       Q    Is there anything else that CAC is

17    supposed to do under that provision?

18       **MS. SADLER:**  Objection calls for a legal

19       conclusion.

20       **MR. ARMENTEROS:**  I don't know the answer.

21    BY MR. DOMONOSKE::

22       Q    When you reviewed the contract, did you

23    see any paragraph about profit sharing?

24       **A    I cannot say yes or no it wasn't important**

25    **to me to be honest with you.  I read it and it**

1   probably said something about profit sharing.

2       Q    What did it say about profit sharing?

3           MS. SADLER:  I'm going to object because

4   the court specifically ruled that we were not

5   required to produce the terms of the contract

6   to you, and under court order we did not

7   produce the specific terms.  You cannot use the

8   deposition as a way to circumvent the court's

9   ruling.

10  BY MR. DOMONOSKE::

11      Q    You can summarize it.

12          MS. SADLER:  No, he can't.  You are asking

13  him to violate the ruling that we got the other

14  day.  We were allowed to produce a disclosure

15  statement to you, which we have done.  You

16  cannot ask him to regurgitate the terms of the

17  contract, which you were allowed to redact.

18          MR. DOMONOSKE:  I'm merely asking him to

19  summarize it.

20          MS. SADLER:  That is not appropriate, as

21  you are aware.  You do not have to answer to

22  that.

23          MR. ARMENTEROS:  I will not answer.

24  BY MR. DOMONOSKE::

25      Q    Are you able to tell me if there's a

Case 5:13-cv-00114-MFU-JGW   Document 88-8   Filed 10/06/14   Page 5 of 25   Pageid#: 1618
b5279c86-cf19-4945-af97-c9870bab9a3f f

1    formula for the profit sharing?

2          **MS. SADLER:** Same objections.

3          **MR. ARMENTEROS:** I don't know of any

4      formula.

5    BY MR. DOMONOSKE::

6        Q   When you look at a contract was the profit

7    sharing part redacted?

8        **A   I cannot say yes or no.**

9    **BY MR. DOMONOSKE::**

10       Q   Label Exhibit Eight, and I'd like to take

11   this opportunity to reed that.

12             12:14 p.m. lets go off the record.

13   1:15 p.m. back on the record.

14   BY MR. DOMONOSKE::

15       Q   I'm handing you Plaintiff' Exhibit Nine

16   through Fifteen, which is a series of documents

17   originally labeled Wynn's One through Seven. Do you

18   know from looking at these documents which of these

19   represent the information available on one computer

20   file or computer screen, and I'll tell you the

21   reason I ask is it looks like this might be some

22   sort of spreadsheet at least the first few pages.

23         **MS. SADLER:** I'm just going to note for

24      the record that the documents have been

25      modified by Plaintiff's counsel including

1          **MS. SADLER:**  Object to form.  Object to

2     relevance.

3          MR. ARMENTEROS:  No.

4   BY MR. DOMONOSKE::

5     Q    And, look at Exhibit Sixteen, please and a

6   few pages in you'll see that the last two pages in

7   the upper left say "Scanned by Britney" do you know

8   who Britney is?

9          **MS. SADLER:**  Objection relevance.

10         **MR. ARMENTEROS:**  An employee.

11   BY MR. DOMONOSKE::

12     Q    Of Phoenix America?

13         **MS. SADLER:**  Objection relevance.

14         **MR. ARMENTEROS:**  Yes.

15         **MS. SADLER:**  I'm just going to note again

16     for the record that Exhibit Sixteen contains

17     modifications that plaintiff's counsel has made

18     to the documents produced by Wynn's.

19   BY MR. DOMONOSKE::

20     Q    I'm handing you Exhibit Seventeen.  Do you

21   recognize Exhibit Seventeen?

22     **A    Yes.**

23     Q    What is it?

24     **A    Retail rate chart.**

25     Q    Whose retail rate chart?

1      A      CAC business.

2      Q      This is a retail rate chart prepared by

3  Wynn's?

4      A      I cannot answer.  I don't know.

5      Q      You don't know.  Is it a retail rate chart

6  prepared by Phoenix American?

