IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | |
|---|---|
| WYNN'S EXTENDED CARE, INC., | : |
| | : |
| Plaintiff/Counterclaim Defendant, | : |
| | : |
| v. | : CIVIL ACTION NO. 5:13-cv-00114-MFU |
| | : |
| PENNY L. BRADLEY, | : |
| | : |
| Defendant/Counterclaim Plaintiff. | : |

### WYNN'S REBUTTAL BRIEF TO BRADLEY'S OPPOSITION TO, AND IN FURTHER SUPPORT OF, WYNN'S MOTION FOR SUMMARY JUDGMENT

Counterclaim Defendant, Wynn's Extended Care, Inc. ("Wynn's"), by and through its undersigned counsel, respectfully submits this Rebuttal to the Defendant/Counterclaim Plaintiff Penny L. Bradley's ("Bradley") Brief in Opposition ("Bradley's Opposition") to, and in further support of, Wynn's Motion for Summary Judgment.

### I.      INTRODUCTION

Bradley has not genuinely disputed any material fact and, as a matter of law, Wynn's is entitled to summary judgment in its favor.  Bradley had the opportunity to conduct full and complete discovery in this matter.  Simply stated, Bradley cannot prove that Armstrong Auto Sales ("Armstrong Auto") or Travis Armstrong was Wynn's agent, or that there are sufficient facts to support Bradley's claims for fraud, violations of the Virginia Consumer Protection Act ("VCPA"), or the Magnuson-Moss Warranty Act ("MMWA").

### II.      PROCEDURAL DEFECTS

Principally, Federal Rule of Civil Procedure 56(c)(B)(2) permits objection on the grounds that an attached exhibit would not be admissible at trial.  Bradley cites to exhibits in support of her opposition which would not be admissible at trial and therefore should not be considered in

support of her opposition. Document 88-1 is the deposition of Travis Armstrong from the Arbitration Proceedings ("Arbitration") between Bradley, Armstrong Auto and Credit Acceptance Corporation ("CAC") to which Wynn's is not a party. Wynn's was neither present nor afforded the opportunity to participate in this deposition. Fed. Civ. Proc. R. 32(a). Furthermore, the deposition transcript was not produced in the discovery in this case. Document 88-3 is also a document stemming from the Arbitration Proceedings. Document 88-3 purports to be a communication between respective counsel for Bradley and Armstrong Auto in the Arbitration ("Arbitration Communication"). The exhibit is objectionable on multiple grounds including hearsay, lack of relevance and foundation. The exhibit is inadmissible at trial and cannot serve as the basis to support Bradley's Opposition.

### III.    STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE

Wynn's will address only those facts that Bradley purports to dispute, as numbered in Wynn's opening brief and using terms as defined therein. Bradley "disputes" those facts without citation or reference to any supporting evidence, instead often crafting her arguments from conjecture or fabricated statements of fact that she hopes to have this Court approve through Bradley's Motion for Sanctions for Violating Profit Sharing Order and for Failure to Produce Knowledgeable Designee at Corporate Deposition (hereinafter "Motion for Sanctions"). As discussed below, not a single material fact here is in dispute.

**2.      Wynn's did not solicit Armstrong Auto to enter into the Dealer Agreement.  Mr. Armstrong has never spoken to any Wynn's officers or employees.  The first time any Armstrong Auto employee ever contacted Wynn's was after Bradley brought the Vehicle in for repairs.**

Bradley's Opposition concedes that the Dealer Agreement is the entire agreement between Wynn's and Armstrong Auto, and argues that how that agreement came about is immaterial. Notably, Bradley does not dispute that Armstrong Auto had no communications

with Wynn's until Bradley took the Vehicle to Armstrong Auto for repairs.

**3.      *Armstrong Auto may in its discretion provide to its customers certain materials on VSCs that were originally prepared by Wynn's, but Armstrong Auto does not have the power to bind Wynn's to any VSC, which power is solely in the discretion of Wynn's.***

The Dealer Agreement and the Application unambiguously prevent Armstrong from binding Wynn's to any VSC. The Dealer Agreement provides in section 1(B) that, the "Dealer shall have no authority to (a) alter, modify, waive or discharge any terms or conditions of the program or any Wynn's Service Contract, (b) incur any liability on behalf of Administrator or (c) make representations about coverage not contained in the Wynn's Service Contract." (Wynn's Ex. 3, Att. A, p.1, ¶¶ A.1.B(5).)[1]  Furthermore, the Application states that Wynn's must accept it for it to become a binding contract. (Wynn's Ex. 6.)

**4.      *Under no circumstances does Armstrong Auto have, or has it ever had, the authority to accept an application for a VSC on behalf of Wynn's and bind Wynn's to a VSC with an Armstrong Auto customer.***

Bradley cherry picks from the Dealer Agreement to make a legal argument that Armstrong Auto could legally bind Wynn's. She refuses to read the Dealer Agreement as a whole document, thereby omitting the clear and undisputed provisions of the Dealer Agreement that limit Armstrong Auto's authority; she further ignores the provisions of the Application which states on its face it must be approved by Wynn's to become binding. Bradley also relies on the imprecise, one-time use of the term "agent" by Wynn's corporate representative, Alfred Armenteros, which was used by Mr. Armenteros when explaining that Wynn's has no authority to rescind the entire transaction for the Vehicle. (Wynn's Ex. 12, pp 138 – 39.) However, in her haste to cling to this miss-statement, Bradley overlooks Mr. Armenteros's subsequent testimony

---

[1] Exhibits in this Brief identified as "Wynn's Ex." refer to Exhibits in Support of Wynn's Motion for Summary Judgment. (Exs. 1-11). Additional exhibits included in this Brief commence at "Wynn's Ex. 12."

whereby he unambiguously states that Armstrong Auto was not Wynn's agent. Specifically, he was asked "if at the time of the Bradley transaction in 2012, did Wynn's use Armstrong Auto as an agent?" He responded, "no." (*Id.* pp. 164.) Mr. Armenteros further clarified this information in the errata pages. (Wynn's Ex. 13, Entry for page 139.)

