```
 1              UNITED STATES DISTRICT COURT
               WESTERN DISTRICT OF VIRGINIA
 2                  Harrisonburg Division

 3

 4   WYNN'S EXTENDED CARE, INC.,    Civil No. 5:13cv00114

 5                   Plaintiff,

 6            vs.                   Harrisonburg, Virginia

 7   PENNY L. BRADLEY,

 8                   Defendant.    November 6, 2014

 9               TRANSCRIPT OF MOTIONS HEARING
            BEFORE THE HONORABLE MICHAEL F. URBANSKI
10                UNITED STATES DISTRICT JUDGE

11

     APPEARANCES:
12
     For the Plaintiff:
13                              Jordan, Coyne & Savits
                                VIRGINIA SADLER
14                              JOHN CARSTENS
                                10509 Judicial Dr. Ste.
15                              200
                                Fairfax, VA  22030
16

17   For the Defendant:
                                THOMAS D. DOMONOSKE
18                              461 Lee Ave.
                                Harrisonburg, VA  22802
19
                                TIMOTHY E. CUPP
20                              Shelley Cupp Schulte PC
                                1951 Evelyn Byrd  Ste. D
21                              Harrisonburg, VA 22803

22   Court Reporter:           Sonia R. Ferris, RPR
                                U.S. Court Reporter
23                              116 N. Main St.  Room 314
                                Harrisonburg, VA 22802
24                              540.434.3181 Ext. 7

25   Proceedings recorded by mechanical stenography;
     transcript produced by computer.
```

```
1                    THE COURT:  Good morning.

2                    Please call the case.

3                    THE CLERK:  Yes, Your Honor.

4                    This is Civil Action Number 5:13cv00114,

5      Wynn's Extended Care, Inc., vs. Penny L. Bradley.

6                    THE COURT:   Good morning, folks.

7                    This case is here today principally on the

8      motion for summary judgment.  There's been motions for

9      summary judgment filed by both parties.

10                   The Court has read all the briefs.  I have

11     read lots of Virginia Supreme Court cases and other

12     cases on the issues.  I have read the attachments.  I'm

13     very familiar with the facts of this case and the Court

14     wants to hear argument on summary judgment.  The

15     principle issue on summary judgment is whether or not

16     the plaintiffs can -- whether there is a genuine issue

17     of material fact from which a reasonable jury could

18     conclude the existence of an agency relationship on

19     behalf of -- with Wynn's as principle and Armstrong Auto

20     as agent, under the facts of this case, with regard to

21     the two representations that have been alleged in the

22     fraud and the constructive fraud allegations in this

23     case and that is; one, paragraph 82, Wynn's agent

24     misrepresented both orally and in writing that

25     24 months, 24000-mile coverage was included in the
```

transaction; paragraph 83, that Wynn's authorized that

transaction; paragraph 86, Wynn's misrepresented that

the August 28 letter was in error and that it should be

ignored.

Those are the representations alleged in the

counterclaim.

So the issue as to the first cause of

action, it also goes to the issue under the VCPA,

whether there's sufficient evidence to get to the jury

from which a reasonable trier of fact could conclude the

defendant in this case, Penny Bradley, has met her

burden of proving the existence of an agency

relationship.  That's the first issue.

Then if you get past the issue of agency,

there's the issue of reasonable reliance. I know that

was dealt with to some extent in the motion to dismiss

in this case, but now we're at the Rule 56 stage, so we

have to consider the issue of reasonable reliance on the

alleged representations.

Then the issue under the Magnuson-Moss, the

third cause of action is whether or not there was a

contract here or whether or not it is merely an

application that was denied by Wynn's because the

vehicle was ineligible as being an electric vehicle.

So, those are the issues I want to hear

```
 1   argument on this morning.  I want to hear from Wynn's
 2   first.
 3               MR. CARSTENS:  Good morning, Your Honor.
 4   I'm John Carstens with Jordan Coyne.  I'm here on behalf
 5   of Wynn's on the motion for summary judgment.
 6               THE COURT:  Good morning, sir.  I'm not sure
 7   we've met, but nice to see you.
 8               Have you been here before on this case?
 9               MR. CARSTENS:  I was at one of the hearings.
10               THE COURT:  But Ms. Sadler did all the
11   talking.
12               MR. CARSTENS:  She did, and I hope to not
13   mess this up at this point, Your Honor.
14               I think Your Honor has identified the three
15   critical issues here. We submit that Armstrong is not
16   our agent as a matter of law.  I think the Court needs
17   to look no further than the Murphy vs. Holiday Inn case
18   for our position.  In that case, the Virginia Supreme
19   Court said --
20               THE COURT:  Hold on.  Give me the cite to
21   that case, would you?
22               MR. CARSTENS:  It's 216 Virginia 490.
23               THE COURT:  I read so many cases over the
24   past few days.  Let me just pull that up on my computer.
25   Hold on. I was reading cases that went back a hundred
```

```
 1   years on the issue of agency.
 2              MR. CARSTENS:  Good jurisprudence in
 3   Virginia.
 4              THE COURT:  Go ahead.
 5              MR. CARSTENS:  That's a slip and fall case
 6   where the patron at the Holiday Inn slipped and fell,
 7   sued Holiday Inn under a theory of agency and the
 8   Supreme Court said when there's a question of agency or
 9   not, when it rests upon unambiguous written documents
10   and inferences deducible from those documents, then it's
11   a question of law for the Court.
12              THE COURT:  You know, I think agency is a
13   question of law for the Court in this case and
14   particularly so because the undisputed evidence is
15   Armstrong and Wynn's never had any conversations.
16              MR. CARSTENS:  Correct.
17              THE COURT:  Armstrong testified in his
18   deposition, and I read a lot of these depositions in
19   this case -- the guy from CAC, the one in Florida from
20   Wynn's. I read Ms. Bradley's.  I looked at Mr.
21   Armstrong's.  Armstrong says the only time they ever
22   talked to Wynn's was after Ms. Bradley's car broke in
23   January of the next year and they said, you know, is
24   this thing covered? What we have here is the papers with
25   regard to the existence of agency.
```

1              MR. CARSTENS:  Correct.

2              So, if you look at our dealer agreement and

3    compare it to the summary of the franchise agreement in

4    Murphy vs. Holiday Inn and the Supreme Court found it

5    affirmed the summary judgment, granting the summary

6    judgment for Holiday Inn finding that that franchise

7    contract in that case did not create an agency

8    relationship.  In that case --

9              THE COURT:  You know, there's another issue,

10   too, that I don't want to forget about.  I'm sorry.

11   I've been thinking about this case.  The other issue is

12   this.  Even if an agency relationship existed, can

13   Wynn's be bound by actions taken by Armstrong that

14   exceeded the scope of the agency relationship.  Because

15   even if the Court were to find there was an agency

16   relationship, this agreement says that Armstrong, the

17   dealer, can only issue sales contracts based on eligible

18   vehicles.

19             MR. CARSTENS:  Correct.

20             THE COURT:  This vehicle wasn't eligible.

21             MR. CARSTENS:  Correct.

22             THE COURT:  So, even if there was an agency

23   relationship, didn't he exceed the scope?  Armstrong?

24             MR. CARSTENS:  That's correct, Your Honor.

25             THE COURT:  I don't want to lose sight of

1    that.

2            Go ahead.

3            MR. CARSTENS:  In that case, Holiday Inn had

4    a lot of authority under the franchise agreement.  It

5    got to dictate the building, the signage.  It actually

6    provided the training for the management, the

7    housekeeper and the restaurant management, even though

8    the licensee had to pay for the training, but they

9    provided that.  They provided stationary.  They provided

10   advertising.  They provided the color scheme for the

11   hotel.  They wanted to make sure that if their trade

12   name was on this building that it met certain standards

13   and they took steps under their franchise agreement and

14   had the right to take those steps under the franchise

15   agreement to do that.  The Virginia Supreme Court says

16   that's not controlling the means and methods of carrying

17   out the agreement and therefore, there is no agency

18   relationship.

19           Compare that to what we have in our case,

20   this dealer agreement.  The dealer agreement is that

21   Armstrong Auto agrees to market our extended service

22   contract.

23           THE COURT:  The dealer will use its best

24   efforts to market Wynn's service contract.