7           MS. SADLER:  Objection relevance.

8           MR. ARMENTEROS:  I cannot answer.

9  BY MR. DOMONOSKE::

10     Q      Do you know who superior protection plan

11  is?

12     A      Yes.

13     Q      Who is superior protection plan?

14     A      The other warranty company used.

15     Q      What other warranty company?

16     A      The same like Wynn's Extended Care they

17  use another company to promote themselves, the

18  vehicle service contracts.

19     Q      Is there any connection between Wynn's and

20  Superior Protection Plan?

21     A      No, Sir.

22     Q      Is there any connection between Phoenix

23  American and Superior Protection Plan?

24     A      No, Sir.

25           MS. SADLER:  Exhibit Seventeen should be

1  BY MR. DOMONOSKE::

2      Q    Did Wynn's decide to add the term electric

3  vehicles to Exhibit Seventeen?

4          **MS. SADLER:**  Objection relevance, beyond

5      the scope.

6          **MR. ARMENTEROS:**

7  BY MR. DOMONOSKE::

8      Q    Did Wynn's decide to add the term electric

9  vehicles to Exhibit Seventeen?

10     **A    Don't now the answer to that.**

11     Q    Did Wynn's decide that the term electric

12  vehicles include hybrid vehicles?

13         **MS. SADLER:**  Objection relevance.

14         **MR. ARMENTEROS:**  Don't know the answer to

15     that.

16  BY MR. DOMONOSKE::

17     Q    Did Phoenix American decides that electric

18  vehicles mean hybrid vehicles?

19         **MS. SADLER:**  Objection relevance.  This

20     witness is here to testify on behalf of Wynn's

21     Extended Care.  He is not here to testify on

22     behalf of Phoenix American.

23  BY MR. DOMONOSKE::

24     Q    You can answer.

25         **MS. SADLER:**  You are not speaking on

Case 5:13-cv-00114-MFU-JGW   Document 88-8   Filed 10/06/14   Page 9 of 25   Pageid#: 1622
b5279c86-cf19-4945-af97-c9870bab9a3f

1       behalf of Wynn's or Phoenix.

2            MR. ARMENTEROS:  There is no answer to

3       that, I mean, in the industry, and this is

4       speaking as Alfred Armenteros, in the industry

5       everybody knows that an electric component in a

6       -- if it's only electric is an electric car if

7       it has electric and gas or diesel is a hybrid.

8   BY MR. DOMONOSKE::

9       Q    Do you recognize Exhibit Eighteen?

10      A    Yes.

11      Q    What is it?

12      A    It's a marketing or sales material.

13      Q    Who prepared it?

14           MS. SADLER:  Objection relevance.

15           MR. ARMENTEROS:  Wynn's Extended Care.

16  BY MR. DOMONOSKE::

17      Q    When you say "Wynn's Extended Care", o you

18  mean that an employee of Phoenix American prepared

19  this?

20           MS. SADLER:  Objection relevance also

21      calls for a legal conclusion in regarding

22      provisions.

23           MR. ARMENTEROS:  I rather don't answer.

24  BY MR. DOMONOSKE::

25      Q    Well, you said Wynn's Extended Care

Case 5:13-cv-00114-MFU-JGW   Document 88-8   Filed 10/06/14   Page 10 of 25   Pageid#: 1623
b5279c86-cf19-4945-af97-c9870bab9a3f

Page 112

1    refers to?

2        **A**      **The department that promotes our products.**

3        Q       Is that a department Phoenix American?

4        **MS. SADLER:**  Objection relevance, beyond

5    the scope.

6        **MR. ARMENTEROS:**  I'm going to answer

7    questions about Wynn's Extended not Phoenix

8    American.

9    BY MR. DOMONOSKE::

10       Q       When you said sales does that refer to the

11   sales department of Phoenix American?

12       **MS. SADLER:**  Same objections.

13       **MR. ARMENTEROS:**  I'm not answering that.