5. *When one of Armstrong Auto's customers wishes to apply for a VSC, an Armstrong Auto employee assists that customer with completing a VSC application, which that customer reviews and signs. Armstrong Auto then submits that VSC application to CAC with the applicable vehicle's financing documentation. The application is then forwarded by CAC electronically to Wynn's for review and approval.*

Bradley fails to dispute this statement of fact, which articulates the usual process that occurs when a customer at Armstrong Auto desires to purchase a VSC. Instead, Bradley obfuscates the issue by providing information regarding the submission of dealer cost funds. She cites to a portion Mr. Armenteros's deposition testimony, out of context, where Mr. Armenteros stated that Armstrong Auto could sell VSCs directly for Wynn's. Mr. Armenteros subsequently testified that Armstrong Auto does not sell VSCs directly for Wynn's and does not have authority to do so under the Dealer Agreement. (Ex. 12, pp. 163-64; Wynn's Ex. 13, Errata Pages entry for page 139.) Armstrong Auto would have to sign an entirely separate agreement with Wynn's in order to do so. The hypothetical question of whether Armstrong Auto "could" sell VSCs for Wynn's is nothing more than mere conjecture and is insufficient to create an issue of material fact.

6. *Wynn's did not provide training to Armstrong Auto concerning the marketing or sale of VSCs. Armstrong Auto was never told anything by Wynn's about how to market or sell VSCs. Armstrong Auto was never directed to provide any information to customers other than blank VSC applications.*

Bradley fails to dispute this statement of fact. In lieu of providing any testimony or evidence demonstrating that Wynn's provides training, Bradley cites out of context to the Dealer Agreement provision that states that Armstrong Auto is to "market Wynn's Service Contracts

4

pursuant to the Program and faithfully perform its duties in compliance with the Administrator's instructions and procedures."  Bradley cites to no evidence of training sessions or instructions. Bradley further cites to one line in a Wynn's marketing brochure which states, "Ask your dealer about the plan that is right for you", and argues that Wynn's provided it to Armstrong.  As noted in Wynn's response to Interrogatory No. 2, Wynn's generally provides a so-called "Dealer Kit" to dealerships.  (Wynn's Ex. 14.)  However, Mr. Armstrong's testimony shows that Armstrong Auto actually never received a Dealer Kit, including the brochure.  (Ex. 15, pp. 111-117.)  Mr. Armstrong further testified that no one explained to him how to market the VSCs.  (*Id.* pp. 41 – 42.)  By the terms of the Dealer Agreement, Armstrong was only to provide the information contained in the Application, and could not modify any terms.  (Ex. 3, Att. A, ¶1(B)(5).)

**7.     *Wynn's does not control the manner in which Armstrong Auto provides VSC applications to customers.  Armstrong Auto is not required to submit a fixed number of VSC applications per month for Wynn's acceptance, or to provide an materials on VSCs to any of its customers.***

Bradley fails to dispute this statement of fact, and attempts to create the appearance of a dispute by arguing that Armstrong Auto agreed to market VSCs pursuant to the terms of the Dealer Agreement subject to Wynn's instructions.  However, the evidence clearly shows that Wynn's has no control over whether Armstrong offers VSC applications on a particular deal or not.  (Wynn's Ex. 3, ¶ 10.)

**8.     *Wynn's provides Armstrong Auto with a rate chart and information on vehicle eligibility for a VSC, and Armstrong Auto decides in its sole discretion whether or not to provide its customer with a VSC application.***

Bradley does not and cannot dispute the facts asserted here.  As a result, Bradley has asked this Court to indulge her fabrication and dictate her desired factual record through the Motion for Sanctions.   Wynn's has repeatedly informed Bradley's counsel that the Retail Rate card is the applicable rate chart.  There is no other rate chart.  Bradley cannot fabricate a dispute

in order to survive summary judgment. Likewise, Bradley cannot strain Mr. Armenteros's testimony to create an issue of fact. Bradley cites to Mr. Armenteros's deposition transcript and argues that, "Wynn's agrees that Armstrong Auto could sell service contracts outside of any involvement with CAC and on hybrid vehicles." (Bradley Opp. P. 6.) Bradley conveniently omits Mr. Armenteros's subsequent testimony that Armstrong Auto neither sells VSCs directly for Wynn's nor has any authority to do so. (Wynn's Ex. 12, pp. 163 – 64; *see also* Ex. 13, Errata Pages.)

      *11.    Armstrong Auto is paid a flat fee by CAC out of the VSC retail purchase price for each VSC application that Armstrong Auto submits and that is accepted by Wynn's for which a VSC is issued. Wynn's receives an $80.00 administrative fee from CAC out of the VSC retail purchase price for each VSC issued by Wynn's.*

      Bradley avers that how Armstrong Auto is paid is immaterial. She further concedes that it is not disputed that Armstrong Auto receives a flat fee and Wynn's receives an $80.00 administrative fee. However, despite the abundance of evidence that Wynn's only receives $80.00 and nothing more, Bradley attempts to create a dispute by manufacturing evidence through the Motion for Sanctions. Wynn's has provided information on the funds it receives from the approval and sale of a VSC. Notably, Mr. Armenteros provided a written disclosure summarizing the breakdown of the Retail Rate. (Filed under seal as Ex. C to Dkt. 79). His disclosure, as well as his testimony, unambiguously proves that Wynn's earns nothing other than $80.00 from the sale of an accepted VSC application. (Wynn's Ex. 12, 158–59.) The exact breakdown of the monies received from the Retail Rate, and the recipient of said monies, was provided by way of testimony and through the production of the Program Agreement between Wynn's and CAC, which includes a breakdown of the distribution of all the money from the Retail Rate. Specifically, with a complete description of the amounts and their designated recipients, there is nothing left to understand with respect to "profit sharing." As noted by Mr.

Armenteros, there is simply no other profit to be shared. (Wynn's Ex. 12, p. 166.)

**13.    Bradley told Mr. Armstrong that she wanted an extended vehicle service contract for the Vehicle.**

Bradley's attempt to raise a dispute here appears to be an attempt to recreate the history of this case. At the eleventh hour, Bradley seeks to claim that it was not a VSC that she wanted, but rather a warranty. Notably, the Buyers Order that Bradley signed specifically disclaims any warranties in all capital letters at paragraph 6. (Wynn's Ex. 4.). If Bradley indeed wanted a "warranty" rather than a VSC, Wynn's has no involvement in the transaction between Bradley and Armstrong. The evidence shows that the only item available through the Application for the VSC is the product identified in the Application. Armstrong Auto certainly could not have provided information on products to Bradley that Wynn's does not have or offer.