25           MR. CARSTENS:  Correct.

1          And the dealer agrees to use certain forms

2   in entering into these agreements.  He agrees not to

3   vary from the prices set by the contract.  He agrees

4   that he cannot change the terms and conditions of the

5   contract.  He agrees that he has not authority to bind

6   the company, that it's not a valid contract until it is

7   accepted by the company.  That's what's in there, in

8   that agreement.  The other items are, well, how do we

9   transmit the money, when do we transmit the money, who

10  gets the credit for the money? It's all typical indicia

11  of somebody that's an independent contractor.  There is

12  no control of the means and method.

13         The other four factors we deal with in

14  typical agency relationships -- power to hire, fire.  In

15  the Holiday Inn case, Holiday Inn put in their agreement

16  that the franchisee or the licensee in that case would

17  not hire anybody that was contemporaneously working for

18  a competitor.  So, if you had a night clerk working for

19  you at the Holiday Inn, that person couldn't work as a

20  desk clerk at the Super 8 Motel down the block under

21  that agreement.  So they had some control over who the

22  licensee could hire and there is no evidence in this

23  case whatsoever about any type of control like that.

24         THE COURT:  Look at paragraph 1A of the

25  dealer agreement.  I have it attached at Document 63,

1  attached to the Declaration of R. Steven Brooks.  It's

2  in the record at a lot of different places, but this is

3  the one I'm looking at.  It says, 1A, marketing program.

4  Dealer will use its best efforts to market Wynn's

5  service contracts pursuant to the program and faithfully

6  perform its duties in compliance wit the administrator's

7  instructions and procedures.

8            Does that give rise to sufficient indicia of

9  control to create an agency relationship?

10           MR. CARSTENS:  It does not, Your Honor.

11           That similar type of condition was in that

12  franchise agreement in the Murphy case.  In that case,

13  the licensee agreed to conduct its business consistent

14  with the system established by Holiday Inn.  Holiday Inn

15  had the right to come on the premises periodically to do

16  inspections to make sure they were following the

17  procedures and the accepted practices that were

18  established by Holiday Inn.  Again, Holiday Inn came on

19  and trained the manager, the restaurant manager and the

20  housekeeping people to make sure that certain standards

21  were being met.

22           THE COURT:  But there's no evidence of any

23  of that here.

24           MR. CARSTENS:  Correct.

25           THE COURT:  When you talk about this

particular language in the contract, it says

instructions and procedures.  There's no evidence of any

instructions.

MR. CARSTENS:  The instructions in the

agreement is you're not to sell a contract on an

ineligible vehicle. That's the instruction.

THE COURT:  And you send the money off to

CAC.

MR. CARSTENS:  Correct.

THE COURT:  Wynn's doesn't even deal with

Armstrong.

MR. CARSTENS:  Correct.  The money goes to

CAC.

THE COURT:  The money goes to CAC.  CAC

sends some money to Wynn's.  Wynn's keeps a little bit

of that money, $80, for its service charge, puts the

rest in reserve and then there's a chunk of money the

dealer gets and CAC finances some of that money.

MR. CARSTENS:  Correct.

THE COURT:  There's no magic or secret here.

That's the way it works.

MR. CARSTENS:  Exactly.

THE COURT:  Wynn's doesn't even deal with

these people.  There's no evidence they ever even spoke

to them.

1          MR. CARSTENS:  That is correct.

2          THE COURT:  I was trying to think about this

3 last night and I was trying to think about the law and

4 take a step back.  Why does it make sense in this case

5 or does it make sense in this case for Wynn's to be

6 bound by representations made from this dealer on the

7 street, representations that are, A, inconsistent with

8 the documents themselves.  And I was trying to think

9 about it.  The Virginia Supreme Court has keyed in on

10 control.  One of the factors it talks about in these

11 cases on agency is control.  And there isn't any

12 evidence of control in this case.

13          MR. CARSTENS: Correct, Your Honor.

14          THE COURT:  There just isn't.  Why does

15 control matter? I was trying to think about this from a

16 big picture legal standpoint.

17          Control matters because if Wynn's has the

18 ability to dictate and control what Armstrong does, then

19 Wynn's ought to be bound by what Armstrong says.  But

20 here, Wynn's has no control over Armstrong.  All

21 Armstrong has the ability to do is market these programs

22 and offer them to people who want to buy them with the

23 car.  Send it off to Wynn's for approval or not.  That's

24 what this document says.

25          I just don't see where there's any evidence

1   of control.  I don't see why Wynn's should be bound by

2   reps of Armstrong that are; A, inconsistent with the

3   documents; and B, where Wynn's doesn't control them.

4          MR. CARSTENS:  That is our position exactly.

5          The only thing that Wynn's could do would be

6   to terminate the contract.  That's their only recourse

7   if they find that somebody is acting inconsistent, which

8   is totally inconsistent with an independent contractor

9   agreement.  Somebody violates their independent

10   contract, you terminate the contract.  There is no

11   coming in and doing remediation, putting people on

12   suspension, doing anything like that.

13          THE COURT:  But Ms. Bradley argues, look,

14   Wynn's authorizes Armstrong to sell these contracts.

15   They authorize them to determine how much it cost.  They

16   authorize them to pick the coverage that's available and

17   therefore, they should be held to be their agent.

18   That's the gist of their argument, that they're out

19   there.  Really, we're talking about actual agency out

20   there.

21          Go ahead.

22          How would you deal with that?

23          MR. CARSTENS:  In terms of that, a couple of

24   those things are inaccurate.  One is that they don't get

25   to set the price. The price is set by the terms of the

1    agreement, by that rate sheet.  So it's not that

2    something --

3              THE COURT:  The rate sheet that they say

4    doesn't exist.

5              MR. CARSTENS:  Well, no, there -- I may be

6    using the wrong term, but there is a sheet that the

7    dealer gets on which the price is set out.

8              THE COURT:  It was attached to that same

9    Brooks affidavit.

10             MR. CARSTENS:  Correct.

11             THE COURT:  It's part of the dealer

12   agreement.  It's this page.

13             MR. CARSTENS:  That's correct.

14             So, that is not an issue.  They can't change

15   any of the terms of the agreement.  The only thing they

16   could put in there is the length of the contract,

17   whether it's 24 months and 24000 miles, whether it's

18   12 months and 12000 miles or some other combination.

19   Whatever the customer picks for the length of the

20   contract is what they put in there and that's going to

21   drive the price of the contract.  They have no

22   discretion or authority to change that.  Again, there

23   was no representations made to Ms. Bradley that they

24   somehow were cloaked with such authority to do that.

25   The agreement clearly says they have no ability to bind

the company at all, that it's not a contract until the
application has been accepted.  We know in this case
it's undisputed that the vehicle that they sought to
cover under the contract was ineligible.  That's an
undisputed fact.  And it's also undisputed that Ms.
Bradley got notice the application was rejected within
seven days of the transaction.  It went out in seven
days.  She got it maybe a week or so later.  Those are
all undisputed facts.

          So what we have is somebody who offers a
product for sale.  I go down to the local Food Lion and
buy Green Giant vegetables or something like that.  I
don't believe that Food Lion is an agent of Green Giant.
There's no reasonable belief under those circumstances
that they're anything other than an independent store
that is offering something for sale.  So there is no
agency relationship.

          THE COURT:  What if the box of Green Giant
beans that you're buying at the grocery store has a
label on the box that says, to use your example, that
says, "contains no peanuts."  Food Lion sells that and
Green Giant's box has "contains no peanuts" on it.
Let's say it has peanuts in it and someone has a peanut
allergy and that person gets very sick.  Is Food Lion
liable for selling that?

```
 1              MR. CARSTENS:  That's a separate theory of
 2   liability.  There's an implied warranty of wholesomeness
 3   that attaches under those circumstances.
 4              THE COURT:  But not under an agency theory.
 5              MR. CARSTENS:  Correct.
 6              THE COURT:  It would be implied -- let's say
 7   they get sued for fraud.  Let's say Green Giant gets
 8   sued for fraud.  That's what this case is.  Can Food
 9   Lion be held liable for any fraud theory, for selling --
10   you brought this up, I'm just going with it -- for
11   selling the green beans with the peanuts in them?
12              MR. CARSTENS:  I don't believe they can
13   unless they knew that there were peanuts in there and
14   continued to sell them after with knowledge of the
15   peanuts.  Under those circumstances, possibly, under
16   those circumstances.
17              THE COURT:  How does fraud make any sense in
18   this case with regard to the representation in paragraph
19   86 of the counterclaim where it says Wynn's
20   misrepresented that the August 28th letter was in error
21   and should be ignored? That's nonsense.  Wynn's wrote
22   the letter and said this vehicle is ineligible and it is
23   cancelled and then Ms. Bradley goes over to Armstrong
24   and says, and what about this letter and they say, oh,
25   don't worry, it's a computer glitch? How can Wynn's be
```

liable in fraud for writing a clear letter that says
there's no coverage here?  And then go to somebody else,
the car dealer, and have the car dealer bind Wynn's for
making a representation that's inconsistent with the
writing? That's nonsense.