14   BY MR. DOMONOSKE::

15       Q       On this document where it says "Sales"

16   does that refers to the sales department of Phoenix

17   American?

18       **MS. SADLER:**  Same objections.

19       **MR. ARMENTEROS:**  The sales Wynn's Extended

20   Care and has our address.

21   BY MR. DOMONOSKE::

22       Q       How many people in the sales department of

23   Wynn's Extended Care?

24       **A**      **Don't know the answer.**

25       Q       Are there any employees of Wynn's Extended

**Downtown Reporting**

Page 113

1  Care--

2      **MS. SADLER:**  Counsel, we've cover this in

3  detail, asked and answered.

4  BY MR. DOMONOSKE::

5      Q    Is the answer zero?

6      **MS. SADLER:**  Asked and answered.  Don't

7  batcher him.

8      MR. ARMENTEROS:  --

9  BY MR. DOMONOSKE::

10     Q    I'm sorry?

11     A    **Don't know the answer.**

12     Q    Handing you Exhibit Nineteen.  I'd like

13  you to read it to yourself, please.  Have you read

14  Exhibit Nineteen?

15     A    **Yes, Sir.**

16     Q    Do you recognize it?

17     A    **Yes.**

18     Q    What is it?

19     A    **A brochure.**

20     Q    What kind of brochure?

21     A    **A brochure for Wynn's Extended Care**

22  **program.**

23     Q    Who is this given to?

24     A    **To the consumers.**

25     Q    Do you expect consumers to read it?

Case 5:13-cv-00114-MFU-JGW   Document 88-8   Filed 10/06/14   Page 12 of 25   Pageid#: 1625
b5279c86-cf19-4945-af97-c9870bab9a3f f

Page 114

1      **MS. SADLER:** Objection relevance.

2      **MR. ARMENTEROS:** I don't know. I cannot

3      speculate to that.

4   BY MR. DOMONOSKE::

5      Q    Why was this included in the dealer kit?

6      **MS. SADLER:** Objection relevance.

7      **MR. ARMENTEROS:** It's part of the sales

8      material.

9   BY MR. DOMONOSKE::

10     Q    Did you expect the dealers to give it to

11  consumers?

12     **A    Don't know that. Don't know the answer to**

13  **that.**

14     Q    What did you do to prepare for item seven

15  of corporate deposition notice Exhibit One?

16     **MS. SADLER:** Objection relevance.

17     **MR. ARMENTEROS:** I know the existence of

18     the kit, didn't have to prepare.

19  BY MR. DOMONOSKE::

20     Q    Could you read paragraph seven out loud,

21  please?

22     **A    The content of the dealer kit that should**

23  **have been provided to Armstrong Auto and for each**

24  **part of it the reason it was included and did Wynn's**

25  **expected it's potential customers and follow be**

Case 5:13-cv-00114-MFU-JGW   Document 88-8   Filed 10/06/14   Page 13 of 25   Pageid#: 1626

1    directed to ask their dealer about the service plan

2    that was right for them.

3       Q    Did you do anything to find out why this

4    document was included in the dealer kit?

5       A    Ask the question again.

6       Q    Did you do anything to find out why this

7    document was included in the dealer kit?

8            MS. SADLER:  Objection relevance.

9            MR. ARMENTEROS:  I don't have any answer,

10       no.

11   BY MR. DOMONOSKE::

12       Q    Does that mean you didn't do anything to

13   find out why this document was included in the

14   dealer kit?

15           MS. SADLER:  I'm also going to object to

16       the extent that it would call for attorney

17       client communications.

18           MR. ARMENTEROS:  Do I have to answer?

19           MS. SADLER:  If you did something separate

20       and apart from meeting with counsel --

21           MR. ARMENTEROS:  No, I haven't.

22           MS. SADLER:  Okay.

23           MR. ARMENTEROS:  To answer your question,

24       this dealer kit is no different from any other

25       dealer kit that we send to the Wynn's extended

Case 5:13-cv-00114-MFU-JGW   Document 88-8   Filed 10/06/14   Page 14 of 25   Pageid#: 1627
b5279c86-cf19-4945-af97-c9870bab9a3f

1      Care program to all of our point of sales.

2  BY MR. DOMONOSKE::

3      Q    And do you expect the dealers to give this

4  brochure to customers?