**14.    Mr. Armstrong believed that the Vehicle was eligible for such a contract, even though the Vehicle was a hybrid and he knew that a VSC would not cover an electric vehicle. Mr. Armstrong did not realize a hybrid was an electric vehicle.**

Bradley attempts to create the appearance of a dispute by contending that a hybrid is not an electric vehicle and therefore should be covered under the terms of a VSC. However, the undisputed fact remains that Wynn's considers hybrid electric vehicles (a.k.a. "hybrids") to be electric vehicles and not covered pursuant to the exclusions provisions outlined on the Retail Rate chart. (Ex. 3, Att. B[2]; Wynn's Ex. 12, p. 24.) Bradley has never disputed that the Vehicle was ineligible. (Dkt. No. 10, Bradley's Ans. ¶ 11.)

**15.    Mr. Armstrong did not tell Bradley at any time that he was employed by Wynn's. Bradley did not know whether or not Mr. Armstrong was employed by Wynn's. Mr. Armstrong told Bradley about Wynn's only during the course of explaining the terms of the Application. Armstrong Auto does not display Wynn's insignia or signage anywhere on or around its deanship premises.**

_____

[2] Attachment B was filed under seal as an attachment to Exhibit 3 to Wynn's Motion for Summary Judgment.

The only item here that Bradley appears to contest is that Armstrong Auto displays Wynn's insignia. Specifically, Bradley cites to Wynn's name on the front of the Application. Wynn's agrees that its name unsurprisingly appears on the Application, because it's a Wynn's VSC Application. Nevertheless, Bradley does not dispute that the only time that Wynn's name was brought to the attention of Bradley was during her completion of the Application.

**16.** *Bradley did not take any action in reliance on the belief that Mr. Armstrong was an agent or employee of Wynn's.*

It's undisputed that Bradley took no action in reliance on this purported agency relationship with respect to the purchase of the Vehicle or the completion and submission of the Application. The Notice, on which Bradley chiefly relies, was issued long after the transaction. (Wynn's Ex. 1, pp. 39-40; Wynn's Exs. 7 & 8.) As such, Bradley could not have relied upon the Notice at the time the Vehicle was purchased. Bradley cites no facts supporting her contention that, "she believed that Armstrong had the ability to determine whether her car was eligible, to sell her coverage . . ." (Bradley Opp. p. 9.)

**22.** *Mr. Armstrong did not prevent Bradley from reading the Application before she signed it.*

In order to create the appearance of a dispute of material fact, Bradley seeks to reinvent history by claiming that Mr. Armstrong prevented her from reviewing the Application by including it in a large stack of documents. Bradley's contention flies in the face of her own testimony. Notably, when asked if she read through any of the pages of the Application, Bradley testified, "No, ma'am. I would have been there several hours had I read through all of those." (Wynn's Ex. 1, pp. 25 -26.) Bradley further testified that "basically, [Mr. Armstrong] just went through all of the pages with [her]." (*Id.* p. 26.) Bradley also seeks to rely impermissibly on the deposition of Travis Armstrong from the Arbitration proceedings. Wynn's was not a party to the

Arbitration at the point in time when Mr. Armstrong was deposed. Moreover, it was not produced in discovery in this case. Bradley should be precluded from relying on the Armstrong Transcript, particularly in light of the fact that she is attempting to use the testimony to dispute her own testimony.

**24.** **At the time of purchase, Bradley executed the Installment Contract in order to obtain financing from CAC. Wynn's was not a party to the Installment Contract.**

Whether the financing was through Armstrong Auto or CAC, Wynn's was not a party to the Retail Installment Sales Contract and played no role in the purchase or financing of the Vehicle. (Wynn's Ex. 5.) There are no facts in the record to indicate otherwise.

**25.** **Bradley was charged the VSC Retail Rate in connection with the Application. Bradley elected to finance that amount under the Installment Contract. CAC forwarded a total of $735.00 to Wynn's out of the VSC Retail Rate. The amount included Wynn's $80.00.**

Bradley attempts to create a factual dispute by articulating what she believes should have happened under the terms of the Dealer Agreement rather than based on the testimony in the record over what actually transpired. The undisputed facts indicate that CAC transferred $735.00 to Wynn's. (Wynn's Ex. 3, ¶¶ 12–13 & Att. B; Wynn's Ex. 5, p. 1; Wynn's Ex. 10, pp. 13 – 14, 20.) The fact that Bradley thinks a different amount of money should have been transferred does not change what was actually done.[3]

**26.** **When Wynn's received the Application, Wynn's electronic VIN decoder system immediately identified that the Vehicle was ineligible for a VSC. Wynn's then issued a refund to CAC (the lienholder of record) of the full $735.00 that it had received out of the VSC retail Rate, as per the "Refunds and Charges" section of the Application. That refund was reflected in a batch payment record from CAC to Wynn's dated October 29, 2012. Wynn's neither earned nor retained any monies in connection with the Application.**

Bradley has asked this Court to create disputed facts here by way of the Motion for

---

[3] Bradley desperately contends that Mr. Armenteros was unprepared for his deposition. However, Bradley sought testimony regarding a bank statement from Wells Fargo claiming that the information therein was a communication between CAC and Wynn's. Mr. Armenteros fully testified on the amount sent and returned to CAC.

9

Sanctions. However, the evidence demonstrates that Wynn's refunded $735.00 to CAC. (Wynn's Ex. 3, ¶ 15; Wynn's Ex. 10, p. 22.) In addition, Bradley's counsel questioned Mr. Armenteros regarding Wynn's document production number "Wynn's 000005", which shows a net refund of $735.00.[4] (Ex. 12, pp. 99-102.)

27. ***Armstrong Auto received no payments related to the Application because Wynn's rejected it and never issued a VSC on the Vehicle.***

Bradley does not genuinely dispute this fact. Due to the fact that the Application was rejected, Armstrong would not have received a flat fee for the issuance of the VSC. (Wynn's Ex. 2, p. 144.) Whether or not a down payment was made on the Vehicle is immaterial to whether Armstrong Auto received payment for the issuance of a VSC.