MR. CARSTENS: I agree, Your Honor.

THE COURT:  It's nonsense.

MR. CARSTENS:  I agree.

THE COURT:  I mean, this is a case against
the car dealer.  I mean, if there's any liability here,
and I feel bad for Ms. Bradley because Ms. Bradley
didn't want to buy a car that didn't have a warranty
with it.  She says that.  Armstrong sells her one.
Whether Armstrong was mistaken or not, I don't know, but
Armstrong sells her one and he sells her this car and
then when she gets this notice -- he sells her a car
that's not eligible, for which there's no eligible
warranty.  When she gets this notice that says there's
no warranty, Armstrong says, hey, don't worry about
that.

If there's a case here, it's against
Armstrong.  I don't see how Wynn's has any liability at
all for the fraud in this case.  I don't.

Let's talk about the Magnuson-Moss for a
minute.  Let's talk about that.

```
 1              MR. CARSTENS:  Magnuson-Moss, there has to
 2    be a contract.  The argument is, quite frankly, there is
 3    no contract here because there's an application.  When
 4    Ms. Bradley signs the application, she acknowledges that
 5    it's an application for insurance.
 6              THE COURT:  It says contract/application.
 7              MR. CARSTENS:  It does, but then it says
 8    this is an application which will become your contract
 9    upon acceptance -- only upon acceptance by us.  She
10    acknowledges right above her signature -- let me get to
11    that.
12              THE COURT:  You know, there's no question
13    she had an opportunity to read this.  There's no
14    question she had an opportunity to read it.  I know in
15    the other case before I sent it off to arbitration,
16    there was some argument that Mr. Armstrong held his arm
17    over the arbitration provision when the contract was
18    executed, but she took it home.  She had an opportunity
19    to look at it. She says when asked in deposition about,
20    you know, let's go back to the other issue about was the
21    warranty included in the sales price or was it
22    separately an optional coverage clause? And it's clear
23    from the financing statement, it's optional coverage and
24    it says it there.  Optional coverage.  It says in the
25    retail financing agreement, this is optional coverage.
```

1    She says, well, I didn't pay any attention to that.

2              Well, it's kind of hard for me to see how

3    paragraph 82 can be -- the representation that Wynn's

4    agent misrepresented that this coverage was included in

5    the transaction.  I mean, sure, it was included in the

6    transaction, but it was a separate optional coverage

7    that was purchased.  That's clear from the documents.  I

8    don't know how she could reasonably rely on anything

9    different.

10             MR. CARSTENS:  Correct.  It's in three

11   places.  It's in the bill of sale.  It's broken out

12   there.  It's in the retail installment agreement that

13   she signed where she specifically initialed it and

14   acknowledged that this service contract was not a

15   condition of getting the financing and she acknowledged

16   that also in the application that she signed for Wynn's

17   where she said she understood that this contract was not

18   a condition of obtaining financing on the vehicle.

19   That's in the language right above where she signed

20   where she also acknowledged that it was not a contract

21   until accepted.

22             THE COURT:  I understand the above

23   information may be subject to verification and this

24   application may be rejected if any of the above

25   information is incorrect or if the vehicle is not

eligible for the term of coverage written.

What else could Wynn's have done? Wynn's gets the contract. He wrote it up on a vehicle that wasn't eligible. Wynn's immediately says it's not eligible, writes a letter and says it's not eligible and Armstrong ignores that.

Let's hear what Ms. Bradley has to say.

Thank you, Mr. Carstens.

MR. CARSTENS: Thank you, Your Honor.

THE COURT: Mr. Domonoske, you've heard some of the Court's concerns about your fraud and Magnuson-Moss case. Let's hear what you have to say.

MR. DOMONOSKE: Thank you, Your Honor.

First, let me correct one not clear aspect of our complaint.

We were never going forward on the theory that there was a claim for relief based upon the statement that was initially made to her that she thought it would be part of the deal. In the counterclaim, the part that you just read where the allegation is that he represented it was part of the deal, the transaction, what that's referring to is the entire transaction, the total price that was paid on the contract. That's not an effort to look back at how the initial conversation developed between her and

Armstrong.  The initial conversation was, she said, I
want a warranty.  She thought a warranty would be
included in the price of the car.  The documents
eventually broke that warranty out as a separate price
and we are not making claims based upon her initial
belief that it was included in the price of the car.
Where we say included in the transaction, we're just
simply asserting the undisputed fact that at the bottom
of that document, there's a number that's owed and that
number includes all the stuff above it, which includes
the service contract, because it ended up --

THE COURT:  I'm just looking at what you
alleged.

MR. DOMONOSKE:  Can you read it to me,
please?

THE COURT:  Paragraph 82.  There's only two
reps in here.  It doesn't say -- I mean, there's no
allegation in this case in your claims that Wynn's
representative represented that this vehicle was
eligible or that Wynn's representative represented that
this vehicle is covered.  What you allege in paragraph
82 is Wynn's agent misrepresented, both orally and in
writing, that 24 months/24000 miles coverage was
included in the transaction.

MR. DOMONOSKE:  Yes, Your Honor, and it's in

writing in the retail installment sale contract.  It's
in writing in the buyer's order.  It's in writing where
she signs and pays the down payment.

THE COURT:  And it says right on there it's
optional coverage.  It's optional coverage and she signs
right below it.

MR. DOMONOSKE:  It's included because she
chose the option.

THE COURT:  Okay, fine.  Where's the
misrepresentation? Where is it? What is a material
misrepresentation there?

She signs a document that says I'm buying
optional coverage.  She signs an agreement with Wynn's
that says, okay, this is an application and if it's not
accepted, we can reject it.  Then they reject it.

Where's the fraud? What did Wynn's do?

MR. DOMONOSKE:  That's a different question.
I can answer what Wynn's did or I can answer your
question, what did she rely on to her detriment.

THE COURT:  You answer however you want to,
Mr. Domonoske.  I want to hear what you have to say.