5      **A    I don't expect anything.  I don't -- I**

6  **don't work for sales.  I don't know the facts of how**

7  **they work.**

8      Q    Does the corporation you work for expect

9  that this brochure would be made available to

10 customers?

11         **MS. SADLER:**  Objection relevance.

12         **MR. ARMENTEROS:**  Is the dealer decision to

13     do the best to protect himself and the

14     customer.

15     Q    Does the company you work for expect this

16 brochure could be read by customers?

17         **MS. SADLER:**  Objection relevance.

18         **MR. ARMENTEROS:**  Yes.

19 BY MR. DOMONOSKE::

20     Q    Does the company you work want the

21 customers to ask the dealer about the plan that's

22 right for them?

23         **MS. SADLER:**  Objection relevance.

24         **MR. ARMENTEROS:**  Don't know what the

25     customer would do.

**Downtown Reporting**

1    BY MR. DOMONOSKE::

2        Q    I'm asking does the company you work for

3    expects the consumers to ask the dealers about the

4    plan that's right for them?

5        **MS. SADLER:**  Objection relevance.

6        **MR. ARMENTEROS:**  Don't know the answer.

7    BY MR. DOMONOSKE::

8        Q    Go to the second page of Exhibit Nineteen.

9    Do you see where it says, "Ask your dealer about the

10   plan that is right for you"?

11       **A    Uh-huh.**

12       Q    Is that what the company you work for

13   expects to happen?

14       **MS. SADLER:**  I'm just going to object.

15       The document speaks for itself.  You can answer

16       fi you understand something beyond what the

17       document says.

18       **MR. ARMENTEROS:**  This is a sales material.

19       Nothing is beyond that it's a sales material

20       it's used to promote our product; each dealer

21       will handle it in their own way.

22   BY MR. DOMONOSKE::

23       Q    And for dealers who give this to

24   customers, do they want customers to do that?

25       **A    Absolutely.**

1      Q      Are you able to search by reasonable of

2    legibility?

3      **A**      **No.**

4      Q      Turning to item nine of Exhibit One.  At

5    the time of the Bradley transaction did your company

6    provide a service contract on a hybrid vehicle?

7    I'll reword that question.

8      **A**      **Okay.**

9      Q      I'm not asking for a legal conclusion that

10   would happen in the Bradley transaction.  At the

11   time of the Bradley transaction did your company

12   made available for consumers a service contract on a

13   hybrid vehicle?

14     **A**      **Not on the CAC program.**

15     Q      Outside of the CAC program?

16          **MS. SADLER:**  Objection relevance.

17          **MR. ARMENTEROS:**  Yes.

18   BY MR. DOMONOSKE::

19     Q      How much would it cost?

20          **MS. SADLER:**  Objection relevance.

21          **MR. ARMENTEROS:**  I have no idea.

22   BY MR. DOMONOSKE::

23     Q      How would you find out the cost?

24          **MS. SADLER:**  Objection relevance.

25          **MR. ARMENTEROS:**  This vehicle would never

**Downtown Reporting**

Page 132

1    qualify.

2  BY MR. DOMONOSKE::

3    Q  Al right. What would this hybrid vehicle

4  not qualify for the hybrid service contract that was

5  potentially available through Wynn's?

6    **A  Mileage number one, age number two.**

7    Q  What hybrid vehicles did you cover?

8    **A  New vehicles only.**

9    Q  Does new refer to brand new or was new

10  like within two or three years old?

11    **MS. SADLER:** Objection calls for

12    speculation.

13    **MR. ARMENTEROS:** Depending on the program.

14  BY MR. DOMONOSKE::

15    Q  So, at the time of the Bradley

16  transaction, what was the age limit for vehicles

17  that had been already sold once and they were

18  hybrids?