29. ***The Notice advised Bradley to contact Armstrong Auto with any questions. The reason that the Notice advised Bradley to contact Armstrong Auto with any question was because Mr. Armstrong was in the best position to provide information and assistance related to Bradley's purchase and financing of the Vehicle.***

Bradley does not genuinely dispute this statement of fact. Wynn's has provided its reason for directing Bradley to Armstrong Auto with any questions. Bradley has no evidence to dispute that such explanation provides the reason why Wynn's referred Bradley to Armstrong Auto. Opinion and argument are nothing more than conjecture and insufficient to dispute the statement of fact for purposes of summary judgment.

## IV. BRADLEY'S ADDITIONAL FACTS

Bradley offers additional statements of fact in the Bradley Opposition. Such facts are largely immaterial to the issues presented in the Motion for Summary Judgment, and are addressed as follows:

1. ***For the Wynn's coverage, Bradley was charged $1,580.00 plus $39.50 in tax for***

---

[4] A replacement document had been produced by Wynn's after discovering a copying error. Counsel for Bradley elected to question the witness regarding Wynn's 000005 instead of Wynn's 000049 which clearly identifies the column as the "Net Refund." (Wynn's Ex. 13.)

*a total of $1,619.50.*

In conjunction with the purchase of the Vehicle, Bradley completed the Application and entered into the Buyer's Order. The Buyer's Order reflects a charge of $1,580.00 plus $39.50 in tax. (Wynn's Ex. 4.) That amount was included in the amount financed with CAC. Wynn's received the Application as well as $735.00, which included Wynn's $80.00 administrative fee and $655.00 to be held in reserve for claims and state premium tax payments in the event that Wynn's chose to accept the Application and issue the VSC for the Vehicle based upon the Vehicle's eligibility. (Wynn's Ex. 3, ¶¶ 12-13 & Att. B; Wynn's Ex. 10, Dep. CAC, pp. 13-14, 20-22.) When Wynn's received the Application, Wynn's VIN decoder system immediately identified that the Vehicle was ineligible for the VSC. Wynn's then issued a refund to CAC (the lienholder of record) of the full $735.00 as per the "Refunds and Charges" section of the Application. That refund was reflected in a batch payment record from CAC to Wynn's dated October 29, 2012. Wynn's neither earned nor retained any monies in connection with the Application. (Wynn's Ex. 4, ¶¶ 14-15 & Att. B; Wynn's Ex. 10, pp. 20-22.)

**2.      Statements of fact Numbers 2 through 6 addressing Bradley's finance contract, the amounts owed and the interest rate.**

Bradley cites to additional hypothetical facts surrounding the Retail Installment Sales Contract and the impact of the VSC on the interest rate, payments and the amount financed. That information is not material to the instant litigation Wynn's had no involvement in the financing of the Vehicle. Whether or not Bradley received certain credits from Armstrong Auto or CAC is a matter that she may address in the Arbitration. As previously noted, Wynn's identified the Vehicle as ineligible, notified Bradley of the void and refunded the money to CAC. (Wynn's Ex. 1, pp. 39-40; Wynn's Ex. 3, ¶ 14; Wynn's Exs. 7 & 8.) Interestingly, Bradley

includes the CAC Letter but to her own detriment.[5]  As of August 31, 2012, her account was credited $2,713.68 with a notation "Warranty Cancellation."  This was significantly more than any amount ever transferred to Wynn's for the Application.

**7.** **After CAC applied whatever money was exchanged between it and Wynn's to Bradley's account, CAC showed the total of payments as having been reduced from $22,910.01 to $20,196.33 with no change in the payment amount.**

This fact is immaterial and irrelevant to the case at hand.  Wynn's had no involvement in the financing of the Vehicle.  There is no evidence to suggest that Wynn's in any way dictates the repayment plan under which Bradley is to pay off her loan with CAC.

**8.** **CAC has a secret profit-sharing plan with Wynn's and Wynn's refuses to provide the formula.**

This "statement of fact" is not an actual fact derived from the evidence but rather a convenient work of fiction drawn up by Bradley's counsel and requested of this Court in the Motion for Sanctions.  There is no secret profit sharing agreement and Bradley has been provided with ample information on the Program Agreement between Wynn's and CAC.

**10.** **CAC knows of no supervision, oversight, or training it provided to Armstrong regarding selling Wynn's service contracts other than providing him a rate sheet.**

This purported statement of fact is not a complete statement of the testimony provided and is not material or relevant to deciding Wynn's Motion for Summary Judgment.  Notably, the deposition testimony of CAC provides, "Our market area managers would have trained Armstrong on CAPS and they would have referenced the rate sheet."  When asked regarding additional supervision or monitoring of the sale of VSCs, CAC's representative indicated that he did not know if there was anything else.  (Dkt. No. 88-4, p. 48.)

**11.** **CAC did not monitor how Armstrong sold Wynn's service contracts.**

---

[5] Bradley faisl to authenticate this document in her Opposition.  However, it appears that the document has been authenticated in connection with Bradley's Reply Brief in Support of her Motion for Summary Judgment.

This statement of fact is immaterial and irrelevant for purposes of addressing Wynn's Motion for Summary Judgment.

### Statements 12-13

Bradley's additional statements of fact 12 and 13 indicate that Wynn's provided Armstrong Auto with no ongoing monitoring, guidance or training other than the Dealer Kit and rate sheet. These statements are not material to the determination on Wynn's Motion for Summary Judgment. If anything, these statements further support Wynn's argument that Armstrong Auto is not Wynn's agent as, in Bradley's words, "Wynn's provides no ongoing monitoring or guidance to dealers like Armstrong." Moreover, as noted above, Mr. Armstrong testified that he never saw the Dealer Kit.

**14.     Bradley did what she was instructed to do by the August 28th letter and contacted Armstrong with her questions.**

Whether Bradley followed the direction in the Notice is immaterial to the outcome of Wynn's Motion for Summary Judgment.

### Statements 15-17 & 22.

Bradley's additional statements of fact Numbers 15 to 17 and 22 contain information that is not material to the dispute relating to Wynn's Motion for Summary Judgment.

**18.     Wynn's refused to identify the number of times in the past three years that its dealers have sold service contracts on ineligible vehicles.**

This statement of fact is a discovery dispute, which can serve no basis in opposing Wynn's Motion for Summary Judgment.