MR. DOMONOSKE:  She relied to her detriment
on his specific statement that the vehicle was eligible
for coverage.  That statement is undisputed.  It's in
her deposition.  It's in Travis' deposition.  It's before

```
 1   the Court in the documents and it's alleged in the
 2   counterclaim.
 3             THE COURT:  Why, sir, is Wynn's responsible
 4   for that alleged misrepresentation? Why is Wynn's
 5   responsible for that?
 6             MR. DOMONOSKE:  Your Honor, it is not an
 7   alleged misrepresentation when the two people who were
 8   there both admit it happened.
 9             THE COURT:  Fine.  Call it a
10   misrepresentation.  Take out the "alleged" in my
11   question.  Why is Wynn's responsible for Armstrong's
12   error or mistake or fraud or whatever you want to call
13   it? Why is Wynn's responsible because Armstrong messed
14   up and told her the vehicle was eligible and it wasn't?
15             MR. DOMONOSKE:  Because of the law of
16   agency, which is what we're here to talk about today.
17             Under Virginia, the law of agency, there are
18   three different fundamental analysis.  One is actual
19   agency.  One is apparent authority of an actual agent.
20             THE COURT:  Based on actions of the
21   principle.
22             MR. DOMONOSKE:  Yes.
23             THE COURT:  Based on actions of the
24   principle.
25             Okay.  Go ahead.
```

```
 1            MR. DOMONOSKE:  The third is what's called
 2    agency by estoppel.
 3            THE COURT:  Virginia Supreme Court said that
 4    doesn't apply to a tort claim.
 5            MR. DOMONOSKE:  Virginia Supreme Court said
 6    on the specific facts on a medical malpractice case,
 7    that didn't apply to a hospital.  I was first just
 8    referencing --
 9            THE COURT:  Let's assume for the sake of
10    argument that it does.  Where is -- why do you suggest
11    the facts of this case stack up to agency under any of
12    those theories?
13            Let's take actual agency first.
14            MR. DOMONOSKE:  We'll take actual agency
15    first because I think that's where the analysis starts.
16    Actual agency is going to start with this dealer
17    agreement.  The dealer agreement appeared for the first
18    time as an exhibit to a motion to dismiss,
19    Document 19.1.  The dealer agreement authorizes actions
20    by Armstrong for Wynn's behalf and that dealer agreement
21    is fundamentally different than the Holiday Inn case.
22    It's fundamentally different than when I buy my peas at
23    the Friendly City Food Co-op, and here's why.  I go to
24    the Friendly City Food Co-op and I buy peas made by some
25    third party company.  I have an agreement with the
```

```
 1    Friendly City Food Co-op.  They have a price in cash
 2    because I don't believe people should support credit
 3    card companies when they're supporting their downtown
 4    local businesses.  They get my dollars.  I walk home.  I
 5    have the peas.
 6              THE COURT:  Wait a minute.  Let me get this
 7    right, Mr. Domonoske.  One, you shop at the Co-op; two
 8    you use cash; three, you walk.
 9              MR. DOMONOSKE:  Yes, sir.
10              THE COURT:  God love you.  Go ahead.
11              MR. DOMONOSKE:  When I have those peas at
12    home there on the shelf, my wife and I have a dinner
13    conversation.  And in my house --
14              THE COURT:  They're probably not frozen.
15    They're fresh.
16              MR. DOMONOSKE:  They're fresh.
17              THE COURT: Absolutely.
18              MR. DOMONOSKE:  And when we have a dinner
19    conversation in my house, we actually have rules that we
20    follow when we have the dinner conversation.
21              THE COURT:  No television.
22              MR. DOMONOSKE:  No, sir.
23              THE COURT:  Certainly.  Go ahead.
24              MR. DOMONOSKE:  There are actually positive
25    rules and how you conduct the nature of the conversation
```

1  in order to get to a good result.

2        THE COURT:  I could learn from you,

3  Mr. Domonoske.

4        MR. DOMONOSKE:  When we decide we're having

5  the peas for dinner, the pea manufacturer cannot call us

6  up and say, oh, by the way, you never actually bought

7  the peas, we want them back.  The fundamental nature of

8  the contract is when I'm at Friendly City Food Co-Op, it

9  doesn't matter where they buy their stuff.  I have a

10 contract with them.  I trade dollars for good food.

11       The Holiday Inn case, when the victim, the

12 plaintiff, tried to sue Holiday Inn, under a theory that

13 was not allowed, which we do not dispute in any way that

14 analysis, that analysis doesn't apply to this case

15 because that plaintiff did not have a contract with

16 Holiday Inn, the company that was being solicited and

17 explained to him by the local Holiday Inn.  For

18 instance, the Holiday Inn, the company that was the

19 defendant in that case, could not call him up in the

20 middle of the night and say, you're not allowed to stay

21 at our hotel.  We're cancelling the contract.  They were

22 wrong to let you in, because the nature of the agreement

23 was not between that plaintiff and the principle that

24 they were trying to allege was the principle.

25       It is the same in all the cases.  The

med/mal case, the person who was at the hospital, that
hospital that they tried to get for the liability for
the doctors' negligence did not control the relationship
between the plaintiff and the doctor.  They couldn't
say, you're not allowed to have that doctor treat you.

What our case is exactly like is the
fundamental dynamics of Nationwide.  If you are looking
back more than a hundred years, you may have read the
case Harden v. Alexandria Insurance Company.  I
referenced that because --

THE COURT:  What's the case where these
folks have represented to the insurance agents?
Nationwide says right out there we are insurance agents.
Nationwide represents these people as being insurance
agents.  This contract says there's no agency here.

MR. DOMONOSKE:  When you say this contract,
are you referring to the dealer agreement?

THE COURT:  The dealer contract says that
and the contract with Ms. Bradley says, I understand
that this is subject to verification and if it's
incorrect or if it's not eligible, no deal.  And they
did that and they wrote her a letter and said no deal.
Then you're trying to hold Wynn's responsible because
Armstrong said ignore what Wynn's said? Armstrong says
just ignore that, it's a computer glitch.

1          The person who's responsible here, if it's

2    anybody, is Armstrong.  Wynn's did exactly what the

3    contract document said it would do.  Looked at the

4    vehicle, we don't cover hybrids.  Done.  I don't see why

5    there's a misrepresentation on behalf of Wynn's.

6          MR. DOMONOSKE:  I thought we were talking

7    agency law first.

8          THE COURT:  I'm talking about the whole

9    case.  This case -- I mean, there's a case against --

10   there's a case against Armstrong.  That's pending in

11   arbitration.  I don't see any liability on behalf of

12   Wynn's in this case, under any theory.  But I'll hear

13   what you have to say.

14         MR. DOMONOSKE:  So, under agency law, the

15   actual agency is established by this dealer agreement.

16   The question is, for actual agency, what's the

17   limitation of that?  The dealer agreement does authorize

18   Armstrong to give these documents to consumers.  It

19   authorizes Armstrong to talk to the consumers about

20   these documents.

21         THE COURT:  It authorizes Armstrong to only

22   sell these service contracts on eligible vehicles.  This

23   is not an eligible vehicle, so when he goes ahead and

24   sells this contract and offers it and she signs up for

25   it and the money gets transferred to CAC, he didn't have

 1    authority to do that.  It's not an eligible vehicle.

 2              MR. DOMONOSKE:  I was trying to walk through

 3    the elements of agency and I believe you've agreed that

 4    he was an agent.  It was just limitations in this

 5    agreement.

 6              THE COURT:  I don't think he's an agent.  I

 7    think he's an independent contractor.  I don't think

 8    there's any basis to establish, under the Virginia

 9    Supreme Court's principles of agency law, that Armstrong

10    is the agent of Wynn's.  Armstrong was a car dealer, an

11    independent contractor, that offered as an option to its

12    customers to sign up with this extended service

13    contract.  That's what this is.  This is not an agency

14    relationship.

15              MR. DOMONOSKE:  Your Honor, when I was using

16    the word agency, I wasn't trying to make any claim about

17    how far that agency relationship existed.  I was just

18    saying that this authorizes him to give those service

19    contracts to customers.  This authorizes him to discuss

20    those service contracts with customers and the question

21    is how far that authorization goes.  He is an agent for

22    those first two purposes by the very terms of this

23    contract.

24              The reason I was talking about Harden v.

25    Alexandria Insurance Company is, in 1894, the Virginia

```
 1   Supreme Court was trying to determine what to do about
 2   an insurance policy that was changed by the insurance
 3   company to be different than what was told to the
 4   insured.  In that case, there was a broker.  This was a
 5   general insurance broker.  The Nationwide v. Patterson
 6   case that occurs 100 years later and is a small fact
 7   twist on this underlying case.  But in Harden v.
 8   Alexandria Insurance Co., in November, 1890, one G.W.
 9   Lowell, whose occupation was general insurance business
10   at Big Stone Gap, Wise County, Virginia, went to see
11   W.S. Reese. So a general broker of insurance --
12              THE COURT:  What's the cite to that case?
13              MR. DOMONOSKE:  18 Southeast 911 90 Virginia
14   413.
15              THE COURT:  Go ahead.
16              MR. DOMONOSKE:  He goes and he pays a
17   personal visit to W.S. Reese.  In that visit, they
18   discuss insurance.  This is not a question of someone
19   going to a Nationwide insurance salesman.  This is a
20   general insurance broker who went to see W.S. Reese.
21   They strike a deal.  They pay some money.  They get the
22   policy.  The policy goes up to the insurance company.
23   The insurance company puts amendments to the policy.
24   They send those amendments to him, but his store burns
25   down, he loses his inventory and the question is, does
```

```
 1   the insurance limitation that was in the amendments that
 2   were made by the insurance company apply or does what
 3   G.W. Lowell, the general insurance broker apply? The
 4   Virginia Supreme Court said --
 5             THE COURT:  What happened to those
 6   amendments?
 7             MR. DOMONOSKE:  They were written down. They
 8   were on the policy. They were in the building that
 9   burned down, if you're asking physically what happened
10   to them.
11             THE COURT:  Had Lowell gotten the
12   amendments?
13             MR. DOMONOSKE:  He had actually gotten the
14   piece of mail and it was then burned down.
15             THE COURT:  Okay.
16             MR. DOMONOSKE:  Here's what the Virginia
17   Supreme Court ended up holding; that even though the
18   broker and the company position was that the company had
19   never issued a commission to him as their agent, and
20   they both said he was acting only as a broker, the
21   Virginia Supreme Court said, but this is playing upon
22   words, and the whole testimony and the transaction
23   itself shows that he was held out to the public as the
24   agent or intermediate of the company by and through whom
25   all transactions with the company by parties seeking or
```

having insurance must pass, subject to approval.