19    **A  Don't know the answer to that.**

20    Q  Do you know the cost?

21    **A  No.**

22    Q  Could Armstrong Auto have sold for your

23  company such a service contract?

24    **MS. SADLER:** Objection relevance, calls

25    for speculation.

**Downtown Reporting**

b5279c86-cf19-4945-af97-c9870bab9a3f if

1          **MR. ARMENTEROS:**  I have no idea.

2     BY MR. DOMONOSKE::

3          Q     What kind of dealer would be allowed to

4     sell such service contracts?

5          **MS. SADLER:**  Objection relevance, calls

6          for speculation.

7          **MR. ARMENTEROS:**  Cannot speculate which

8          one.

9     BY MR. DOMONOSKE::

10         Q     Do they have to be associated with certain

11     finance company?

12         **MS. SADLER:**  Objection relevance.

13     BY MR. DOMONOSKE::

14         Q     If Armstrong Auto wanted to sell contracts

15     directly for your company could Armstrong Auto do

16     that?

17         **MS. SADLER:**  Objection relevance.

18         **MR. ARMENTEROS:**  Yes.

19     BY MR. DOMONOSKE::

20         Q     If Armstrong auto would signed up TO sell

21     contracts directly for your company would that

22     include the ability to sell on hybrid vehicle?

23         **MS. SADLER:**  Objection relevance.

24         **MR. ARMENTEROS:**  Don't know the answer.

25     BY MR. DOMONOSKE::

Page 137

1    BY MR. DOMONOSKE:

2         Q    Did you do anything to find out to prepare

3    to respond to item thirteen?

4         A    Read it.

5         Q    Other than reading it did you do anything

6    to answer that question?

7         A    No.

8         Q    Did you ask Mr. Brooks?

9         A    No.

10        Q    Lets' look back at Exhibit Three.  And I'm

11   going to ask you questions under item sixteen right

12   now.  I know I'm jumping around a little bit.  Why

13   did your company tell Penny Bradley to contact their

14   selling dealership?

15        A    'Cause that is the procedure.

16        Q    Did you expect her to do that?

17        A    Yes, Sir.

18        Q    What instructions did you give the selling

19   dealership for how to respond to her questions?

20             MS. SADLER:  Same objection.

21             MR. ARMENTEROS:  I don't know the question

22        so I can't answer that.

23   BY MR. DOMONOSKE::

24        Q    How did you want the selling dealership to

25   respond?

Case 5:13-cv-00114-MFU-JGW   Document 88-8   Filed 10/06/14   Page 20 of 25   Pageid#: 1633

b5279c86-cf19-4945-af97-c9870bab9a3f

Page 138

1     A     Don't know the answer.  He has options.

2     Q     All right.  2:27 p.m. off the record.

3  2:42 p.m. back on the record.

4  BY MR. DOMONOSKE::

5     Q     Turning to item fifteen of Exhibit One.

6  What steps were taken by your company after it

7  learned of the Bradley transaction to ensure what

8  occurred in that transaction does not occur again?

9          MS. SADLER:  Objection relevance.

10         MR. ARMENTEROS:  No steps were taken.

11  Everything that was supposed to occur occurred.

12  BY MR. DOMONOSKE::

13    Q     Turn into seventeen, what steps did the

14  company take to insure that dealers who sold a

15  service contract on an ineligible vehicle provide

16  the customer with the opportunity to cancel the

17  entire transaction?

18         MS. SADLER:  Objection relevance.

19  BY MR. DOMONOSKE::

20    Q     And by "Entire transaction" I mean the

21  sale of the car.

22         MS. SADLER:  Objection relevance.

23         MR. ARMENTEROS:  That's not our

24  responsibility.  That's CAC responsibility if

25  they choose to do so.

Case 5:13-cv-00114-MFU-JGW   Document 88-8   Filed 10/06/14   Page 21 of 25   Pageid#: 1634

b5279c86-cf19-4945-af97-c9870bab9a3f 3f

Page 139

1  BY MR. DOMONOSKE::

2      Q    Why is it not your responsibility?

3          **MS. SADLER:**  Objection relevance, calls

4      for speculation.