**19.     Wynn's has done nothing to solve the problem of dealers like Armstrong selling service contracts on ineligible vehicles because it believes that what occurred in the Bradley transaction is what it wanted to occur and that it has no other responsibility.**

In the Bradley transaction, the Wynn's internal process functioned properly. The VIN

decoder identified the Vehicle as ineligible, Bradley was notified and the money was returned to CAC. (Wynn's Ex. 3, ¶¶ 14-15; Wynn's Ex. 10, pp 20-21.) Wynn's provided a rate chart so dealers could verify eligibility of vehicles. (Wynn's Ex. 3, Att. B.) Wynn's neither controls the dealers nor CAC's financing system.

### Statements 20 & 21.

Bradley's additional statements of fact Numbers 20 and 21 indicate that neither Wynn's nor Armstrong Auto refunded the taxes to Bradley. Whether or not this is true, it is worth noting that Wynn's did not receive the taxes paid for the Application, and thus had no obligation to refund them. As noted above, Wynn's received the $80.00 administrative fee and the $655.00 in reserve funds. Moreover, as noted in paragraph 5 of the "Additional Conditions of Sale," the buyer "assumes and agrees to pay any and all such taxes, and any and all other taxes, except income taxes, imposed on or incidental to the transaction covered by this Order, regardless of who may have the primary tax liability." (Wynn's Ex. 4.) As the party responsible for paying the taxes, it would be incumbent upon Bradley to obtain any refund of the taxes from the government.

## V.    LEGAL ARGUMENT AND AUTHORITIES

### A.    *Bradley Has Failed to Create a Material Factual Dispute on her Theories of Actual or Apparent Agency.*

#### 1.    *Bradley's Theory of Actual Agency Fails Under Settled Law.*

Bradley does not take issue (nor could she) with the well accepted principle that a principal is not liable for torts committed by an independent contractor. *See Terril v. Credit Acceptance Corp.*, 2010 U.S. Dist. LEXIS 31269 at *6-7 (W.D. Va. Mar. 30, 2010). Bradley recognizes that the test for determining whether Armstrong Auto is an agent or an independent contractor hinges on control. *See Naccash v. Burger*, 223 Va. 406, 418-419 (1982). And

Bradley does not dispute that this test requires control over the means and methods of performance, rather than the final result. *See, e.g., Hesse v. Ebbets*, 2007 U.S. Dist. LEXIS 93464 at *10-11 (E.D. Va. Dec. 20, 2007). Bradley makes no effort to distinguish the cases of *Murphy v. Holiday Inns, Inc.,* 216 Va. 490 (1975) and *Jones v. C.H. Robinson Worldwide, Inc.*, 558 F. Supp. 2d 630 (W.D. Va. 2008). In both of those cases, the alleged agent was subject to a significant amount of control by the principal. Nonetheless, the claim for vicarious liability was denied in both cases, because the principal did not have control over the details of the agent's day-to-day operations. *See Murphy*, 216 Va. at 695; *Jones*, 558 F. Supp. 2d at 639.

Bradley concedes (as she must) that, "Wynn's provides no ongoing monitoring or guidance to dealers like Armstrong about how to sell its service contracts." Bradley Opp. at 14. Therefore, under the clear authority of *Murphy* and *Jones*, the claim for vicarious liability against Wynn's has no merit and should be dismissed. The undisputed facts certainly do not support the existence of a fiduciary relationship between Armstrong Auto and Wynn's. *See Reistroffer v. Person*, 247 Va. 45, 48 (1994). Instead of addressing the cases on point, Bradley misguidedly relies on *Nationwide Ins. Co. v. Patterson*, 229 Va. 627 (1985). As explained in Wynn's Opposition to Bradley's Motion for Partial Summary Judgment, far from supporting her claim of actual agency, the *Nationwide* case usefully illustrates the shortcomings of Bradley's agency argument.

Bradley further relies on Mr. Armenteros's imprecise, one-time use of the term "agent" during the course of the 30(b)(6) deposition. The proffered testimony was Mr. Armenteros's attempt to distinguish Wynn's from the other entities involved in the sale of the Vehicle to Bradley. Notably, he was asked what steps Wynn's takes to allow a person purchasing a vehicle from a dealership to rescind the entire transaction – i.e. the purchase of the vehicle. Mr.

Armenteros attempted to clarify that Wynn's has no authority to rescind the transaction for the vehicle.[6]  When later asked regarding his use of the term agent, he expressly denied that Wynn's used Armstrong Auto as its agent at the time of the transaction in 2012.  (Wynn's Ex. 12, p. 164.)

Interestingly, Bradley has repeatedly argued, "[t]he relationship of the parties does not depend upon what the parties themselves call it, but rather in law what it actually is."  *Murphy v. Holiday Inns, Inc.*, 216 Va. 490, 492 (1975).  Agency is a term of art.  Mr. Armenteros was not asked to offer a legal opinion concerning the alleged agency relationship, and did not intend to define Armstrong Auto's legal status through his testimony.  The use of an imprecise word during a deposition does not change the underlying relationship between the parties.  The relationship between Wynn's and Armstrong Auto is clearly defined by the Dealer Agreement, and thus it constitutes important evidence as to the nature of this relationship.

### 2.    *The Undisputed Facts Defeat Bradley's Theory of Apparent Agency.*

Bradley contends that Armstrong Auto appeared to be an agent of Wynn's because "[i]n the Bradley transaction, Armstrong was the only person to whom she could ask questions about coverage."  Bradley Opp. at 19.  But that is true whenever an independent vendor provides any information on products manufactured or issued by a third party.  A salesperson employed by Best Buy does not become an apparent agent of Sony merely because he is responsible for explaining the features of a television.  Similarly, a travel agent can negotiate with a customer concerning the purchase of an airline ticket, and even provide marketing materials to the customer, without becoming an apparent agent of the airline.  Bradley's apparent agency argument relies heavily on the Notice issued by Wynn's, informing Bradley that her Application had been rejected.  However, Bradley ignores the testimony that she gave at her deposition, in which she repeatedly said she did not know that the Notice was issued by Wynn's.  (Wynn's Ex.

---

[6] This testimony was also clarified in the errata pages.  (Wynn's Ex. 13, Entry for Page 139.)

1, pp. 32, 41, 61-62.)  Therefore, Bradley could not possibly have interpreted the Notice to mean that Armstrong Auto was an agent for Wynn's.  Bradley's Opposition neglects to address her own devastating admission.  Bradley also ignores her deposition testimony on the issue of reliance.  Her testimony demonstrates, at a minimum, that she did not know and did not care whether Mr. Armstrong was acting as an agent for Wynn's.  She was interested only in "getting my warranty that I wanted."  (*Id.*, p. 42.)