The insurance company furnished him with all needful papers and blanks, responded to his acts, approved permits of removal given by him, paid his rent, thereby treating and holding him out as an agent to the public.

The only thing different in there is paying the rent and I mention that because this deal didn't go down at his office. And furthermore, a general broker doesn't tell a customer who pays the rent. The payment of the rent is unnecessary for the analysis. The important thing about the analysis is there was a company who decided who would interact with the public on their behalf to solicit business. What this dealer agreement does is this dealer agreement says, in Harrisonburg, Virginia, Armstrong Auto is authorized to solicit business for Wynn's. My client can't call Wynn's and get a service contract. There is only one way my client interacts to get the service contract and that's by and through an intermediary. The intermediary is Armstrong Auto.

I have a hypothetical that I think shows this. Let's say that Wynn's had approved this deal. Let's say that there was never an ineligible -- actually, let's roll the hypothetical back. Let's say

```
 1    it was a Honda Civic that was not a hybrid so that it
 2    was eligible for this service contract.  When Wynn's
 3    then got this, it would be in place.  They wouldn't void
 4    it and the question would be, who interacted on Wynn's
 5    behalf to solicit this contract? Who did Wynn's use to
 6    solicit the contract? Wynn's uses dealers like Armstrong
 7    Auto, like dealers nationwide.  They have a form dealer
 8    agreement and this dealer agreement authorizes those
 9    dealers to solicit business for Wynn's.  And in fact,
10    there's only one way --
11              THE COURT:  Sure.  There's a dealer
12    agreement that says a dealer will use its best efforts
13    to market contracts.
14              MR. DOMONOSKE:  Yes.
15              THE COURT:  That doesn't mean that Wynn's is
16    responsible for fraudulent or statements made by dealers
17    of which it has no knowledge and which are inconsistent
18    with the documents itself.
19              MR. DOMONOSKE:  First, that is exactly what
20    the Virginia Supreme Court held in Harden v. Alexandria
21    Insurance.  They held that indeed the company was bound
22    by the initial agreement that was made between the
23    people.  They were bound by what was said.  They could
24    not rely on what they sent in writing after their
25    intermediary, their chosen intermediary, had negotiated
```

1 the deal.

2    THE COURT:  Well, you know, there's a very,

3 very long -- I'm trying to read that case as you're

4 talking.  There is an incredibly long paragraph that

5 says the facts of that case are this.  I didn't read

6 this case before now.  I'm not sure it had been cited.

7 It may have.  I don't know.  But I'm not sure that this

8 case is square with the facts of that.  I'll have to

9 study it because as with cases that date from the

10 1890's, the fact paragraph here is really long.  It's

11 like more than a page.  I'd have to study that.

12    But go ahead.

13    MR. DOMONOSKE:  The point is that in the

14 Holiday Inn case, in the insurance -- I'm sorry, in the

15 hospital case, in the Green Giant example of the peas,

16 the principle is not using the intermediary to solicit

17 business --

18    THE COURT:  Sure, they are.  Sure, they are.

19 Just forget -- that's a goofy example.  Just forget that

20 example.

21    MR. DOMONOSKE:  In the Holiday Inn case and

22 in the medical malpractice case, the alleged principle

23 was not using the intermediary to get a contract that

24 then the alleged principle controlled.  Here, Wynn's is

25 saying that was never a contract.  We voided it.  They

1  actually admit in their pleadings that the contract was

2  in effect and then they voided it.  Right when this case

3  starts out, they talk about we voided the contract after

4  it was created.  It is a contract directly with them.

5          In the Holiday Inn case, that overnight

6  visitor was not in the process of negotiating a contract

7  directly with Holiday Inn International.

8          In the med/mal case, the person was not

9  using the doctor to negotiate a contract with the

10 hospital.  There's a fundamental difference between

11 those fact patterns and this fact pattern and in fact,

12 this fact pattern lines up exactly with the insurance

13 cases because there is a company that is using an

14 intermediary as the only way for a member of the public

15 to do contractual business with them.  In fact, they

16 testified at their 30(b)(6) deposition that Armstrong

17 was their agent.

18          THE COURT:  No, I read that page.  I read

19 that page.  That's page 139 of Mr. Armistero's

20 deposition.  I read that page.

21          There was an old Virginia Supreme Court case

22 which I think sheds a little light on this.  It was

23 abrogated for other reasons, but it's Virginia Iron and

24 Coal vs. Odle's Administrator.  Here's the real problem

25 with what your argument is.

1    It says, in headnote one -- you know, this

2    case has been abrogated, but the principle that it talks

3    about is not abrogated.  It says, it is insisted by

4    counsel for defendant that the doctor -- this was a

5    doctor case -- was the agent of the company and the

6    failure on the part of the agent to perform the services

7    contract performed by his principle is negligence and

8    breach of contract under the law.

9    This is the part of this thing that

10    interested me.  Apparently, the word agent -- and this

11    case is old.  Maybe I didn't go back to 1894, Mr.

12    Domonoske.  I only went back to 1920.  Apparently, the

13    word agent in the paragraph quoted is used in the

14    generic sense of representative, but the representative

15    may be what is usually and properly termed an agent or

16    he may be a servant.  There's a well defined distinction

17    between the two.  Usually the agent represents the

18    principle in the formation in the discharge of contracts

19    between third persons.

20    It talks about just the sort of -- the

21    difference between an agent and a representative.  I'm

22    not sure this amounts to a hill of beans, but, you know,

23    the thing that is troubling here, I think that goes to

24    the point of Mr. Armenteros when he says -- he's not

25    talking in legal terms.  He says the dealer is an agent

in the way of selling the product on behalf of CAC and
Wynn's Extended Care. Page 139 of his deposition. They
chose to do business with CAC and purchased the warranty
service contract. Basically, he's saying these guys are
there, they provide the service contract to the
customers, the customers can decide to sign up or not
with them. They sign up with them and we say -- if the
car had been eligible, would have been no problem. But
the car wasn't eligible here and Wynn's writes them
right back and says, not eligible.

Maybe this case is like your Harden case had
the car battery gone bad between the time this contract
is sent in and the time Wynn's says no deal, abrogate
it. That's like the fire in your Harden's case, as best
I can parse the facts sitting here in this argument.
But that's not the case. Wynn's writes the letter, says
not eligible, no contract. Then five or six months
later, three or four months later, whatever it is, her
battery goes bad.

Why in the world should Wynn's be held
responsible for that? Wynn's did everything it could to
say that there's no agreement here. They refunded the
money. There's no agreement here. Wynn's cannot, under
the law, be held responsible for a statement by
Armstrong that is flat inconsistent with a writing from

```
 1    Wynn's.  It would be ignoring that.  That's nonsense.
 2                 MR. DOMONOSKE:  All right, two things.
 3                 First, they continue to say they refunded
 4    the money.  We tried to do discovery and they would not
 5    give us the cash flow documents.  We have not seen the
 6    refund of that money.
 7                 THE COURT:  It doesn't matter.  Whether
 8    Wynn's gave the money back to CAC or not doesn't matter.
 9    What matters is what Wynn's told Ms. Bradley and Wynn's
10    told Ms. Bradley this car is not eligible.  She goes to
11    Armstrong.  Armstrong says -- if there's fraud here, and
12    I can't see that there's any representation based on
13    what you alleged in paragraph 82, that representation is
14    that it was covered -- well, that's flat inconsistent
15    with the contract documents.  There's no fraud there.
16    So the alleged fraud here, if there is any fraud, is
17    when Armstrong says ignore the letter from Wynn's.
18    Ignore it.  How can Wynn's be held responsible for that?
19                 I understand the letter says contact your
20    dealer.  But it doesn't say, oh, if your dealer lies to
21    you about whether this letter is valid or not that we
22    should be held liable.  I mean, that's crazy.  What more
23    could Wynn's have done, Mr. Domonoske?
24                 MR. DOMONOSKE:  Well, one thing they could
25    have done is after they had 103 ineligible service
```

1  contracts sold on electric vehicles by dealers who were

2  making mistakes, they could have done something to keep

3  that from occurring.