5          **MR. ARMENTEROS:**  The dealer is an agent in

6      the way of selling the product on behalf of CAC

7      and Wynn's Extended Acre.  In other words, they

8      choose to do business with CAC and they

9      purchase the warranty -- service contract, I'm

10     sorry, that was available when they sold the --

11     when they did the finance through CAC.  What we

12     received was the transaction and we processed

13     the transaction according to our

14     responsibility.

15 BY MR. DOMONOSKE::

16     Q    Do you expect your service contract to

17 give the customer peace of mind about the vehicle

18 being covered?

19         **MS. SADLER:**  Objection calls for

20     speculation.

21         **MR. ARMENTEROS:**  Not answering that.

22 BY MR. DOMONOSKE::

23     Q    I'm sorry you don't know the answer?

24     **A    I know the answer I'm not answering.**

25     Q    What is the answer?

Page 151

1    Q    Yes, the agreements that you got.

2    A    **The one that I had, close to an hour.**

3    Q    Did it include Exhibit Twenty Three?

4    A    **I don't know.**

5    Q    Did it include 2008 program agreement?

6    A    **I don't recall.**

7    Q    Did it include amendments to an agreement?

8    A    **Yes.**

9    Q    With a lot of big black redacted parts?

10   A    **Yes.**

11   Q    Did you discuss that with Mr. Brooks?

12   A    **No.**

13   Q    Did you discuss that with anyone?

14        **MS. SADLER:**  I'm just going to object to

15   the extent that it would call for

16   communications with counsel.

17  BY MR. DOMONOSKE::

18   Q    Did you ask to see the unredacted?

19   A    **No.**

20   Q    Back on Exhibit Twenty Two when you were

21  asked to sing this on Friday, what were you told?

22        **MS. SADLER:**  Objection o the extent that

23   calls for communications with counsel.

24  BY MR. DOMONOSKE::

25   Q    By Mathew.

**Downtown Reporting**

1    **MS. SADLER:** Objection Mathew Brooks is

2    corporate counsel for Wynn's you would be

3    seeking privilege communication instruct the

4    witness not to answer.

5    **MR. ARMENTEROS:** No, answer.

6  BY MR. DOMONOSKE::

7    Q    Did you talk about Exhibit Twenty Two with

8  anyone other than counsel?

9    **MS. SADLER:** To the extent that calls for

10    communications with counsel same objection.

11  BY MR. DOMONOSKE::

12    Q    Other than counsel in the room and Mr.

13  Mathew Brooks, did you talk about Exhibit Twenty Two

14  with anyone?

15    **A    No.**

16    Q    Were you by yourself?

17    **A    Yes.**

18    Q    Did he handed delivered it to you did he

19  email it to you?

20    **MS. SADLER:** Objection relevance.

21    **MR. ARMENTEROS:** E-mail.

22  BY MR. DOMONOSKE::

23    Q    What time of day?

24    **MS. SADLER:** Objection relevance.

25    **MR. ARMENTEROS:** Passed 5:00.

1      **MS. SADLER:** Which column are you pointing

2  to?

3      **ARMENTEROS:** The additional.

4      **MS. SADLER:** 385.

5      **MR. ARMENTEROS:** 385.

6  BY MR. DOMONOSKE::

7      Q    Okay.  So if we wanted to know the dealer

8  cost in the Bradley transaction we would subtract

9  385 from what number?

10     **A    The retail.**

11     Q    AND what was the retail cost?

12     **A    1580.**

13     Q    All right.  Would you agree that 1580

14  minus 385 is $1195?

15     **A    Yes.**

16     Q    So, that's the dealer cost in the

17  transaction.

18     **A    Yes.**

19     Q    That's how much should have been sent to

20  Credit Acceptance Corporation?

21     **A    That is not what it would be.  This**

22  **vehicle -- all credit acceptance contracts are**

23  **fully, fully financed, there is no money exchange on**

24  **this contracts as far as we are concern.  Customer**

25  **doesn't have a down payment that includes a portion**