### 3.  Virginia Law Does Not Recognize Apparent Agency as a Proper Basis for Tort Liability.

Bradley attempts to distinguish the binding precedent of *Sanchez v. Medicorp Health Sys.*, 270 Va. 299, 308 (2005).  In that case, the Virginia Supreme Court affirmed the circuit court's demurrer on a claim for vicarious liability, explaining as follows:

> In virtually all these cases imposing vicarious liability, the particular jurisdiction involved had already adopted the theory of apparent agency or agency by estoppel as a basis of tort liability when the jurisdiction used the theory to hold a hospital vicariously liable for negligent medical care rendered by an emergency room physician working as an independent contractor. . . .  Unlike these jurisdictions, in Virginia, we have not previously imposed vicarious liability on an employer for the negligence of an independent contractor on the basis of apparent or ostensible agency, or agency by estoppel. We find no reason to do so in the specific context presented in this case.

*Id.* at 308.  Bradley is correct that *Sanchez* was decided in the context of a claim for medical malpractice.  But the fact remains that the Virginia Supreme Court has never recognized apparent agency as the basis of tort liability in any factual context.

Any doubt as to the application of *Sanchez* to the facts at bar is put to rest by the case of *Craddock v. A & E Moving Storage, Inc.*, 82 Va. Cir. 491 (Norfolk 2011).  In *Craddock*, the plaintiff filed suit against two moving and storage companies for fraudulent inducement and violation of the VCPA.  The court granted a demurrer to both of those claims.  With respect to

the VCPA claim, the court explained:

> Plaintiffs argue in Count II that Mayflower is vicariously liable for the VCPA violations committed by its apparent agent, New Bell. Under Virginia law, an apparent agent may bind his principal only in contract. Virginia has not adopted the theory of apparent agency as a basis of tort liability. *Sanchez v. Medicorp Health Systems*, 270 Va. 299, 618 S.E.2d 331 (2005).

*Id.* at 493. As to the claim for fraudulent inducement, the court reiterated: "Plaintiffs argue that Mayflower is vicariously liable for the fraudulent statements of its apparent agent. Apparent agency does not provide a basis for vicarious liability in tort. *Id.* While *Craddock* is not binding on this Court, it is persuasive for the interpretation of Virginia law. Particularly given the other glaring holes in Bradley's theory of apparent agency, this theory should not be used to impose vicarious liability on Wynn's for the alleged conduct of Armstrong Auto who is undisputedly an independent vendor.

### 4. There Is No Meaningful Difference Between the Doctrines of Apparent Agency and Agency by Estoppel.

Bradley contends, in the alternative, that Wynn's is liable under the doctrine of agency by estoppel.[7] However, at least in Virginia, there is no meaningful difference between the doctrines of apparent agency and agency by estoppel. *See Zao Odessky Konjatschnyi Zawod v. SIA "Baltmark Invest"*, 999 F. Supp. 2d 851, 860 (E.D. Va. 2014) ("[a]pparent agency is also known as agency by estoppel"); *First Am. Title Ins. Co. v. First Alliance Title, Inc.*, 718 F. Supp. 2d 669, 681 (E.D. Va. 2010); *Tyc Dev. Co., LLC v. Birach Broad. Corp.*, 2010 U.S. Dist. LEXIS 41551 at *16 (E.D. Va. Apr. 27, 2010). The Virginia Supreme Court has not recognized agency by estoppel as a proper basis for tort liability. *Sanchez*, 270 Va. at 307-308.

### B. Bradley Fails to Address Any of the Elements of Her Fraud Claim.

---

[7] Bradley had not previously alleged or presented the theory of agency by estoppel and doing so in the Bradley Opposition at this late juncture is improper.

In its Motion for Summary Judgment, Wynn's argued that the claim for fraud has no merit because: (1) Bradley did not reasonably rely on Armstrong Auto's alleged misrepresentations, which contradicted the Application as provided to Bradley; (2) Bradley did not sustain any damages because Wynn's refunded the full amount related to that application that it had received from CAC; (3) Armstrong Auto's alleged misrepresentations are, at best, promises concerning the future, which cannot support a claim for constructive fraud; and (4) there is no evidence that Armstrong Auto acted with fraudulent intent, or even had a motive to defraud Bradley.[8]  Bradley quite literally has no response to these arguments.  She cites no case law concerning the elements of a claim for fraud, and does not even attempt to distinguish the cases cited by Wynn's, therefore does not refute Wynn's position.  In Bradley's response to ¶ 22 of Wynn's Statement of Undisputed Material Facts, she raises two arguments that have potential bearing on her claim for fraud.  Neither of those arguments has merit.

First, Bradley asserts that Armstrong Auto prevented her from reading the Application by simultaneously providing her with other documents.  Bradley lists those other documents in Bradley's Opposition.  However, she has not produced copies of those documents in discovery and has not attached them as exhibits to Bradley's Opposition.  Moreover, the citations are to the Armstrong Transcript and should not be considered here, as discussed above in Section II, *infra*.  In any event, Bradley is a competent, well-educated adult.  She made the decision to purchase the Vehicle, to finance it, and to apply for a VSC.  As a result of her decisions, Bradley had to sign documents—which surely came as no surprise to her.  Some of those documents were necessary to execute the various transactions.  Others were disclosures required by law.  There is no allegation (and certainly no evidence) that Armstrong Auto provided Bradley with extraneous

---

[8] Wynn's also argued that Armstrong Auto is not an actual or apparent agent of Wynn's, as discussed above.

documents solely for the purpose of dissuading her from reviewing them.