4        THE COURT:  They did.  They wrote a letter

5  right here like within a week saying there's no contract

6  here.  You may have an argument -- if, for example, this

7  car had gone bad between the time the contract is

8  entered and the time Wynn's sends this letter or

9  somewhere around there, this battery had gone bad and

10  poor Ms. Bradley thinks I have a contract with Wynn's

11  and in the meantime -- I think that's that Harden case

12  you're talking about.  If the car burns up or like in

13  that case, the liquor factory burns up in the interim,

14  you've got an argument as to agency and binding Wynn's

15  then.  But not here, not where Wynn's says no deal, no

16  deal.  You've got a claim.  Ms. Bradley's got a claim

17  against Armstrong for misrepresenting to say ignore the

18  letter from Wynn's.  That is out and out fraud and I

19  can't see how under any theory of the law Wynn's can be

20  held responsible for a dealer saying ignore an express

21  writing from Wynn's.  And I want to hear your best

22  argument on that because that's my biggest problem with

23  this case.

24        MR. DOMONOSKE:  All right.

25        We have this letter, August 28th.

 1          THE COURT:  Yes, sir.

 2          MR. DOMONOSKE:  The letter says:

 3  "Regrettably, your contract has been voided due to the

 4  following.  This vehicle model is ineligible for

 5  coverage.  Please contact your selling dealership with

 6  any questions."

 7          First thing about the letter, it's not

 8  signed by anyone.  It's clearly a form letter, and I

 9  believe that's important.

10          Second, it tells her what she should do if

11  she has any questions.  And she has a question.  Her

12  question is, how can this be true? You checked on the

13  computer.  We discussed this.  I told you I only wanted

14  this car if I have coverage.  You went and checked and

15  said, there's coverage.  She has questions.  And they're

16  reasonable questions.  They're reasonable questions

17  because this deal never would have happened but for

18  Armstrong checking something and coming back and telling

19  her, it's eligible, you have coverage.  She relied on

20  that statement -- "it's eligible, you have coverage,"

21  and she signed a bunch of documents and she agreed to

22  pay for this and she paid $1,200 down.

23          THE COURT:  And it wasn't eligible.  There's

24  no dispute.  Armstrong's representation that you say he

25  says it was eligible is false.

1          MR. DOMONOSKE:  Yes.

2          THE COURT:  Under the dealer agreement, how

3    can Wynn's be responsible for that because Armstrong is

4    only authorized, the extent of the agency is to sell

5    eligible vehicles.

6          MR. DOMONOSKE:  First, she doesn't have the

7    dealer agreement.

8          THE COURT:  So what?

9          MR. DOMONOSKE:  I'm talking about how she

10   reacted to this letter.  You're telling me she acted

11   unreasonably.

12         THE COURT:  No, I'm not saying that.  What

13   I'm saying is, all right, her reliance on a

14   representation by Armstrong that it's covered, it's

15   covered, it's part of the deal, is unreasonable in view

16   of the terms of the contract itself.  I'm not saying

17   when she gets this letter, when she calls up Armstrong

18   and says what am I supposed to do about that, that she

19   acted unreasonably.  I'm not blaming Ms. Bradley for

20   that.  But how can Wynn's be held liable for this

21   statement made by Armstrong that is inconsistent with

22   exactly what Wynn's is telling her in writing?

23         MR. DOMONOSKE:  I was getting there.

24         THE COURT:  Go ahead.

25         MR. DOMONOSKE:  She gets this letter.  The

letter tells her two things:  Your contract has been
voided.  If you have questions, contact your selling
dealership.  She does exactly what Wynn's tells her to
do because she does have questions.

THE COURT:  I got that, but so what?

MR. DOMONOSKE:  So she goes back to
Armstrong and she says, what does this letter mean? How
can I not have coverage?

THE COURT:  Why doesn't she -- if what she
was doing was reasonable, why doesn't she call the
number on the letter and say, hey, I got this letter, my
dealer says this.  What's up? She doesn't do that.  So
maybe there is a fact question as to whether or not her
reliance is reasonable.

I'm talking about whether or not as a matter
of law Wynn's can be held liable for a representation by
the dealer that is flat inconsistent with its writing.
I don't see it.  Tell me why.

You're saying -- I know what your argument
is.  It's because the letter says "contact your dealer."

MR. DOMONOSKE:  Yes.

She had questions and she is a better
respondent to Wynn's writing than apparently they think
Armstrong Auto is.  They think Armstrong Auto violated
the terms of that rate card.  There actually is an issue

whether Armstrong reasonably violated the terms of that
rate card because his understanding of electric vehicle
is something different than what they say their
understanding of electric vehicle is.  But they're
saying Armstrong screwed up because he didn't do what we
told him to do and therefore, it's all Armstrong's fault
because Armstrong didn't do what we told him to do.

Ms. Bradley did exactly what they told her
to do.  They said contact your selling dealership with
any questions.  She followed their instructions to the
very word, to the very letter.  That's why they're
responsible for what Armstrong said because Armstrong
told her, look, that's just a form letter, ignore it.
It's a computer glitch.

Now, the next question is you apparently
think it was unreasonable for her to believe him.  I
understand that position. I've been practicing law in
Virginia court for a long time.

THE COURT:  What I'm saying is -- no, I'm
not blaming Ms. Bradley.  What I'm saying is -- what I'm
saying is, how, under the law, under this dealer
agreement and under the relationship where Wynn's had no
conversation with Armstrong, had no control over
Armstrong except in this writing, how can Wynn's be held
liable for -- let's assume it is an out and out lie, a

deliberate falsehood by Armstrong. How can Wynn's be held liable for that where it is inconsistent with the terms of the letter itself?

MR. DOMONOSKE: She reasonably relied on that representation by them.

THE COURT: Reasonable reliance is the second point. Where is the liability attaching to Wynn's for a statement by Armstrong inconsistent with everything that's here in terms of the relationship between Wynn's and Armstrong? There's no agency relationship that allows Armstrong to disregard what Wynn's is telling Ms. Bradley. Even if there was one, it's outside the scope. Armstrong has no authority to tell Ms. Bradley, oh, ignore that letter, just ignore it. There's no authority to do that. So even if there was an agency relationship, it exceeds the scope.

Go ahead.

MR. DOMONOSKE: All right.

There's no response to it. I'll take the second one up first because the second one follows exactly what you just said. Even if there was an agency, it exceeds the scope.

If there was an agency and it exceeds the scope, the legal avenue for her relief is the apparent authority of the agent, not actual agency. The actual

```
 1   agency -- under this analysis, the actual agency is
 2   limited.  This exceeds that limitation.  So for these
 3   purposes, I'm agreeing with you on that.  The question
 4   is under the apparent authority of an agency --
 5                THE COURT:  Apparent authority must be based
 6   on representation by the principle and all you have is
 7   the letter from them saying no coverage, this vehicle is
 8   not eligible and if you have questions, contact your
 9   dealer.  That is your only evidence to support apparent
10   authority.
11                MR. DOMONOSKE:  For apparent authority, I
12   was talking about specifically about when she was at the
13   dealership and Armstrong said ignore the letter.
14                THE COURT:  I think she called in, didn't
15   she?
16                MR. DOMONOSKE:  She both talked on the phone
17   and she was there.
18                This actually is a jury issue because
19   Armstrong said, I never said that.  There is a dispute
20   --
21                THE COURT:  Assume for the sake of argument
22   that Armstrong did.
23                MR. DOMONOSKE:  Apparent authority --
24                THE COURT:  That's an issue in the
25   arbitration against Armstrong.  It's not an issue in
```

1　this case.

2　　　　　MR. DOMONOSKE:  It's the authority a third

3　person reasonably believes an agent has based on

4　dealings with the principle, even if the principle did

5　not actually give it.