Bradley could have chosen not to purchase the Vehicle, or to finance it, or to apply for a VSC. But if she wanted the Vehicle, the financing, and a VSC, she needed to sign documents. She chose to sign them without reading them. She is an adult, and she was entitled to make that choice; but she is also stuck with the consequences. *See Ostolaza-Diaz v. Countrywide Bank, N.A.*, 360 Fed. Appx. 504, 507 (4th Cir. 2010); *Calhoun v. Exxon Corp.*, 1995 U.S. App. LEXIS 21668 at *7-8 (4th Cir. Va. Aug. 11, 1995); *Foremost Guaranty Corp. v. Meritor Sav. Bank*, 910 F.2d 118 (4th Cir. 1990). A plaintiff who has failed to read the relevant documents cannot be heard to complain. *See Johnson v. Washington*, 559 F.3d 238, 245 (4th Cir. 2009). Notably, *Ostolaza-Diaz* involved a claim for fraud in connection with the refinancing of a home mortgage. *Ostolaza-Diaz*, 360 Fed. Appx. at 506. The plaintiffs in that case were presumably provided with a substantial number of documents in connection with that transaction. Nonetheless, because they failed to read the documents, their reliance on the defendant's oral statements was held to be unreasonable. *Id.* at 507. Here, any purported reliance by Bradley is no different.

Second, Bradley contends that by the time she reviewed the Application, she had already made the down payment and signed the purchase contract for the Vehicle, relying on the Armstrong Transcript. Bradley has not produced a complete copy of the Armstrong Transcript in discovery, and has only attached an excerpt from it as an exhibit to her Motion for Partial Summary Judgment. As such, her foregoing contention should not be considered as evidence in this litigation.

Nonetheless, her argument fails because, as a matter of law, Bradley did not enter into a binding agreement of any kind until she reviewed and signed all of the documents associated with her purchase of the Vehicle, including the Application. "Where two papers are executed at

the same time or contemporaneously between the same parties in reference to the same subject matter, they must be regarded as parts of one transaction, and receive the same construction as if their several provisions were in one and the same instrument." *Union First Mkt. Bank v. Bly*, 2014 U.S. Dist. LEXIS 15071 at *13 (E.D. Va. Feb. 6, 2014). Mr. Armstrong testified that if Bradley had asked him to repurchase the Vehicle after she received the Notice, he would have refunded the entire purchase price. (Wynn's Ex. 2, p. 152.) Certainly, at the time Bradley signed the Application, she had not irrevocably bound herself to purchase the Vehicle.

Moreover, at the corporate deposition of Armstrong Auto that was taken in this case, Mr. Armstrong offered testimony that he did not prevent Bradley from reading anything and that she, like some people do, could have taken the documents home with her to read them (*Id.* pp. 141-142). To the extent that this Court considers the deposition from the Arbitration, it is worth noting that Mr. Armstrong testified that if a customer wanted to bring the documents home with her for further review, he would readily provide copies of the documents.

Bradley was simply not interested in reading the documents presented to her. Before leaving the dealership, Bradley was provided with a copy of all the documents she signed. Even after bringing them home, Bradley did not bother to read anything until she began experiencing problems with the Vehicle. (Wynn's Ex. 1, p. 30.) The suggestion that Bradley was defrauded because she tendered the down payment a few minutes before she received a copy of the Application, while creative, is well off the mark.

### C. *Bradley Fails to Address Any of the Elements of Her VCPA Claim.*

Bradley argues that she does not need to prove all the elements of fraud in order to recover under the VCPA. Plainly, she misstates the law. "[A] misrepresentation of fact is a necessary element of proof to . . . the claim for a violation of the [VCPA]." *Lambert v. Downtown Garage*, 262 Va. 707, 711 (2001). "Allegations of misrepresentation of fact must

include the elements of fraud: a false representation, of material fact, made intentionally and knowingly, with intent to mislead, reliance by the party misled, and resulting damage." *Weiss v. Cassidy Dev. Corp.*, 63 Va. Cir. 76, 78 (2003). Moreover, even if there were some distinction between the elements of a claim for fraud and the elements of a VCPA claim, that would not support Bradley's insinuation that a cause of action under Va. Code § 59.1-204 has no elements whatsoever. In fact, the elements of a VCPA claim are well defined, and Bradley cannot satisfy any of them. "In order to sustain a claim under the VCPA, a plaintiff must prove that the defendant acted with an intent to deceive or otherwise mislead, i.e., with ***fraudulent intent***, as to a material fact on which the plaintiff relied to his detriment and which resulted in measurable damages." *Padin v. Oyster Point Dodge*, 397 F. Supp. 2d 712, 722 (E.D. Va. 2005) (emphasis added). "Virginia courts have consistently held that reliance is required to establish a VCPA claim." *Fravel v. Ford Motor Co.*, 973 F. Supp. 2d 651, 658 (W.D. Va. 2013). For such purposes, reliance must be "reasonable and justified." *Adardour v. American Settlements, Inc.*, 2009 U.S. Dist. LEXIS 56675 at *8 (E.D. Va. July 2, 2009). *See Cooper v. GGGR Invs., LLC*, 334 B.R. 179, 189 (E.D. Va. 2005) (reliance requirement "is as true for paragraph 8 as it is for the other prohibited practices"). Indeed, this Court, in ruling on Wynn's Motion to Dismiss, held that Bradley must prove reasonable reliance. *Wynn's Extended Care, Inc. v. Bradley*, 2014 U.S. Dist. LEXIS 71673 (W.D. Va. May 23, 2014). Bradley makes no attempt to distinguish these cases, or to explain why they do not govern the facts at bar. Nor has Bradley even attempted to explain how she can satisfy the applicable elements. Therefore, the VCPA claim should be dismissed as a matter of law.

> ### D. *The MMWA Does Not Create a Cause of Action for Failing to Tell the Truth.*

Bradley concedes that a private action under the MMWA requires a failure to comply with statutory obligations or obligations arising under a "written or implied warranty" or a

"service contract."  Bradley argues that the MMWA creates "an obligation to tell the truth," and Bradley's MMWA claim is premised on this purported obligation.  However, Bradley does not cite any statutory provision, regulation, or judicial decision recognizing an obligation to tell the truth under the MMWA, much less a statutory cause of action for failing to tell the truth.  The text of the MMWA does not contain the word "truth."  *See* 15 USC § 2301 *et seq.*  Nor does the word "truth" appear anywhere in the regulations interpreting the MMWA.  *See* 16 C.F.R. § 700.1 *et seq.*  "Claims under the statute are limited to those for breach of a written or implied warranty, and thus, there is no federal remedy for breaches of oral express warranties or for written promises that do not meet the definition of 'written warranties' under the Act."  17 Am Jur 2d Consumer Product Warranty Acts § 38.  Moreover, Bradley did not allege in her Counterclaim that Armstrong Auto violated the MMWA by failing to tell the truth.  *See* Counterclaim ¶¶ 97-102.  Rather, Bradley alleged that "Wynn's failed to comply with its obligations under the service contract."  *Id.* ¶ 102.  As Wynn's argued in its Motion for Summary Judgment, the parties never entered into a VSC, and therefore the MMWA does not apply – there was no contract between Wynn's and Bradley.  Bradley apparently now concedes the point.  She should not, at this late juncture, be permitted to seek relief under a new theory that was not pled in the Counterclaim and is entirely devoid of legal merit.