6　　　　　Did she reasonably believe that Armstrong

7　had authority to answer her questions based upon

8　dealings with the principle? Here, we have a letter that

9　says, if you have any questions, contact your selling

10　dealership. Our legal position, it's nothing more than

11　it was reasonable for her to believe that Armstrong had

12　authority to answer her questions.  That's the apparent

13　authority of an agent.  They gave that apparent

14　authority to Armstrong when they sent this letter.

15　　　　　If the Court says there's nothing in the

16　dealer agreement that actually makes him an agent at

17　all, then we're talking about agent by estoppel, which

18　is, even if he doesn't start out being an agent, did

19　someone give the appearance that he had authority to be

20　the agent? Well, guess what? The letter does.  The

21　letter says, please contact your selling dealership with

22　any questions.  This letter clothed Armstrong with

23　authority to answer her questions.  She went there and

24　Armstrong said, look, that's a form letter.  Ignore it.

25　That's just a glitch.  Of course you have the service

contract.  I told you, you did.  I charged you for it.
You have the coverage.  You only wanted the car if you
had the coverage.  And she believed him.

Furthermore, the dealer kit, I think, is
evidence there was actual agency.  Armstrong has a
dealer kit.  Their Interrogatory says we provide that to
our dealers nationwide.

THE COURT:  That's irrelevant to this case
because there's no evidence Ms. Bradley ever saw it.

MR. DOMONOSKE:  Your Honor, can we back up
just a minute?

Here's the dealer agreement.  We agree the
dealer agreement is relevant to the actual agency.  I'm
talking about actual agency.  Under actual agency, they
tell their dealers, you have authority to select the
right service contract.  They have a brochure that their
dealers are to give to consumers that say ask your
dealer which is the right one.

This dealer agreement is really interesting
because they say the dealer agreement is the complete
agreement, but there's a rate card that is part of the
dealer agreement, which is that rate card they've given
the Court.  They've never actually shown us the dealer
cost document.  It is impossible for me to read this
agreement and understand how the rate card fits in with

the dollar flow on this.

THE COURT:  That's beside the point.  I want to stay on task.  I don't want to get into this whole Wynn's CAC conspiracy theory that you have because that's not the issue in this case.

Let's go back to the letter of August 28, 2012.

Ms. Bradley testified she didn't even -- I mean, in order to have apparent authority or agency by estoppel or any of that stuff in this case, Ms. Armstrong (sic) has to have information that the principle, the principle is making some representations or indicating to the third party that, yeah, you should look to the agent.  Ms. Bradley testifies I got this letter.  I don't even know who it came from.  I had no idea this came from Wynn's.  I had no idea.  How can Wynn's be bound by it? How can agency by estoppel be created here when Ms. Bradley herself doesn't even know that Wynn's sent this letter?

MR. DOMONOSKE:  So she doesn't know the name, Wynn's Extended Care.  She doesn't know the name of the corporate entity.  Your Honor, I've been down there and  deposed this person.  I'm not sure who Wynn's Extended Care is.  They apparently have no employees. All their employees are apparently employees of Phoenix

America.  Now, who pays the Phoenix America employees, I
have no idea.  She didn't know the name.  She did know
this is a letter about my service contract that I
bought.  She doesn't have to know Wynn's Extended Care,
Inc., is the formal name of the service contract holder.

            THE COURT:  That's fine.  You can make that
argument, but the fact of the matter is, I don't see how
Wynn's can be held liable in a fraud case where you have
to prove fraud by clear and convincing evidence, how a
reasonable jury could possibly hold Wynn's liable for --
somehow be responsible for a statement by Armstrong that
is flat inconsistent with the letter Ms. Bradley got.  I
just don't see it.

            MR. DOMONOSKE:  All right.

            What I hear you saying is that as a matter
of law, it was not reasonable for her to believe his
statement.

            THE COURT:  What I'm saying is, as a matter
of law, there's no agency relationship here.  There's no
agency relationship in fact.  There's no agency
relationship by estoppel.  There's no apparent agency
relationship.  Wynn's had no dealings with these people.
All Wynn's did is allow them to sell these agency
contracts.  Armstrong goes off on his own, signs up an
ineligible vehicle.  Wynn's responds immediately this

1    vehicle is ineligible and Armstrong says ignore that.

2              Your case is against Armstrong.  Wynn's did

3    absolutely what it was supposed to do under these

4    documents.  There's no fraud here, no constructive fraud

5    here.  None.  Wynn's gives the dealers applications for

6    service contracts.  It says right on its face it's an

7    application for a service contract.  Wynn's responds

8    immediately and says no, this car is ineligible.

9              You may have an argument had the car gone

10   bad between the time this application is sent in to

11   Wynn's and the time they responded.  That may be your

12   Harden v. Nationwide case.  Not here.

13             If you have a claim, it's against Armstrong.

14   There is no claim against Wynn's under fraud or

15   constructive fraud.  I see under no theory that a

16   reasonable jury -- as a matter of law, the Court finds

17   there is no agency relationship.  These documents do not

18   establish an agency relationship.  There is nothing here

19   -- there is nothing here, no evidence of control at all.

20   The record is clear.  Wynn's does not control Armstrong

21   at all.  No evidence of that.  Control is important

22   because if Wynn's had controlled Armstrong, then there

23   may be some rationale and theory under the agency law

24   why Wynn's should be liable for representations made by

25   Armstrong.  But there's no control here.  There's no

evidence of procedures and all that other stuff.  The
only evidence we've got in this case is this dealer
agreement and this letter and what does this dealer
agreement say? Armstrong can only sell eligible
vehicles.  What did Armstrong do? He sold an ineligible
vehicle.  What does Wynn's do? Wynn's responds
immediately.  Wynn's responds immediately that there's
no contract here, your application is rejected.

In the Harden case that you talk about,
there was an actual contract issue.  There was an actual
policy issued in that case.  In this case, there is no
agreement reached between Wynn's and Ms. Bradley.  She
signs an application for a service contract on an
ineligible vehicle.  Wynn's responds and says this
vehicle is not eligible.  End of story.

She has a claim against Armstrong.  She has
a claim for a misrepresentation, but I see no basis and
I believe no reasonable jury could conclude that there
is an -- the Court finds as a matter of law, there's no
agency relationship based on the documents.  So I reject
the notion of actual agency.

This letter of August 28th, which is the
only communication between Penny Bradley and Wynn's,
does not create apparent agency or agency by estoppel or
anything like that.  This letter says there's no

agreement here, no contract.

You may have an argument, and this would be a different case, had the battery gone bad between the time the application is signed and the time the letter is sent. You may have a case against Wynn's then, but it didn't happen. It wasn't until months later. I find as a matter of law that there is no agency relationship here.

I find as to paragraph 82 of the complaint, the representation that this was included in the transaction in part of the deal automatically included, the reliance on that is flat inconsistent with the documents in this case. Even if there was an agency relationship as regards the representation in paragraph 82 -- doesn't exist. The documents say this is an application. Right above her signature, this is an optional contract. The retail sales agreement says optional contract and you sign up for it. It's separately priced. It's absolutely clear from the documents what is here.

And there's no basis for paragraph 83 to say that Wynn's authorized Armstrong in saying that this was part of the deal. It's not. The documents itself that she signed say I understand that the information may be subject to verification. This application may be

rejected if any of the information is incorrect or if
the vehicle is not eligible.  She signed that.  She knew
that.  What does Wynn's do? This document is dated -- I
can't tell what the date of this is, but very shortly
after this sales contract is done, Wynn's writes her a
letter and says, sorry, sorry, sorry, ma'am; ineligible
for coverage.

Paragraphs 82 and 83, there's no basis for
any agency there.  It's inconsistent with the agreement.
There are no facts that support it.  No reasonable jury
could find agency.

With regard to paragraph 86, Wynn's
misrepresented that the August 28th letter was an error
and should be ignored.  Wynn's never did that.  There's
no evidence to support that.

If anybody's responsible here, it's
Armstrong for making a statement that's inconsistent
with the letter.

So the Court finds as a matter of law
there's no agency and I'm dismissing -- I'm granting
summary judgment to the defendant for the first cause of
action, fraud and constructive fraud, because there is
no agency in this case:  Actual, apparent, by estoppel,
none, zero.

Secondly, even if there was, as I've

1    indicated, there's no reasonable reliance by Ms. Bradley

2    in paragraphs 82 and 83. There's absolutely no basis

3    under the law for which Wynn's can be held liable for

4    Armstrong's subsequent representation after August 28,

5    2012, to ignore its written letter.