### E.  *Punitive damages are not warranted -- Bradley Does Not Even Argue that Wynn's Authorized or Ratified the Alleged Tortious Conduct.*

To state a claim for punitive damages on a theory of *respondeat superior*, Bradley must demonstrate that Wynn's participated in, authorized, or ratified the alleged wrongful conduct of its purported agent.  *See Oakes v. Patterson*, 2014 U.S. Dist. LEXIS 54596 at *32 (W.D. Va. Apr. 17, 2014).  The basis for this rule was stated in *Hogg v. Plant*, 145 Va. 175, 180 (1926): "Exemplary or punitive damages, being awarded, not by way of compensation to the sufferer but

by way of punishment of the offender, and as a warning to others, can only be awarded against one who has participated in the offense." In a previous filing, Bradley expressly conceded that she bears the burden of proving authorization or ratification in order to sustain a claim for punitive damages. *See* Bradley's Opposition to Wynn's Objection to Magistrate Judge Ruling at 13-14. (Dkt. No. 92.) As explained in Wynn's Motion for Summary Judgment, Wynn's never authorized or ratified Armstrong Auto's alleged misrepresentation concerning the Vehicle's eligibility for a VSC. To the contrary, Wynn's specifically repudiated this alleged misrepresentation.

In Bradley's Opposition, she does not argue that Wynn's authorized or ratified Armstrong Auto's alleged misrepresentations. Instead, she relies on *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 123 S. Ct. 1513 (2003), a case that addressed whether the amount of a punitive damages award was grossly excessive, in violation of the Due Process Clause of the Fourteenth Amendment. *Id.* at 416-418, 1591-1521. The *State Farm* analysis is distinct from the threshold question of whether punitive damages can be awarded at all. *State Farm* does not abrogate the need for authorization or ratification, as Bradley has already conceded. Because Bradley's Opposition does not even attempt to demonstrate authorization or ratification, Wynn's is entitled to summary judgment on the claim for punitive damages. *See William v. AES Corp.*, 2014 U.S. Dist. LEXIS 88047 at *7 (E.D. Va. June 26, 2014) ("By failing to address these counts in their opposition, Plaintiffs have effectively abandoned these claims.").

### F. The Claim for Treble Damages Under the VCPA Requires Proof of Authorization or Ratification.

Bradley contends that even if Wynn's did not authorize or ratify the alleged misrepresentations, it can still be held liable for treble damages. Bradley attempts to distinguish treble damages from punitive damages based solely on the amount of money at stake. However,

24

rationale set forth in *Hogg* is equally applicable to Bradley's claim for treble damages under the VCPA. "The very idea of treble damages reveals an intent to punish past, and to deter future, unlawful conduct, not to ameliorate the liability of wrongdoers." *Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 786, 120 S. Ct. 1858, 1870 (2000). *See Cook County v. United States ex rel. Chandler*, 538 U.S. 119, 130-131, 123 S. Ct. 1239, 1246-1247 (2003) (holding that treble damages under the False Claims Act serve both a punitive and compensatory purpose because up to 30% of the recovery can be diverted to a private relator under the *qui tam* provisions of the Act); *Act II Jewelry, LLC v. Mu Ying Zhu*, 2010 U.S. Dist. LEXIS 70185 at *23-24 (E.D. Va. June 7, 2010) (authorization and ratification were not required to support a treble damages claim for trademark infringement because Va. Code § 50-73.95 makes a partnership liable for any penalty incurred as a result of a wrongful act by a partner in the ordinary course of business). Bradley's Opposition does not even argue that Wynn's participated in the alleged tortious conduct, or that Wynn's authorized or ratified Armstrong Auto's alleged conduct. Therefore, it would be grossly unfair to punish Wynn's by awarding treble damages.

**VI.   <u>CONCLUSION</u>**

As there are no material facts to be determined by a fact finder and Wynn's is entitled to judgment as a matter of law, Wynn's respectfully requests that summary judgment be entered in its favor and against Bradley, and such further relief as this Court deems just and proper.

WYNN'S EXTENDED CARE, INC.
By Counsel

_____/s/_____

Virginia M. Sadler
Virginia State Bar No. 48736
Attorney for Wynn's Extended Care, Inc.
JORDAN COYNE & SAVITS, L.L.P.
10509 Judicial Drive, Suite 200
Fairfax, Virginia 22030
(Tel.)   (703) 246-0900
(Fax)   (703) 591-3673
E-Mail:  v.sadler@jocs-law.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 28th day of October, 2014, I electronically filed Wynn's Rebuttal to Bradley's Opposition to, and in further support of, Wynn's Motion for Summary Judgment with the Clerk of the Court using the CM/ECF system, which will send notification of such filing (NEF) to the following:

> Timothy E. Cupp, Esquire
> Virginia State Bar No. 23017
> CUPP & CUPP, P.C.
> 1951-D Evelyn Byrd Avenue
> P.O. Box 589
> Harrisonburg, Virginia 22803-0589
> (Tel.) (540) 432-9988
> (Fax) (540) 432-9557
> E-Mail: cupplaw@comcast.net


> Thomas D. Domonoske, Esquire
> Virginia State Bar No. 35434
> 461 Lee Avenue
> Harrisonburg, Virginia  22802
> (Tel.)  (540) 442-7706
> E-Mail: tomdomonoske@earthlink.net

> *Counsel for Counterclaim Plaintiff*



_____/s/_____
Virginia M. Sadler
Virginia State Bar No. 48736
Attorney for Wynn's Extended Care, Inc.
JORDAN COYNE & SAVITS, L.L.P.
10509 Judicial Drive, Suite 200
Fairfax, Virginia 22030
(Tel.)  (703) 246-0900
(Fax)  (703) 591-3673
E-Mail:  v.sadler@jocs-law.com