6         If there is a case here -- and I feel bad

7    for Ms. Bradley because she bought this car and the

8    battery went bad. I'm sure -- but I feel bad for her,

9    but her claim's against the dealer. That's who her

10    claim is against, for making statements inconsistent

11    with this letter of August 28th.

12         With regard to the Magnuson-Moss claim --

13    so, for those reasons, I find there is no agency in this

14    case. None. The document don't establish it.

15         In addition, I find paragraphs 82 and 83 and

16    86 to be flatly contradicted by the evidence in this

17    case. 82 and 83, the allegation is that Wynn's agent

18    misrepresented that the warranty was included in the

19    transaction. Well, A, no agency; B, the documents on

20    their face don't support a notion that the warranty

21    itself was somehow inside of the sales document. It's

22    clear, the warranty was an optional warranty coverage.

23    She signed right there on the retail sales contract

24    saying optional warranty coverage. She signed it. It's

25    there. She can't now claim some sort of fraud against

1  Wynn's on 82, 83.

2         86, like I said, there's no facts that

3  suggest that Wynn's should be liable for Armstrong's

4  representation if indeed it happened, and I take the

5  defendant's case at its strongest that Armstrong says

6  ignore it, it's a computer glitch, ignore the letter.

7  Wynn's is not responsible for that under the law and

8  that's nonsense. There's no way any reasonable juror

9  could conclude that Wynn's is responsible for that

10 representation.

11        On the VCPA, the Court finds there is no

12 contract here.  This was an application which was

13 rejected.  There is no contract here.  You've got to

14 have a contract under the VCPA -- I'm sorry, I'm sorry.

15 I am completely wrong.  I'm talking about the third

16 cause of action, Magnuson-Moss act.

17        There is no contract here.  Wynn's does what

18 it does.  It says, give you an application, you fill it

19 out.  Wynn's does its due diligence.  It looks at the

20 car and says, gosh, we don't cover these cars and it's

21 ineligible.  They write her back right away.  There's no

22 basis to impose liability on Wynn's for doing exactly

23 what it did in this case, which was reject an

24 application from Ms. Bradley.

25        So I dismiss the third cause of action under

1    the Magnuson-Moss Warranty Trade Improvement Act.

2              Under the VCPA, and I'm sorry I misstated

3    that, under the second cause of action, there is no VCPA

4    claim here because there is no agency.  There is no --

5    paragraph 93 says, she says by charging for coverage

6    that was not provided by misrepresenting that coverage

7    was provided. These documents say it is an application

8    for an optional warranty coverage and it's only binding

9    when accepted.  It's not accepted here.  There is no

10   violation of the VCPA.

11             Give me a minute.  I'll be back in a moment.

12             I am dismissing -- I'm granting summary

13   judgment to the defendant for those reasons on Counts 1,

14   2 and 3.  No agency for Counts 1 and 2.  No contract on

15   Counts 1 and 2.

16             Give me a minute and I'll be right back.

17             Ask the Marshal to declare a recess.

18             (Recess at 10:50 a.m. until 10:53 a.m.)

19             To further distinguish the Harden case that

20   Mr. Domonoske cites, the Court would note, A, there was

21   no extended discussion in that case as to the level of

22   control.  Here, we know what the control is and it's

23   non-existent. There is no control.  We do know in the

24   Harden case, the insurance agent paid the rent of the

25   agent.  Second, in Harden, there was a contract in place

and here, there was none.  I think as a matter of
equity, as a matter of law, that Harden case may make
some sense because there was the issue about whether the
insured got the letter, this new policy.  Here, she got
it.  She got the letter.  The car didn't go bad in the
meantime.  There's no case here.

For the same reasons, the Court denies the
motion to amend the counterclaim.  Those are additional
representations which rely on an agency theory which the
Court rejects.  So I deny the motion to amend the
counterclaim.

Now, there is a host of other extraneous
issues out there dealing with motions for sanctions,
motions to seal, motions to unseal that are out there.
In the Court's view, all of those deal with, by and
large, the relationship between Wynn's and CAC.  All of
those deal with this theory that the plaintiffs have
that there's some conspiracy here that Wynn's and CAC
try to make money by getting people to buy ineligible
contracts, which is just flatly contradicted by the
August 28th letter, and that just doesn't make any sense
whatsoever.  But plaintiffs have this theory and they
tried to pursue it and they pursued it in the discovery
in this case, to the nine's.

I am dismissing all other motions in this

case, including the motion for sanctions, including all
the motions to seal, all the motions for discovery, all
of those issues.  In the Court's view -- and I've read
all of them.  I've looked at these documents in camera.
I've looked at all this stuff.  I've studied them all
and all of those go to the relationship between Wynn's
and CAC, which is a non-issue in this case because the
Court finds no agency -- no agency that could possibly
bind Wynn's to the fraud that the plaintiff alleges in
this case.

Counts 82 and 83, as I've said are flat
inconsistent with the documents.  Even if there was an
agency, there's no factual basis for that and no way she
could reasonably rely.

As to Count 86, there is no reasonable jury
that could conclude Wynn's is responsible for the
representation in this case that Armstrong made to
ignore the written letter.  It's nonsense.  There's no
possible way to bind Wynn's for that.

So I'm going to dismiss as moot all other
pending motions, including the motion for sanctions.
I'm dismissing them all as moot.

MR. DOMONOSKE:  Can I be heard on one point
that won't challenge your order?

THE COURT:  Mr. Domonoske, it's always a

1     pleasure to have you here.  I'll be happy to hear what

2     you have to say.

3            MR. DOMONOSKE:  You characterized these many

4     discovery motions and motion for sanctions about our

5     theory of the case that Wynn's is conspiring with other

6     people to make money by having ineligible service

7     contracts sold and I want to be very clear what we were

8     doing in this case.  We were trying to conduct discovery

9     on their defense.  That's what you articulated and

10    called our theory and that was never once our theory.

11    Our theory was the legal issues which we've talked

12    about; whether there was agency relationship, whether

13    that August 28th letter clothed Armstrong with apparent

14    authority. In response -- and we lost that and that's

15    fine.

16            THE COURT:  We just flat disagree on that

17    and maybe the Fourth Circuit will tell me I'm wrong.

18            MR. DOMONOSKE:  From the very beginning

19    though, they raised a defense that they wanted to make

20    in response to our argument, which was, look, we never

21    would have done it because there's no way we're making

22    any money when that happens.

23            THE COURT:  I understand.

24            MR. DOMONOSKE:  So we were conducting

25    discovery on their defense.

THE COURT:  I'm not faulting you for what
you have done in this case.  All this motion to seal
stuff and the discovery disputes did get a little bit
out of hand in this case, but my only point is this.
Most of that issue that you took discovery on directed
to their defense that they wouldn't take money and this
issue of a secret profit-sharing plan between CAC and
Wynn's directed to their defense, all of that, at this
point, given my ruling that there is no action, no basis
for the fraud under Count 1, no basis for the VCPA under
Count 2, no basis for Magnuson-Moss under Count 3, all
that is immaterial.  All that is a side show and beside
the point.

I'm denying all those motions, each side;
the defendant's motion and the plaintiff's motions.  I'm
denying them all as moot because by oral order, I'm
dismissing this case with prejudice.

The Fourth Circuit may view the agency
differently, but I see -- at the end of the day when I
think about this case, and I read the documents and I
look at everything that's here, at the end of the day,
this is a case in which Mr. Armstrong signs up an
ineligible vehicle, inconsistent with the contract
documents.  He makes a mistake or he commits fraud,
however you want to do it.  Wynn's is not responsible

1  for that, under the law.

2          Secondly, at the end of the day, when Wynn's

3  sends a letter back and says this car is not covered,

4  Armstrong, taking the plaintiff's case at its best says

5  it is covered, ignore it, Wynn's is not responsible for

6  that.

7          I understand you disagree, Mr. Domonoske.

8  Probably disagree strenuously and I credit your zealous

9  advocacy in this case, but I find no agency.  I am

10  dismissing the case with prejudice for the reasons I

11  have said.

12          Thank you.

13          Ask the Marshal to declare a recess.

14          (Recess).

15

16

17

18  "I certify that the foregoing is a correct transcript

19  from the record of proceedings in the above-entitled

20  matter.

21

22

23  /s/ Sonia Ferris                    November 19, 2014"

24

25